**No. 25-10365**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

—————————————————————————————————

UNITED STATES OF AMERICA
Plaintiff-Appellee,

v.

DEHSHID NOURIAN; and
CHRISTOPHER RYDBERG,
Defendants-Appellants.

—————————————————————————————————

Appeal from the United States District Court for the
Northern District of Texas, Dallas Division
No. 3:17-CR-155

————————————————————

**APPELLANT'S OPENING BRIEF**

————————————————————

Brent Evan Newton
Attorney at Law
Texas Bar No. 00788115
19 Treworthy Road
Gaithersburg, MD 20878
(202) 975-9105
brentevannewton@gmail.com

**Attorney for Appellant
Christopher Rydberg**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fifth Circuit Local Rule 28.2.1, the undersigned counsel for Defendant-Appellant, Christopher Rydberg, certifies that the following persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal in this appeal.

1.    United States of America, Plaintiff-Appellee;

2.    Christopher Rydberg, Defendant-Appellant.

3.    Brent Evan Newton, Appellate Attorney for Defendant-Appellant;

4.    Diane Kozub, Michael Payma, Joshua M. Russ, Margaret Dunlay Terwey, and Andrew Wirmani, Attorneys for Defendant-Appellant in the District Court Proceedings;

5.    Jeremy Raymond Sanders and Stephen S. Gilstrap, Appellate Attorneys for Plaintiff-Appellee;

6    Edward E. Emokpae, Darren Clay Halverson, Carlos Antonio Lopez, Kelly Marie Lyons, Alexander Pogozelski, Dimitri Rocha, Gary Alan Winters, and Ethan Womble, Attorneys for Plaintiff-Appellee in the District Court Proceedings.

Respectfully submitted,

/s/ *Brent Evan Newton*
Brent Evan Newton

**STATEMENT CONCERNING ORAL ARGUMENT**

Defendant-Appellant Christopher Rydberg requests oral argument. This appeal involves complex legal and factual issues. It also involves an important issue of first impression: whether the Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8101 *et seq.*, is a "health care benefit program" within the meaning of 18 U.S.C. § 24(b). Oral argument would aid this Court's decisional process.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS………………………………….. ii

STATEMENT CONCERNING ORAL ARGUMENT ………………………..iii

TABLE OF AUTHORITIES……………………………………….……………v

STATEMENT OF JURISDICTION …………………………………………1

STATEMENT OF THE ISSUES…………………………………..……2

STATEMENT OF THE CASE……………………………………………….3

SUMMARY OF THE ARGUMENT……………………………………19

ARGUMENT……………………………………………………………….21

    **Issue One**: There is insufficient evidence that appellant is guilty of healthcare fraud conspiracy in violation of 18 U.S.C. § 1349………24

    **Issue Two**: There is insufficient evidence that appellant is guilty of the money-laundering charges in Counts 10 through 16………..……43

    **Issue Three**: There is insufficient evidence that appellant conspired to defraud the Internal Revenue Service.…………..…………………45

    **Issue Four**: Appellant was deprived of a fair trial by the "three monkeys" slide and associated argument made by the government in summation, in derogation of the district court's ruling denying a "deliberate ignorance" instruction…………………………………..52

    **Issue Five**: The district court committed plain error by applying a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) for an offense involving more than 10 victims. …………….…………..52

CONCLUSION………………………………………………………..54

CERTIFICATE OF COMPLIANCE…………………………………….55

CERTIFICATE OF SERVICE………………………………………….56

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Bell v. United States*,
   366 U.S. 393 (1961) ...................................................................................26

*Bittner v. United States*,
   598 U.S. 85 (2023) .................................................................................36, 37

*Collins v. United States*,
   35 Fed. Cl. 620 (1996)...............................................................................27

*Environmental Defense v. Duke Energy Corp.*,
   549 U.S. 561 (2007) ...................................................................................32

*Grove Lumber & Bldg. Supply v. Argonaut Ins. Co.*,
   2008 WL 2705169 (C.D. Cal. July 7, 2008) .....................................................35

*Haynes v. Rederi A/S Aladdin*,
   362 F.2d 345 (5th Cir. 1966) ......................................................................25

*Henderson v. United States*,
    568 U.S. 266 (2013) ..................................................................................53

*Howard Delivery Service, Inc. v. Zurich American Ins. Co.*,
   547 U.S. 651 (2006) ...................................................................................35

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ...................................................................................21

*Kachanis v. United States*,
   844 F. Supp. 877 (D. R. I. 1994) .............................................................31, 32

*LeBlanc v. Cooper/T. Smith Stevedoring, Inc.*,
   130 F.3d 157 (5th Cir. 1997) ......................................................................34

*Mourning v. Family Publications Service, Inc.*,
   411 U.S. 356 (1973) ...................................................................................36

*Skilling v. United States*,
   561 U.S. 358 (2010) ...................................................................................36

*State Insurance Fund v. Mather (In re Southern Star Foods, Inc.)*,
   210 B.R. 838 (10th Cir. Bankr. App. Panel 1997) .............................................34

*United States v. Allison*,
   616 F.2d 779 (5th Cir. 1980)........................................................................21

*United States v. Anderson*,
   980 F.3d 423 (5th Cir. 2020)................................................................. passim

*United States v. Annamalai*,
   939 F.3d 1216 (11th Cir. 2019) ...................................................................44

*United States v. Brown*,
   186 F.3d 661 (5th Cir. 1999)........................................................................21

*United States v. Chambers*,
  408 F.3d 237 (5th Cir. 2004)................................................................23, 28

*United States v. Chandler*,
  586 F.2d 593 (5th Cir. 1978)........................................................................51

*United States v. Collins*,
  774 F.3d 256 (5th Cir. 2014)................................................26, 28, 29, 36

*United States v. Cooper*,
  38 F.4th 428 (5th Cir. 2022)........................................................................34

*United States v. Cuomo*,
  525 F.2d 1285 (5th Cir. 1976)....................................................................34

*United States v. DiSimone*,
  660 F.2d 532 (5th Cir. 1981)......................................................................43

*United States v. Edwards*,
  488 F.2d 1154 (5th Cir. 1974)....................................................................51

*United States v. Greenlaw*,
  84 F.4th 325 (5th Cir. 2023)........................................................................40

*United States v. Hanafy*,
  124 F. Supp. 2d 1016 (N.D. Tex. 2000)....................................................44

*United States v. Hughes*,
  195 F. Supp. 795 (S.D.N.Y. 1961) ............................................................31

*United States v. Kieffer*,
  991 F.3d 630 (5th Cir. 2021)......................................................................21

*United States v. Kottwitz*,
  614 F.3d 1241 (11th Cir.).....................................................................50, 51

*United States v. Lake*,
  472 F.3d 1247 (10th Cir. 2007)..................................................................44

*United States v. Lombardi*,
  138 F.3d 559 (5th Cir. 1998)................................................................22, 23

*United States v. Lucien*,
  347 F.3d 45 (2d Cir. 2003)....................................................................28, 29

*United States v. Mackay*,
  33 F.3d 489 (5th Cir. 1994)........................................................................51

*United States v. Medina*,
  485 F.3d 1291 (11th Cir. 2007)..................................................................40

*United States v. Merino*,
  846 Fed. App'x 494 (9th Cir. 2021)...........................................................40

*United States v. Moreland*,
  665 F.3d 137 (5th Cir. 2011)......................................................................21

*United States v. Nora*,
  988 F.3d 823 (5th Cir. 2021).........................................................22, 40, 41

*United States v. Plezia*,
115 F.4th 379 (5th Cir. 2024) .................................................................50

*United States v. Romo*,
669 F.2d 285 (5th Cir. 1982) ..................................................................43

*United States v. Salad*,
907 F. Supp.2d 743 (E.D. Va. 2012) .......................................................31

*United States v. Sanders*,
966 F.3d 397 (5th Cir. 2020) ............................................................23, 28

*United States v. Shah*,
84 F.4th 190 (5th Cir. 2023) ...................................................................25

*United States v. Shah*,
95 F.4th 328 (5th Cir. 2024) ...................................................................30

*United States v. Skilling*,
638 F.3d 480 (5th Cir. 2011) ..................................................................37

*United States v. Smith*,
739 F.3d 843 (5th Cir. 2014) ..................................................................21

*United States v. Smith*,
831 F.3d 793 (7th Cir. 2012) ..................................................................31

*United States v. Takhalov*,
827 F.3d 1307 (11th Cir. 2016) ..............................................................38

*United States v. Tencer*,
107 F.3d 1120 (5th Cir.1997) .................................................................44

*United States v. White*,
569 F.2d 263 (5th Cir. 1978) ..................................................................43

*United States v. Willett*,
751 F.3d 335 (5th Cir. 2014) ..................................................................22

*United States v. Williams*,
809 F.2d 1072 (5th Cir. 1987) ................................................................51

*United States v. Willoughby*,
27 F.3d 263 (7th Cir. 1994) ....................................................................23

*Wisconsin Central Ltd v. United States*,
585 U.S. 274 (2018) ...............................................................................32

**Statutes**

5 U.S.C. § 8101 .................................................................................3, 24

5 U.S.C. § 8103(a) ..................................................................................24

5 U.S.C. § 8124(a) ..................................................................................27

5 U.S.C. § 8145 ......................................................................................27

10 U.S.C. § 1079 ....................................................................................25

11 U.S.C. § 507(a)(5) ................................................................34
18 U.S. C. § 1956(h) ..................................................................3
18 U.S.C. § 24(b) ............................................................... passim
18 U.S.C. § 371 ....................................................................2, 3
18 U.S.C. § 1347 ............................................................... passim
18 U.S.C. § 1349 ............................................................... passim
18 U.S.C. § 1956 (a)(1)(B)(i) ......................................................3
18 U.S.C. § 3231 ......................................................................1
18 U.S.C. § 3553(a)(6) .............................................................53
28 U.S.C. § 1291 ......................................................................1
42 U.S.C. § 1320a-7b ..............................................................30
42 U.S.C. § 1395 ....................................................................25
42 U.S.C. § 1396 ....................................................................25
Cal. Health & Safety Code § 1343(e)(1) ................................35

## Rules and Sentencing Guidelines

Fed. R. App. P. 32(a)(5) .........................................................56
Fed. R. App. P. 32(a)(6) .........................................................56
Fed. R. App. P. 32(a)(7)(B) .....................................................56
Fed. R. App. P. 32(a)(7)(B)(iii) ..............................................56
Federal Rules of Appellate Procedure 4(b) .............................1
Federal Rule of Appellate Procedure 28(i) .............................52
Federal Rule of Criminal Procedure 29 ...................................21
USSG § 2B1.1(b)(1) ...............................................................38
USSG § 2B1.1(b)(2)(A)(i) ..............................................8, 2, 52

## Other Authorities

H.R. Rep. 104-747 ..................................................................36

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291.  On April 1, 2025, appellant filed a timely notice of appeal from the district court's final judgment (which was entered on March 19, 2025, ROA.13976), under Rule 4(b) of the Federal Rules of Appellate Procedure.  ROA.13997.[1]  The district court possessed jurisdiction under 18 U.S.C. § 3231.

---

[1] The electronic record on appeal is cited as "ROA."

## STATEMENT OF THE ISSUES

1. Whether there is sufficient evidence that appellant is guilty of healthcare fraud conspiracy under 18 U.S.C. § 1349.

2. Whether is there is sufficient evidence that appellant is guilty of the money-laundering charges in Counts 10 through 16.

3. Whether there is sufficient evidence that appellant conspired to defraud the Internal Revenue Service in violation of 18 U.S.C. § 371.

4. Whether appellant was deprived of a fair trial by the "three monkeys" slide and associated argument made by the government in summation, in derogation of the district court's ruling denying a "deliberate ignorance" instruction.

5. Whether the district court committed plain error by applying a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) for an offense involving more than 10 victims.

## **STATEMENT OF THE CASE**

### I.    **Procedural Background**

On September 11, 2019, the grand jury returned a superseding indictment charging appellant and several codefendants with (1) a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347) (Count 1); (2) conspiracy to launder money, in violation of 18 U.S. C. § 1956(h) (Count 10); (3) money laundering, in violation of 18 U.S.C. § 1956 (a)(1)(B)(i) (Counts 11-16); and (4) conspiracy to defraud the United States (i.e., the Internal Revenue Service) in violation of 18 U.S.C. § 371 (Count 17).  ROA.10946.

After the first jury trial ended in a mistrial, a second jury convicted appellant of all charges against him on November 16, 2023.  ROA.1633, 12403. On March 19, 2025, the district court (U.S. District Judge Sam Lindsay, presiding) sentenced appellant to a total prison sentence of 180 months and three years of supervised release, as well as $115,389,128.20 in restitution, jointly and severally with codefendant David Nourian and partially jointly and severally with codefendant Leslie Williams. ROA.13976-82. The court also ordered appellant to forfeit various assets and property. ROA.13984.[2]

---

[2] Both the district court and a panel of this Court denied appellant's motion for release on bond pending appeal.

3

## II.    Evidence at the Jury Trial

The government presented testimony and evidence seeking to prove that appellant committed three related sets of offenses: (1) appellant allegedly conspired with others – including James Noryian (appellant's step-father and the behind-the-scenes owner of three pharmacies[3]), Dehshid (also known as "David") Nourian (Noryian's brother, a pharmacist), and three physicians as well as a physician's assistant[4] – to defraud the Department of Labor's Office of Workers' Compensation Programs (OWCP) and Blue Cross-Blue Shield (BCBS) of over $146 million in requested payments for medically-unnecessary prescriptions (primarily for compound pain creams); (2) appellant allegedly conspired with, and aided and abetted, Noryian, Nourian, and others in laundering the money paid by the OWCP and BCBS; and (3) appellant allegedly conspired with Noryian, Nourian, and others to evade nearly $24 million in federal income taxes due on the money paid by the OWCP and BCBS by obtaining and later voiding cashier's checks for false business expenses (which were illegally deducted on tax returns).

---

[3] The three pharmacies were Ability Pharmacy, Industrial & Family Pharmacy, and Park Row Pharmacy.

[4] The three physicians were Leslie Benson, Michael Taba, and Kevin Williams, who all wrote prescriptions for federal employees claiming workers' compensation from the OWCP. The physician's assistant was Nicolas Aguilar, who wrote prescriptions for actual and purported Park Row Pharmacy employees and their family members, which were billed to BCBS. ROA.4483-4556.

## A.     Relationship Between Appellant and James Noryian

Appellant was James Noryian's longtime stepson.  ROA.4036-37. As a result, appellant loved, trusted, and felt loyal to Noryian.  ROA.4037, 4227.  As an adult, appellant worked for Noryian's real estate business, Noryian & Associates.  ROA.3958, 4030.  Although Noryian amassed great wealth, appellant's income working for Noryian was modest,[5] and he led a modest lifestyle; appellant did not wear expensive clothes or watches or drive expensive cars.  ROA.4047-49.  He was "nerdy" and was interested in things like comic books.  ROA.4047.

Between 2014 and 2016, Kim Necessary worked closely with appellant, typically for several hours per workday, while she also was employed at Noryian & Associates.  ROA.4030.  Necessary testified that she and appellant both performed many of the same types of administrative or clerical functions for the real estate business, including managing rent payments, paying utility bills and property taxes, and dealing with various maintenance issues.  ROA.4031-32.  She and appellant were both basically "assistants" to Noryian.  ROA.4032.  She testified that, although appellant was Noryian's stepson, Noryian did not operate his businesses like a father-son partnership.  ROA.4037.  Instead, Noryian was clearly in charge of appellant, and appellant followed Noryian's instructions and

---

[5] For instance, in 2015 – a year when Noryian's pharmacies made tens of millions of dollars – appellant's income was only $24,349.  ROA.6112-14.  The government offered no evidence that appellant had amassed wealth by working for Noryian.

did not act independently. ROA.4037-38. Necessary agreed that, if Noryian said "jump," Rydberg would say, "how high." ROA.4038. Necessary also testified that, when Noryian gave her and appellant instructions, Noryian did not provide an explanation for why he was requesting a task to be done. ROA.4038-39.

One of the main tasks of both Necessary and appellant was to prepare and sign checks for Noryian's businesses. Noryian and his family members had various business interests operated through various entities, and appellant was listed as a signatory on several bank accounts so that he could write the checks for the various businesses. ROA.4041. Necessary typically would fill out the checks to pay bills, and appellant would sign those checks. ROA.4041-42.

At one point, Necessary and appellant created business cards in which they gave themselves titles at various entities connected with Noryian, such as Necessary's title as "Director of Operations" and appellant's titles as "Manager" and "CFO." ROA.4044-45. These titles did not reflect their actual job responsibilities; instead, as Necessary testified, Noryian wanted her and appellant to use these titles merely to facilitate transactions. ROA.4045-46. Appellant merely signed checks but did not perform typical CFO duties, such as making budgets. ROA.4045-46. Necessary did not consider the use of such titles to be fraudulent. ROA.4045.

Without any warning, Noryian would become angry with appellant and scream at him. ROA.4029, 4039. In the presence of appellant, Noryian also became "heated" and "aggressive" with another employee when Noryian believed that the other employee had not performed as Noryian wished. ROA.4226. Noryian fired appellant on numerous occasions, although Noryian ultimately rehired appellant. ROA. 4040.

Noryian's former girlfriend, Dr. Marjaneh Hedayat, described appellant as having "acted like a secretary" who would handle tasks such as arranging for plane tickets and hotel reservations for Noryian and also would provide copies of tax documents (such K-1 forms) to investors in Noryian's businesses. ROA.5743-44, 5906-07. Hedayat testified that Noryian gave his employees, including appellant, directions without explaining why Noryian wanted a certain task to be performed. ROA.4038-39. According to Hedayat, even if appellant was nominally "in charge" while Noryian was out of the office, appellant consulted with Noryian for his guidance concerning the decisions to be made in Noryian's absence. ROA.4081.

**B.    Appellant's Limited Involvement in Noryian's Pharmacy Businesses**

As employees of Noryian's real estate and pharmacy businesses testified, appellant had minimal involvement in the running of the pharmacies. For instance, Kimberly Necessary testified that "there would sometimes be a little bit

of overlap" between the real estate business and pharmacy business in terms of appellant's roles. ROA.3960-61.

Although the real estate office initially was located in the same building as Ability Pharmacy, the real estate office later was moved to a different location, which was separate from Noryian's pharmacy business. ROA.4030-31. When the real estate and pharmacy businesses were located in the same building, they shared a breakroom and pharmacy employees interacted with appellant socially. ROA.4422, 4455-56. After Ability Pharmacy closed and the real estate office no longer shared any space with Noryian's pharmacy business, appellant and Necessary did not work in any significant manner for Industrial Pharmacy and Park Row Pharmacy. ROA.4033, 4446, 4457-58.[6]

Appellant assisted in moving money from one account to another at the pharmacies or related entities or in writing checks, but those tasks were always done at the direction of James Noryian. ROA.4036, 4456. The employees of both the real estate and pharmacy businesses understood that appellant's employment was at the real estate office, not at a pharmacy. ROA.4036, 4225, 4438, 4226. Pharmacy employees never saw appellant interact with doctors or participate in the

---

[6] The government presented evidence that some pharmacy records were found in the real estate office after it was no longer located in the same building as a pharmacy. ROA.4800. However, the mere presence of such records did not show that appellant was involved in the pharmacy business with respect to preparing prescriptions or billing the OWCP or BCBS – the activities charged in the superseding indictment.

preparation of any prescriptions, nor did appellant instruct any pharmacy employees. ROA.4456. He also never requested daily reports of prescriptions or billing the OWCP or BCBS or inquired about earnings at the pharmacy. ROA.4459. His interactions with the pharmacists were limited to "just cordial talk, like everybody else." ROA.4456. Appellant was not the "boss" of anyone at the pharmacy nor was he involved in the day-to-day operations of any of the pharmacies. ROA.4458,59. Dr. Jiminez, the Government's medical expert, did not recall seeing appellant's name in the medical or pharmaceutical records that he reviewed. ROA.5607-08.

Pharmacy employee Robbie Jossa spent significant time with appellant socially. In 2015 while working or Ability Pharmacy, Jossa lived with Noryian and appellant and shared an office with appellant at the real estate office that shared the building with Ability Pharmacy. ROA.4193,4200,4204. Jossa testified that he had "one hundred percent dealings with" Noryian – as opposed to appellant – with respect to the pharmacy's business. ROA.4239. He stated that, "I never discussed business with Chris [i.e., appellant]." ROA.4239.

Appellant played no role in Noryian's pharmacy business with three exceptions – none of which prove that appellant is guilty of health care fraud conspiracy, money laundering, or tax-evasion conspiracy  The first exception was appellant's nominal titles related to various entities controlled by Noryian,

9

including the three pharmacies. For instance, appellant was the nominal "manager" and "CFO" of Ability Pharmacy when the enrollment application was filed with OWCP in 2014, and he had the nominal role as the "registered agent" for and "vice president" of Park Row Pharmacy in 2014. As Kimberly Necessary testified, appellant's titles were done so that he could conduct financial transactions for the various entities (at Noryian's direction). ROA.4045-46. Such titles did not reflect appellant's actual degree of responsibility or involvement at the pharmacies. ROA.4045-46.

Regarding Ability Pharmacy, the government presented evidence that appellant was listed as the "manager" and contact person on a payment information form from the government for Ability Pharmacy, which provided ACH payment information to the Department of the Treasury so that the pharmacy could be paid electronically. ROA.3628-29; Gov't Exh. 201. As Dr. Elliott Cook, the government's expert testimony on OWCP billing data, clarified, however, the form only provided information about the entities' bank accounts to facilitate payments; it was not the form required for physicians or other prescribers to become approved providers with certain government agencies. ROA.3840-41. Furthermore, the fact that appellant's name and signature were on the document merely meant that he was the contact person and did not indicate that he had an ownership or financial

interest in the pharmacy or that he was responsible for or billing on behalf of the pharmacy.  ROA.3841-42, 3843.

The second exception was appellant's making edits to a boilerplate compound prescription pad used by one of the pharmacies.  Yet that work was merely clerical – appellant input changes at the direction of Robert Ritter[7] or James Noryian.  ROA.4033-34.  The government offered no evidence that appellant knowingly participated in any fraud related to medically unnecessary or bogus prescriptions.  Nor was there any evidence that appellant was involved in the process of submitting claims to BCBS or OWCP for reimbursements for prescriptions.  ROA.4058.

Third, as part of his administrative work, appellant was a signatory on financial accounts of the pharmacies and related entities.  In that role, he transferred money between accounts controlled by Noryian, signed company checks,[8] and obtained 214 cashier's checks for purported business expenses in 2015.  Those cashier's checks were cancelled as "not used for purpose intended" or converted to different payees not related to business expenses.  ROA.6522-25,

---

[7] Ritter was the chief pharmacist at Ability who supervised the preparation of the compound prescriptions.  ROA.4223-24.

[8] Among the checks that appellant wrote were bonus checks to employees of Noryian's businesses, including pharmacy employees. ROA.4435.  However, the bonuses were paid at the discretion of Noryian, who asked pharmacy employees to write him a letter justifying their bonuses. ROA.4435.

6638-74, 6830, 6943-49, 6973. The government offered no evidence that appellant did any of these things while exercising independent judgment (as opposed to at Noryian's direction) or with knowledge of any illegality.

TD Ameritrade representative Jared Haggard testified regarding phone records that listed a few conversations involving appellant. Specifically, TD Ameritrade's phone records indicate that Noryian once asked appellant to hand him a prescription during a phone call. ROA.4370-71. Appellant also spoke with TD Ameritrade to transfer funds between accounts and to facilitate the completion of due-diligence paperwork, which he asked to be sent to Noryian at Noryian's e-mail address. ROA.4400-04. But Haggard testified that none of these conversations indicated that appellant was involved in the pharmacy business or in any purported fraud scheme. In fact, Haggard was clear that appellant did not own the account and his interactions with appellant were limited to "basically just help[ing] with some admin issues with getting the form and things like that." ROA.4408, 4409. Haggard "wasn't talking to [appellant] about where the money came from, or, you know, like all the conversations I had with James Noryian. It was just some quick admin conversations we had." ROA.4409.

## C. Appellant's Limited Interactions with the Prescribing Physicians

Although the government presented testimony of Dr. Williams that appellant, at the direction of Noryian, provided Williams numerous checks

12

representing kickbacks for prescriptions that Williams referred to Noryian's pharmacies, Williams was significantly impeached with financial and cell phone text records – undermining the accuracy of his testimony. ROA.13008-14. Regardless, Williams did not testify that appellant was aware of the medically unnecessary nature of the prescriptions at issue. At most, his disputed testimony about appellant was limited to appellant's alleged role delivering him checks representing kickbacks. As Williams stated, "We really just interacted when it was time for me to get a check." ROA.4990. Williams did not testify that appellant was aware that he was paying kickbacks. In any event, as discussed *infra*, merely paying kickbacks does not violate the health care fraud statute, 18 U.S.C. § 1347.

There was no evidence that appellant interacted with any other doctor or physician's assistant who wrote fraudulent prescriptions. Although Necessary testified that she had visited Dr. Taba on occasion, appellant never accompanied her there, nor did she have any knowledge that appellant had anything to do with Taba's patients or prescriptions. ROA.4035-36. Although appellant was the signatory of a check given to Taba by Noryian representing a kickback, ROA.6780, 6785-87, there was no evidence that appellant ever communicated in any manner with Taba or ever was told that the check represented a kickback payment.

13

Physician's Assistant Nicolas Aguilar, who wrote bogus prescriptions for Park Row Pharmacy employees (including appellant and his ex-wife Celine Rydberg) that were paid for by BCBS, testified that he wrote those prescriptions at David Nourian's direction and never examined the purported "patients," including appellant and his ex-wife. ROA.4543-44, 4546-47, 4504-05. Aguilar testified that he did not know appellant and never had any agreement with him to write prescriptions for him or his ex-wife, nor was he told that appellant had consented to having prescriptions in his name or his ex-wife's name submitted to BCBS. ROA.4634-35, 4635-36. In fact, Aguilar did not even spell appellant's name correctly on the prescription. Gov't Exh. 306, at 19. In short, there was no evidence of appellant's knowing involvement with the healthcare fraud perpetrated by Aguilar.

Finally, Dr. Benson's former employee, Latosha Morgan, testified that her interactions with appellant were limited to real estate business, for things like rent and maintenance for Benson's office, and that she had no interactions at all with appellant with respect to the pharmacy. ROA.4759-60.[9] When asked whether appellant had anything to do with kickbacks, Morgan testified clearly, "To my knowledge, absolutely not." ROA.4760.

---

[9] Dr. Benson, who was deceased by the time of trial, did not testify.

**D.**     **Appellant's Alleged Role in the Alleged Money Laundering**

Appellant was charged with one count of money-laundering conspiracy and six substantive money-laundering offenses.  The conspiracy charge does not list any specific transactions or accounts.  ROA.10962-63.  The six substantive charges related to money transferred among the following accounts:

- **Count 11**, which involved the transfer of $3.5 million from Industrial & Family Pharmacy's Wells Fargo Account # 0302 to Industrial & Family Pharmacy's Chase Account # 9863;

- **Count 12**, which involved the transfer of $3.5 million from Industrial & Family Pharmacy's Chase Account # 9863 to Jade and Joy Holdings's Chase Account # 3462;

- **Count 13**, which involved the transfer of $3.5 million from Jade and Joy Holdings's Chase Account # 3462 to a Scottrade investment account held by Sherri Mofid;

- **Count 14**, which involved the transfer of $5.266 million from Ability Pharmacy's Prosperity Bank Account # 9542 to Ability Pharmacy's Chase Account # 2280;

- **Count 15**, which involved the transfer of $5.266 million from Ability Pharmacy's Chase Account # 2280 to Jade and Joy Holdings's Chase Account # 3462; and

- **Count 16**, which involved the transfer of $5.266 million from Jade and Joy Holdings's Chase Account # 3462 to a Wells Fargo bank account held by Deshid Nourian.

ROA.10964-65.

The government presented two demonstrative exhibits to illustrate the movement of money in Counts 11 through 16:

15





Mark Burrell, a financial expert called by the government, testified that appellant was one of the signatories on several accounts involved in the

transactions.    ROA.6521-25.[10]    Appellant was not any owner on any of the accounts, however.    The government identified only one account owned by appellant, and that account was not involved in any of the transactions. ROA.6830.

Burrell testified that approximately $82.5 million in funds from the Department of Labor (DOL) were deposited into the accounts of Ability Pharmacy, Park Row Pharmacy, and Industrial & Family Pharmacy.  ROA.6636-38.  Burrell testified that he did not actually know who conducted any of the online transfers or wire transfers between the accounts at issue in Counts 11 to 16.  ROA.6836, 6837.

### E.    Appellant's Limited Role in the Preparation of the Tax Returns

The government presented no evidence at trial that appellant had any knowledge of a tax evasion scheme or evidence that he provided instructions to the tax preparers who prepared the tax returns at issue in Count 17.  Instead, in his role as Noryian's administrative assistant, appellant merely provided bank records and other financial information at the tax preparers' request.  Jamie Allen, who prepared the business records that identified business expenses, testified that Noryian provided her with the bank statements for the pharmacy and provided her

---

[10] *See also* Gov't Exhs. 534 (Wells Fargo Account #8897 for Bandoola Pharmaceutical), 552 (Wells Fargo Account # 3119 for HJLM Holdings), 557 (Wells Fargo Account # 0302 for Industrial & Family Pharmacy), 561 (Chase Account # 9863 for Industrial & Family Pharmacy), 564 (Chase Account # 3462 for Jade and Joy Holdings), 572 (Prosperity Bank Account # 9542 for Ability Pharmacy), 577 (Chase Account #2280 for Ability Pharmacy), 600 (BancorpSouth Bank Account # 5371 for Bandoola Pharmaceutical), 609 (Compass Bank Account # 4076 for Park Row Pharmacy).

with the instructions for identifying business expenses. ROA.5320, 5322, 5353, 5355. Allen testified that she spoke with appellant on only one occasion when Noryian was unavailable but that she could not recall the subject of that conversation. ROA.5324, 5353. There was no testimony or other evidence that appellant provided her with any instructions as to how to categorize expenses, nor did appellant review or approve Allen's work after it was complete.

Likewise, Mohammed Imtiyazuddin, an accountant who helped to prepare tax returns for the pharmacies, testified that appellant was merely his point of contact for retrieving financial documents for the pharmacies when the pharmacy owners were not available. ROA.6053, 6059, 6062-63, 6078-79. However, there was no evidence that appellant gave Imtiyazuddin any independent instructions about how to characterize expenses related to the 214 cashier's checks. ROA.6111. Although appellant would provide specific documents or provide answers in response to Imtiyazuddin's questions, Imtiyazuddin understood that the "final answers [were] from Mr. Nourian," not appellant. Appellant was effectively a "delivery person," not a "decision maker" about tax information provided to Imtiyazuddin. ROA.6067, 6101, 6105-06.[11] It was undisputed that appellant never reviewed, approved, or signed any of the tax returns on behalf of the pharmacies,

---

[11] Noryian's girlfriend, Hedayat, similarly testified that appellant passed on tax documents at the instruction of others. ROA.5743-44, 5879-81, 5884-85, 5907.

nor was appellant authorized to finalize the tax returns. ROA.6108. Imtiyazuddin viewed appellant's role as clerical and administrative. ROA.6109.

**F.    No Evidence that Appellant Profited from the Alleged Fraud Scheme**

Although the government's theory of the case was that appellant participated in the related conspiracies to unjustly enrich himself, there was no evidence presented at trial that showed that appellant had received *any* of the ill-gotten money from the alleged scheme. Dr. Cook, one of the government's expert witnesses, testified that there was no evidence showing that appellant received any of the $90 million paid to the three pharmacies by the Department of Labor. ROA.3844. Imtiyazuddin, who also prepared appellant's personal tax return, testified that appellant had $24,349 in taxable income in 2015, a year in which the pharmacies reported making millions of dollars. ROA.6112-15. The government offered no proof that appellant failed to report any income.

<b><u>SUMMARY OF THE ARGUMENT</u></b>

When viewed in a light most favorable to the jury's verdict, the government's evidence at trial failed to prove beyond a reasonable doubt any of the offenses of conviction. Among other deficiencies, there is insufficient evidence of the required *mens rea* elements for healthcare fraud and tax evasion – intent to defraud and willfulness. Without sufficient proof of those elements, there is insufficient evidence of all charges.

19

Regarding Count One, there is no proof that appellant was aware of the medically unnecessarily or bogus nature of the prescriptions for which the pharmacies sought reimbursement from OWCP or BCBS. Without such knowledge, he could not have conspired to commit health care fraud. In addition, concerning the portion of Count One related to the Federal Employees' Compensation Act (FECA ), the evidence is insufficient to prove that appellant conspired to commit health care fraud because FECA is not a "health care benefit program" within the meaning of 18 U.S.C. §§ 24(b), 1347 & 1349.

Regarding Counts 10 through 16, there is insufficient evidence of money laundering because the sole "specified unlawful activity" alleged in those counts is health care fraud. Because there is insufficient evidence of healthcare fraud, there necessarily is insufficient evidence of any money-laundering offense, including conspiracy.

Finally, there is insufficient evidence that appellant conspired to impede the IRS's collection of federal income taxes from the owners of the pharmacies. Although appellant took out 214 cashier's checks for purported pharmacy expenses, which were later cancelled or reissued to different payees, there is insufficient proof that appellant was aware that the pharmacy owners used the original versions of the cancelled or reissued cashier's checks to reduce their federal income taxes. Appellant merely served in a clerical or administrative role

20

concerning the pharmacies' financial activities and its preparation of federal tax returns. There is no proof that he acted fraudulently or willfully with respect to the pharmacy owners' evasion of federal taxes.

## ARGUMENT

### Standard of Review Applicable to Insufficient-Evidence Issues (Issues One Through Three)

Because appellant repeatedly moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) & (c) concerning all counts of conviction, *see* ROA.7133, 7629, 12358, 12949, 13061, this Court engages in *de novo* review. *United States v. Kieffer*, 991 F.3d 630, 634 (5th Cir. 2021); *United States v. Allison*, 616 F.2d 779, 783-84 (5th Cir. 1980). Although this Court "view[s] the evidence in the light most favorable to the verdict," it will "uphold the verdict if, but only if, a rational juror could have found each element of the offense beyond a reasonable doubt." *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999); *see generally Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In determining whether the evidence is insufficient, a court must consider "the countervailing evidence as well as the evidence that supports [a guilty] verdict." *United States v. Smith*, 739 F.3d 843, 845 (5th Cir. 2014); *see also United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (citation and internal quotation marks omitted).

21

With respect to the *mens rea* element of the charged offenses, "[n]either conspiracy nor aider and abettor liability lowers th[e] *mens rea* requirement." *United States v. Nora*, 988 F.3d 823, 830 (5th Cir. 2021). "To prove a conspiracy to commit health-care fraud in violation of 18 U.S.C. § 1349, 'the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health-care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (citations omitted). "Conspiracy 'has two intent elements – intent to further the unlawful purpose and the level of intent required for proving the underlying substantive offense.'" *Nora*, 988 F.3d at 830 (citations omitted).

"To be convicted of aiding and abetting, the defendant must have (1) associated with a criminal venture, (2) participated in the venture, and (3) sought by action to make the venture successful. Moreover, to aid and abet, a defendant must share in the intent to commit the offense as well as play an active role in its commission." *United States v. Lombardi*, 138 F.3d 559, 561 (5th Cir. 1998) (citations omitted). "In other words, an aider and abettor must share the same level of intent as the principal." *Nora*, 988 F.3d at 830. A defendant must be shown to

22

have aided and abetted each and every element of the charged offense. *See Lombardi*, 138 F.3d at 561.

In assessing whether the evidence is sufficient to support a conviction, a reviewing court must consider the allegations concerning each element of the charged offenses *as set forth in the indictment*. A court may not find sufficient evidence to support a conviction based solely on evidence outside of the scope of the allegations in the indictment (i.e., evidence of uncharged allegations introduced at trial), even if such evidence sufficiently proves the commission of an offense, because such an affirmance would constructively amend the indictment. *See United States v. Sanders*, 966 F.3d 397, 408-06 (5th Cir. 2020); *United States v. Chambers*, 408 F.3d 237, 247 & n.6 (5th Cir. 2004);[12] *see also United States v. Willoughby*, 27 F.3d 263, 266-67 (7th Cir. 1994) (court's review of sufficiency of the evidence depends on how the alleged offense was charged in the indictment).

---

[12] This Court in *Chambers* stated that:

> Where the indictment has been constructively amended, by prosecution evidence wholly outside the proper scope of the indictment and/or by a jury charge authorizing a verdict of guilty thereon, but there is evidence within the proper scope of the indictment which supports the verdict, then the normal remedy is to reverse for a new trial. . . .  Here, however, as Chambers urged in his motions for judgment of acquittal, there is no evidence to support the "in or affecting commerce" element of the offense **on the factual basis alleged in the indictment**. Chambers' motions for judgment of acquittal should have been granted.

*Chambers*, 408 F.3d at 247 n.6 (emphasis added).  In his motion for a judgment of acquittal, appellant contended that the district court's assessment of the sufficiency of the evidence was limited to the superseding indictment's specific allegations.  ROA.12949 (citing *Chambers*).

23

**<u>Issue One</u>: There Is Insufficient Evidence that Appellant Is Guilty of Healthcare Fraud Conspiracy in Violation of 18 U.S.C. § 1349.**

**A. The Federal Employees' Compensation Act (FECA) is Not a "Health Care Benefit Program" Within the Meaning of 18 U.S.C. §§ 24(b), 1347 & 1349.**

Count One charges that appellant conspired with others to "defraud FECA and BCBS, both allegedly "health care benefit programs" as defined in 18 U.S.C. § 24(b), and to obtain money and property owned by, and under the care and control of, FECA and BCBS, by means of materially false and fraudulent pretenses, representations, and promises . . . ."  ROA.10958.  The jury instructions likewise referred to FECA and BCBS as the sole alleged "health care benefit programs." ROA.12382.  Section 24(b) defines a "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b).  Significantly, "plan" and "contract" are undefined in § 24(b).

With respect to the superseding indictment's FECA allegations, the government's evidence at trial was insufficient because FECA is not a "health care benefit program" within the meaning of 18 U.S.C. §§ 24(b), 1347 & 1349.

FECA is a federal statute set forth in 5 U.S.C. § 8101 *et seq*.  The primary relevant provision of FECA is 5 U.S.C. § 8103(a) ("The United States shall furnish

24

to an employee who is injured while in the performance of duty, the services, appliances, and supplies prescribed or recommended by a qualified physician, which the Secretary of Labor considers likely to cure, give relief, reduce the degree or the period of disability, or aid in lessening the amount of the monthly compensation."). FECA created a governmental *workers' compensation* program, not a government *health care insurance* program – in contrast, for example, to Medicare,[13] Medicaid,[14] and Tricare.[15] *See Haynes v. Rederi A/S Aladdin*, 362 F.2d 345, 350 (5th Cir. 1966).

The district court rejected appellant's argument that FECA is not a "health care benefit program" as follows:

> The Government . . . contends that [appellant's] argument is foreclosed by Fifth Circuit authority, including cases in which the Fifth Circuit has directed courts to interpret broadly the term "health care benefit program" as used in § 24(b). Doc. 875 at 9 (quoting *United States v. Anderson*, 980 F.3d 423, 428 (5th Cir. 2020)). The Government notes that, as recently as October 2023, the Fifth Circuit described FECA as a federal health care program on par with Medicare. Doc. 875 at 9-10 (citing *United States v. Shah*, 84 F.4th 190, 211 (5th Cir. 2023) (explaining that some patients within the case were covered by "a federal health care program including Medicare, TRICARE, or DOL/FECA."), *cert. denied sub nom. Henry v. United States*, ___U.S.___, 144 S. Ct. 821, 218 L.Ed.2d 31 (Feb. 20, 2024)).

---

[13] *See* 42 U.S.C. § 1395 *et seq.*

[14] *See* 42 U.S.C. § 1396 *et seq.*

[15] *See* 10 U.S.C. § 1079.

. . . The court . . . determines that the Government has the better argument, particularly in light of the guidance provided by the Fifth Circuit in *Anderson* in interpreting "broadly" the term "health care benefit program" consistent with section 24(b)'s broad categorization of the term as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." *Anderson*, 980 F.3d at 428 (5th Cir. 2020) (quoting 18 U.S.C. § 24(b)). The court in *Anderson* also explained that applying a "broad meaning" to the term "health care benefit program" was consistent with its prior directive in *United States v. Collins*.  In *Collins*, the court rejected the defendant's argument that automobile insurance companies did not qualify as health care benefit programs under section 24(b), reasoning that, "[t]o the extent automobile insurers pay for medical treatment, they are health care benefit programs under the statute." *See id*. (discussing *Collins*, 774 F.3d 256, 260 (5th Cir. 2014)).  Moreover, Defendant Rydberg acknowledges in his Motion that FECA "provides health care benefits to federal workers injured on the job." Doc. 862 at 12. The court, therefore, agrees with the Government that FECA falls within section 24(b)'s definition of a "health care benefit program" such that Defendant Rydberg is not entitled to an acquittal on this ground.

ROA.13962-63.

The district court erred in several ways in concluding that FECA is a "health care benefit program" – which, as noted, must be either a health care "plan" or a "contract" for the provision of health care benefits.  First, it is self-evident that FECA, a statute, is not a "contract."  *Cf. Bell v. United States*, 366 U.S. 393, 401 (1961) (distinguishing between entitlements created under a statute from those created under a contract); *see also* BLACK'S LAW DICTIONARY 341 (8th ed. 2004) (defining "contract" as "[a]n agreement between two or more parties creating

26

obligations that are enforceable or otherwise recognizable at law."). The provision of benefits under FECA is ultimately within the discretion of the Secretary of Labor (who delegates that discretion to OWCP) and, thus, is not "contractual" in nature. *See Collins v. United States*, 35 Fed. Cl. 620, 624-25 (1996) ("The FECA vests plenary authority in the Secretary to 'administer, and decide all questions arising under' the Act. 5 U.S.C. § 8145. Specifically, the Secretary may grant or refuse to grant compensation. 5 U.S.C. § 8124(a).").[16]

Nor can a statute like FECA be a "plan" capable of being defrauded or cheated out of money or property in its custody or control. Section 1347 makes it an offense to "knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice . . . to defraud *any health care benefit program* [or] . . . to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, *any health care benefit program*." 18 U.S.C. § 1347(a) (emphasis added). That is, § 1347(a) requires that the "health care benefit program" itself be the victim of the charged

---

[16] Any attempt by the government on appeal (as it appeared to do in the district court, ROA.13030) to rely on federal employees' underlying employment agreements with the federal government – as creating a "contract" to provide workers' compensation benefits (within the meaning of § 24(b)) – would fail. The government offered no evidence at trial that any of the federal employees had employment agreements that included a *promise* to provide health care benefits if the employee were to be injured or become ill related to their federal employment. Furthermore, the superseding indictment did not allege that the employment agreements of the federal employees for whom prescriptions were written were the "health care benefit program." The superseding indictment solely alleged FECA – not the employees' underlying employment agreements – was the "health care benefit program" at issue.

offense.  It is obvious that FECA, a statute, cannot be defrauded of, or cheated out of, money or property. As appellant pointed out in the court below, the superseding indictment did *not* allege that the Department of Labor's OWCP – the agency that administers FECA through the exercise of administrative discretion – is the relevant "plan" for purposes of § 24(b).  ROA.12952-53 (footnote 2).

Regardless of whether OWCP's regulatory scheme comprises a "health care benefit program" and regardless of whether OWCP (an arm of the federal government) was defrauded or cheated, this Court's assessment of the sufficiency of the evidence is limited to deciding whether there is sufficient evidence of *what the superseding indictment specifically alleged*: that FECA, a federal statute, is a "health care benefit program" within the meaning of §§ 24(b), 1347 & 1349. *See Sanders*, 966 F.3d at 408-06; *Chambers*, 408 F.3d at 247 & n.6.  As a mere statute, it clearly is not.  Therefore, this Court should reverse appellant's conviction of the offense charged in Count One.

Alternatively, even assuming *arguendo* that a federal statute by itself could be a "health care benefit program" under 18 U.S.C. §§ 24(b), 1347 & 1349, the district court erred by deeming FECA to be such a statute.  None of the cases cited by the court – *Collins*, 774 F.3d at 260 (following *United States v. Lucien*, 347 F.3d 45, 51 (2d Cir. 2003)), *Anderson*, and *Shah* – addressed a workers' compensation statute.  They all addressed qualitatively different types of programs.

The district court erred by relying on *Collins*, which followed the Second Circuit's decision in *Lucien.* Those two cases did not address whether § 24(b) covers a workers' compensation statute like FECA; instead, they addressed an automobile liability insurance policy with medical coverage. Automobile insurance with health care coverage is closely akin to a health insurance policy and is qualitatively different from a workers' compensation statute. Both automobile insurance and traditional health care insurance promise – *prospectively* – to provide health care coverage for eligible injuries. As the Second Circuit held in *Lucien*, an automobile insurance policy involves a "contract" between the insured and the insurance company to provide medical benefits to a person injured in an automobile accident in need of covered medical treatment. *See Lucien*, 347 F.3d at 52 ("Because Yves Baptiste – as well as Policia Baptiste and Guerline Dormetis – received a *medical benefit* as a result of the vehicle owners' no-fault *insurance contracts*, a health care benefit program is, under the statutory definition of § 24(b), plainly implicated.") (emphasis in original). As discussed above, FECA is not a "contract." Therefore, *Collins* and *Lucien* are readily distinguishable, and the district court erred by relying on those cases.

The district court's reliance on *Anderson* also was erroneous because it, too, is readily distinguishable. *Anderson* turned on this Court's conclusion that BCBS, the third-party administrator of self-insured employer (American Airlines), paid

insurance benefits pursuant to a "contract" (within the meaning of § 24(b)) whereby the administrator stepped into the shoes of the self-insured employer. *Anderson*, 980 F.3d at 428.[17]  As noted, FECA is not a "contract."

Finally, the district's citation to *Shah*[18] was erroneous because that decision did not interpret 18 U.S.C. § 24(b).  Instead, *Shah* addressed the 42 U.S.C. § 1320a-7b, the Anti-Kickback Statute (AKS), and its distinct definition of a "federal health care program."  Section 1320a-7b(f)(1) defines "federal health care program" as "any plan or program that provides health benefits, *whether directly, through insurance,* **or otherwise** . . ."  42 U.S.C. § 1320a-7b(f)(1) (emphasis added).[19] Section 1320a-7b(f)(1)'s broad definition divides covered "plans and

---

[17] As this Court reasoned in *Anderson*:

> American entered a contract to allow BCBS to administer American's Plan. Under the terms of that contract, BCBS agreed to process claims, make available its network of providers, and pay claims in accordance with American's benefits. American agreed to reimburse BCBS weekly for the claims BCBS paid and to pay BCBS a monthly administrative fee for its services.  Under the plain text of the statute, an administrator's payment to a health care provider who has furnished services or equipment to an individual is the provider of a "medical benefit, item, or service."  BCBS under this Plan was a health care benefit program as defined by Section 24(b).

980 F.3d at 428.

[18] The opinion cited by the district court was withdrawn on rehearing and replaced with a substituted opinion. *United States v. Shah*, 95 F.4th 328 (5th Cir. 2024).  The substituted opinion contains the same passage cited by the district court.  *See id.* at 349.

[19] Although appellant disputes that FECA is a "plan" within the meaning of § 24(b), he agrees that FECA qualifies as a program that "otherwise" provides "health benefits" within the meaning of § 1320a-7b(f)(1).  However, appellant was not charged under the AKS.

programs" into two categories: (1) those that provide health care benefits "directly, *through insurance*" and (2) those that provide health care benefits "*otherwise*."

Although appellant pointed out the significant difference between the AKS's definition and § 24(b)'s distinct definition, ROA.12952, 13063-64, the district court inexplicably failed to address that important difference. The AKS's *broader* definition of "federal health care program" in § 1320a-7b(f)(1) stands in contrast to § 24(b)'s *narrower* definition of "health care benefit program." Most important, § 24(b) does not define a "health care benefit program" as including any medical benefit "whether directly, through insurance, *or otherwise.*" *Cf. United States v. Smith*, 831 F.3d 793, 802 (7th Cir. 2012) (noting "the broad 'or otherwise' language" of a different statute); *United States v. Salad*, 907 F. Supp.2d 743, 748 (E.D. Va. 2012) (same); *United States v. Hughes*, 195 F. Supp. 795, 799 (S.D.N.Y. 1961) (same). Instead, § 24(b) solely speaks of an undefined health care "plan" or "contract" – neither of which plainly covers the federal workers' compensation scheme in FECA as opposed to a private or public health insurance system like BCBS or Medicare (as discussed *infra*). FECA, although a workers' compensation statute, does not create a system of workers' compensation "insurance" – in contrast to state workers' compensation statutes protecting private employers by creating a system of insurance for employers covering work-related illnesses and injuries of their employees. *See Kachanis v. United States*, 844 F. Supp. 877, 883

31

(D. R. I. 1994) (noting that, "while FECA does provide insurance-like benefits to employees, . . . there is no insurance policy at issue in a FECA situation"); *see also id.* (noting the United States does not enter into a relationship with another entity to provide insurance but rather provides any money due under FECA itself" and "the federal employee . . . receives benefits under a federal statute").

Significantly, the two statutory definitions – § 1320a-7b(f)(1) and § 24(b) – were enacted simultaneously by Congress in the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[20]  That simultaneous enactment matters here.  When Congress has defined similar statutory terms in different ways in distinct provisions of the same act, Congress presumptively must have intended the terms to mean different things.  *See Wisconsin Central Ltd v. United States*, 585 U.S. 274, 279 (2018) ("We usually presume differences in language like this [in two related federal statutes] convey differences in meaning. . . .  And that presumption must bear particular strength when the same Congress passed both statutes to handle much the same task. . . ."); *cf. Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) ("[T]he natural presumption that identical words used in different parts of the same act are intended to have the same meaning . . . is not rigid and readily yields whenever there is such variation in the

---

[20] *See* Health Insurance Portability and Accountability Act of 1996, P.L. 104-191, §§ 204, 241-42, 110 Stat 1936 (Aug. 21, 1996).

connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.") (citation and internal quotation marks omitted).

The two statutory definitions use the common term, "plan." However, Congress' choice to define "plan" to include medical benefits provided "whether directly, through insurance, *or otherwise*" in § 1320a-7b(f)(1), but not in § 24(b), is telling. The absence of § 1320a-7b(f)(1)'s broad definition in § 24(b) is strong evidence that Congress intended "plan" in § 24(b) to have a narrower scope than "plan" in § 1320a-7b(f)(1). In particular, the juxtaposition of "through insurance" and "otherwise" in § 1320a-7b(f)(1) but not in § 24(b) strongly indicates that "plan" in § 24(b) does not include medical benefits provided "otherwise" than through "insurance." That narrower scope in § 24(b) means that it is limited to public or private health insurance – or "contracts" related to such insurance – and does not include benefits provided by a workers' compensation program.

Such an interpretation is supported by the way in which health care "plan" is used in the medical context. When one speaks of a health care "plan," clearly the most common understanding of that term is public or private health insurance.[21] A health care "plan" is an arrangement between a person and a private

---

[21] If people are asked, "what is your health care plan," they surely would respond by mentioning private health care insurance like BCBS or governmental health care insurance like Medicare. People carry their "health care plan" cards in their wallets to cover *future* treatment for illness or

entity (such as an insurance company) or a governmental entity (such as the Centers for Medicare and Medicaid Services) to cover the *future* costs of treating a covered illness or injury.[22]

Under that common meaning of health care "plan" in "the medical context,"[23] FECA does not qualify. It is a workers' compensation program – not health care insurance. *See LeBlanc v. Cooper/T. Smith Stevedoring, Inc.*, 130 F.3d 157, 160 (5th Cir. 1997) ("Compensation under [a workers' compensation program] is not the equivalent of health . . . insurance."); *cf. State Insurance Fund v. Mather (In re Southern Star Foods, Inc.*), 210 B.R. 838, 841 (10th Cir. Bankr.

---

injury. It seems highly improbable that anyone would answer, "the Federal Employees' Compensation Act," if asked what their "health care plan" was. There is no such thing as a "FECA card" that people carry in their wallets in the event that they are injured in the future. It is not a health care "plan."

[22] A Westlaw search in the "all federal" and "all states" databases (as of September 29, 2025) – "health care plan" or "healthcare plan" – yielded over 9,200 cases. A review of those cases reveals that phrase invariably refers to *health care insurance* – not workers' compensation insurance. A Google search likewise yields voluminous search results in which "health care plan" or "healthcare plan" is used in the same manner.

[23] *Cf. United States v. Cooper*, 38 F.4th 428, 432-33 (5th Cir. 2022) ("While the [Anti-Kickback] statute does not define the word 'refer,' '[w]hen interpreting statutes, [w]ords are to be understood in their everyday meanings – unless the context indicates that they bear a technical sense. . . . Given the medical context of the applicable anti-kickback provisions, the word 'refer' should be given a technical meaning."); *see also United States v. Cuomo*, 525 F.2d 1285, 1291 (5th Cir. 1976). In the court below, the government cited the non-technical dictionary definition of "plan." ROA.13031. That position is untenable because "plan" in the health care context must be given its meaning in that specific context.

App. Panel 1997) (in context of 11 U.S.C. § 507(a)(5),[24] stating that a "[w]orkers' compensation insurance is not a 'plan,' but is a statutorily mandated system requiring employers to spread risks of work-related injuries"); *Grove Lumber & Bldg. Supply v. Argonaut Ins. Co.*, No. 07-cv-1396, 2008 WL 2705169, at \*7 (C.D. Cal. July 7, 2008) (holding that "workers' compensation policies are not 'health care service plans' under CAL. HEALTH & SAFETY CODE § 1343(e)(1)"); *see also Howard Delivery Service, Inc. v. Zurich American Ins. Co.*, 547 U.S. 651, 652-53 (2006) ("Unlike . . . group . . health . . . insurance . . . workers' compensation prescriptions modify, or substitute for, the common-law tort liability to which employers were exposed for work-related accidents.").

Because Congress clearly wished to expand the scope of the AKS beyond kickbacks in the context of health care insurance, Congress specifically added "or *otherwise*" – following the reference to "insurance" – in the statutory definition in § 1320a-7b(f)(1). But Congress did not do so in § 24(b).

Finally, the legislative history of § 24(b) further supports appellant's argument that "plan" does not include FECA. In the key piece of legislative history, the 1996 House report supporting the enactment of 18 U.S.C. §§ 24(b) &

---

[24] That bankruptcy statute, which concerns creditors' priorities in a bankruptcy proceeding, speaks of "unsecured claims for contributions to an employee benefit plan." 11 U.S.C. § 507(a)(5).

1347,[25] there is only a mention of private and government health "insurance" programs – referred to 13 times as "health care plans" – and no mention whatsoever of benefits provided by workers' compensation statutes.  *See* H.R. Rep. 104-747, 2nd Sess. 1996, 1996 WL 440279.

Finally, to the extent that the undefined term "plan" in § 24(b) is uncertain, ambiguous, or vague, this Court must "construe[] [it] strictly against the government and in favor of individuals" under the Due Process Clause and the rule of lenity.  *Bittner v. United States*, 598 U.S. 85, 101 (2023) (citation and internal quotation marks omitted); *see also Skilling v. United States*, 561 U.S. 358, 405-07 (2010).[26]  Although this Court has stated that it should "apply a broad meaning" to "health care benefit program," *Anderson*, 980 F.3d at 428,[27] this Court did not address the specific meaning of "plan."  Furthermore, that approach in broadly

---

[25] *United States v. Lauersen*, No. 98 CR. 1134 (WHP), 1999 WL 637237, at *6 (S.D.N.Y. Aug. 20, 1999 (noting the 1996 House report is the relevant legislative history concerning the health care fraud statute, including § 24(b)).

[26] If this Court agrees with appellant's statutory interpretation, the government would not be left unable to prosecute people who defraud worker's compensation plans (including FECA) related to the provision of health care benefits.  Charges could be brought under the mail or wire fraud statutes, as claims for reimbursement from invariably involve the use of the postal system or interstate wires.

[27] This Court in *Anderson* stated that it was required to follow the "direction" of this Court's prior decision in *Collins*, *supra*.  Yet nothing in *Collins* directs courts to give such a "broad meaning" to the specific statutory language at issue (i.e., the undefined term "plan").  *See Collins*, 774 F.3d at 260.  Nor did this Court in *Anderson* explain why courts should give a "broad meaning" to an undefined phrase in a criminal statute when the well-established rule of statutory construction requires a *narrow* (not a *broad*) construction of a criminal (as opposed to a civil) statute.  *See, e.g.*, *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 375 (1973).

interpreting the undefined term "plan" in § 24(b) would conflict with the Supreme Court's requirement that federal courts must "construe[] [a criminal statute] strictly against the government and in favor of individuals," *Bittner*, 598 U.S. at 101, with respect to any ambiguous terms in a criminal statute. For the reasons set forth above, to the extent that the undefined term "plan" is ambiguous or vague, it must be strictly – rather than broadly – construed to exclude FECA.

**\*\*\***

The foregoing insufficient-evidence argument about FECA does not address the allegations in Count One concerning BCBS.[28] However, as explained *infra*, there was insufficient evidence that appellant *knowingly* participated in a conspiracy to defraud BCBS resulting from Physician Assistant Aguilar's bogus prescriptions. In any event, because the jury returned a general verdict concerning Count One, the insufficient evidence related to the alleged FECA fraud in Count One would still require reversal of that conviction because there is no way to know whether the jury would have convicted solely based on appellant's alleged role in the BCBS fraud. *See, e.g.*, *United States v. Skilling*, 638 F.3d 480, 482 (5th Cir. 2011) (an error is harmless if an appellate court, after a thorough examination of the record in a light most favorable to the defendant, is able to conclude *beyond a reasonable doubt* that the jury verdict would have been the same absent the error;

---

[28] Appellant acknowledges that BCBS, a private insurance company, is a "health care benefit program" within the meaning of § 24(b).

however, if the record contains evidence, when viewed in a light most favorable to the defendant that could rationally lead to an acquittal with respect to the alternative, valid theory of guilt, the error is not harmless); *accord United States v. Takhalov*, 827 F.3d 1307, 1321 (11th Cir. 2016) (Thapar, J., sitting by designation), *opinion modified on other grounds on reh'g,* 838 F.3d 1168 (11th Cir. 2016). Because, when viewing the evidence of the alleged BCBS fraud in a light most favorable to appellant, a rational jury could have acquitted him, the insufficient evidence concerning the FECA fraud allegations requires reversal of appellant's conviction of the offense charged in Count One.

Finally, at the very least, because the loss amount at sentencing – for purposes of the sentencing guideline range, restitution, and forfeiture – was driven by the FECA allegations rather than the BCBS allegations, reversal of appellant's 180-month prison sentence (and the district court's restitution and forfeiture orders) would be required, and resentencing should occur. ROA.14031, 14040, 14154 (presentence report's guidelines loss amount of over $146 million adopted by the district court in applying USSG § 2B1.1(b)(1)); ROA.13991 (forfeiture); ROA.13982 ($90,938,838 in restitution owed to the Department of Labor). Although the district court varied downwardly from the advisory guideline range in imposing a 180-month prison sentence, ROA.17018, the court's sentencing

decision clearly was premised on appellant's conviction of the FECA allegations in the superseding indictment. The error thus was not harmless.

### B. The Evidence Failed to Prove Beyond a Reasonable Doubt that Appellant Was Aware of the Medically Unnecessary and Bogus Nature of the Prescriptions.

As noted, Count One alleges that appellant conspired with others to defraud two health care benefit programs – FECA and BCBS. The alleged health care fraud conspiracy had three aspects: (1) three doctors' writing of "medically unnecessary" compound prescriptions for federal employees, which were filled by three compound pharmacies owned or controlled by codefendants Noryian and Nourian and billed to the OWCP; (2) the payment of kickbacks to the three doctors by appellant and others at the direction of codefendant Noryian; and (3) recruitment of a physician's assistant by Noryian and Nourian to write prescriptions for Ability Pharmacy employees and their family members (including appellant and his wife), which were billed to BCBS. ROA.10953-58.

At trial, the prosecution repeatedly focused on the evidence of appellant's alleged role in the conspiracy as the "money guy" who paid the kickbacks (in the form of checks) to the doctors who wrote the compound prescriptions billed by the pharmacies to the OWCP. ROA.7752, 7760, 7784. Although the government offered evidence that appellant may have written checks to prescribing doctors representing kickbacks, the government offered no evidence that appellant *knew*

39

that the checks represented kickbacks. Therefore, the evidence that appellant wrote and delivered checks is insufficient to support appellant's conviction. *See United States v. Nora*, 988 F.3d 823, 830 (5th Cir. 2021) (discussing the *mens rea* for health care fraud, which is an intent to do something that the law forbids).

Furthermore, even assuming *arguendo* that there was sufficient evidence that appellant *knowingly* paid kickbacks to the doctors, merely paying kickbacks does not constitute healthcare fraud (or conspiracy) in violation of 18 U.S.C. §§ 1347 & 1349. *See United States v. Medina*, 485 F.3d 1291, 1298 (11th Cir. 2007); *United States v. Merino*, 846 Fed. App'x 494, 495-97 (9th Cir. 2021).[29] Instead, as the jury instructions stated, health care fraud requires an "intent to defraud" – meaning the defendant "acted with the specific intent to deceive [through false representations] for the purpose of causing some financial loss to another or bringing about some financial gain to himself." ROA.12383. *See also United States v. Greenlaw*, 84 F.4th 325, 249-50 (5th Cir. 2023) (intent to defraud requires intent to "cheat" the victim). Kickbacks do not involve such an intent to deceive or cheat.

Therefore, this Court's focus should be on whether the government offered sufficient proof that appellant conspired with others to engage in health care fraud with respect to *making false statements* to OWCP or BCBS concerning the

---

[29] Appellant was not charged with violating the Anti-Kickback Statute.

medically unnecessary prescriptions billed to OWCP and outright bogus prescriptions billed to BCBS. Although the government offered evidence that the three pharmacies fraudulently billed for medically unnecessary or bogus prescriptions and thereby defrauded OWCP and BCBS, the government offered insufficient evidence that appellant *was aware* of such medically unnecessary or bogus prescriptions. If the government did not prove beyond a reasonable doubt that appellant was aware that the prescriptions were medically unnecessary or bogus, then the government failed to prove the *mens rea* of the health care fraud statute. *See Nora*, 988 F.3d at 830 (discussing the *mens rea* for health care fraud, which is an intent to defraud and an intent to do something that the law forbids).

There was no evidence that appellant was told, or observed, that medically unnecessary prescriptions were being billed to OWCP. There also was no evidence that appellant had the knowledge or experience necessary to determine whether prescriptions were being appropriately prescribed and billed. ROA.4456, 4459, 4058. Indeed, the government's evidence was that Noryian – whom appellate trusted and looked up to – regularly claimed that the compound prescriptions were highly effective. ROA.4014-15.

The fact that appellant worked occasionally at Ability Pharmacy – where he assisted in the financial operations of the pharmacy and worked in a clerical manner on the pharmacy's compound prescription pads given to doctors – by no

means proves beyond a reasonable doubt that appellant *knew* that any doctor was prescribing medically unnecessary compound medications or that the reimbursement requests to OWCP were fraudulent.

There also was insufficient evidence of the distinct allegation that Ability Pharmacy submitted fraudulent requests for reimbursement to BCBS based on bogus prescriptions for pharmacy employees and their family members (including appellant and his ex-wife) written by Nicolas Aguilar, a physician's assistant. The evidence failed to prove that appellant played any *knowing* role in that distinct aspect of the alleged conspiracy. In particular, Aguilar testified that he never saw appellant (and did not know him), ROA.4544-46, and the prosecution offered no proof that either appellant or his wife ever received such prescriptions (or any notice of them) or were otherwise aware that the pharmacy was fraudulently billing BCBS for prescriptions in their names.[30] Significantly, appellant's name was *misspelled* on the prescription written by Aguilar. Gov't Trial Exh. 306; *see also* ROA.4635-36. The government offered no evidence whatsoever that appellant was aware that bogus prescriptions had been written by Aguilar for appellant and his ex-wife (or for anyone else).

The bottom line is that the government offered no witnesses or evidence to prove that appellant *knew* about any medically unnecessary or bogus prescriptions

---

[30] Aguilar created bogus prescriptions for pharmacy employees in exchange for kickbacks from Nourian and Noryian, who filed claims for reimbursement from BCBS. ROA.4483-4556.

(and correspondingly fraudulent billing practices) – related to either OWCP or BCBS. The evidence showed at most that appellant associated with those involved in a conspiracy or was in the vicinity of the conspiracy to meet its burden to prove appellant's *mens rea*. But this Court has a "long-established rule that a defendant's guilt may not be proven by showing that he associates with unsavory characters." *United States v. Romo*, 669 F.2d 285, 288 (5th Cir. 1982). Likewise, "it is well-settled that a conspiracy cannot be proven solely by family relationship or other types of close association." *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978). Evidence that merely establishes that a defendant was in "a climate of activity that reeks of something foul" is insufficient to "prove[] beyond a reasonable doubt that [a defendant] had the 'deliberate, knowing, specific intent to join the conspiracy.'" *United States v. DiSimone*, 660 F.2d 532, 537 (5th Cir. 1981).

Therefore, this Court should reverse appellant's healthcare fraud conspiracy conviction and remand with instructions to enter a judgment of acquittal on that charge.

### Issue Two: There Is Insufficient Evidence that Appellant is Guilty of the Money-Laundering Charges in Counts 10 Through 16.

There is insufficient evidence of money laundering (including conspiracy) because there is insufficient evidence of health care fraud – for the reasons set

forth in Issue One, *supra*.[31]    Health care fraud is the sole "specified unlawful

activity" alleged in those charges in the superseding indictment and the jury

instructions. ROA.10962-64, 12387.    If there is insufficient evidence of the

charged specified unlawful activity, then there is insufficient evidence of money

laundering. *See United States v. Annamalai*, 939 F.3d 1216, 1232 (11th Cir. 2019)

("Because we have reversed all of Mr. Annamalai's convictions for substantive

bankruptcy fraud and conspiracy to commit bankruptcy fraud due to insufficient

evidence, there are no specified unlawful activities which provide a basis for the

money laundering charges. We therefore reverse all of Mr. Annamalai's money

laundering convictions."); *United States v. Lake*, 472 F.3d 1247, 1260 (10th Cir.

2007) ("The indictment in this case stated that the specified unlawful activity was

wire fraud. . . . The government conceded at oral argument that reversal of the

wire-fraud counts would require reversal of the money-laundering convictions.");

*United States v. Hanafy*, 124 F. Supp. 2d 1016, 1028 (N.D. Tex. 2000) (stating that

*United States v. Tencer*, 107 F.3d 1120 (5th Cir.1997), "indicated that there must

be evidence sufficient to show the specified unlawful activity" in order for there to

---

[31] Although Count One charges conspiracy to commit health care fraud, the same arguments in Issue One, *supra*, equally apply to appellant's position that there is insufficient evidence that he committed a substantive health care offense (as a specified unlawful activity).  Regarding both the health care fraud conspiracy and the substantive health care fraud offenses, there is insufficient evidence of appellant's *mens rea*.  And, alternatively, with respect to the alleged health care fraud related to the Federal Employees' Compensation Act, appellant is not guilty because FECA is not a "health care benefit program."

be sufficient evidence of money laundering), *aff'd*, 302 F.3d 485, 490 (5th Cir. 2002) ("The government asserts that once the counterfeit trademark and misbranding verdicts are reinstated, the [money] laundering . . . charges must also be reinstated. As we affirm the district court's decision on the previous issues, however, these remaining issues are also affirmed.").

Assuming *arguendo* that this Court were to conclude that there is insufficient evidence of health care fraud related to payments under the Federal Employees' Compensation Act – but sufficient evidence related to payments by Blue Cross Blue Shield – this Court still should find insufficient evidence of the charges in Counts 10 through 16. That is because the government's evidence of the alleged money laundering was limited to the money obtained by the defendants from the Department of Labor (as opposed to BCBS). ROA.6828 (testimony of money-laundering expert witness Mark Burrell that he only considered "DOL funds"); *see also* ROA.6513 (same). The government offered no evidence that any of the money obtained from BCBS was laundered or that appellant conspired to launder such money.

Therefore, if this Court reverses appellant's conviction for the charge in Count One, it also must reverse appellant's convictions of the money-laundering charges in Counts 10 through 16. This Court should remand with instructions to enter a judgment of acquittal on those charges.

**Issue Three: There Is Insufficient Evidence that Appellant Conspired to Defraud the Internal Revenue Service.**

Count 17 charged that appellant conspired with others, including Noryian and Nourian, to evade federal income taxes by "fabricating nonexistent expenses and fraudulently deducting them" on tax returns for the owners of the three pharmacies. ROA.10966-67.

The government's version of appellant's alleged role in the tax-fraud conspiracy was summarized in the government's response to appellant's motion for judgment of acquittal:

> During trial, an IRS agent, Adam Little, testified that [in 2015] Rydberg purchased 214 cashier's checks totaling nearly $60 million over many months and then redeposited all of them[32] in a new tax year with notations handwritten or stamped stating "Not Used for Purpose Intended," converted them into new cashier's checks in the name of David Nourian or to related Noryian business entities, or both. (Nov. 6, 2023 Tr., Vol. 21, at 9, 41, 50.) . . . [A]ll of these were sham checks with memo lines falsified by Rydberg, and none of the 214 checks was ever given by Rydberg to the party listed on the check. (*Id*.) Little testified that Rydberg was a signatory on all of the bank accounts involved and was a party to all of the transactions at issue. (*Id*. at 25, 52.) Rydberg then took falsified bank statements showing artificially lowered balances due to his purchases of millions of dollars in sham cashier's checks to Mohammed Imtiyazuddin, a tax preparer. (Oct. 6, 2023 Tr., Vol. 11B, at 46-47.) Having purchased the sham checks himself only to redeposit them in the new tax year, he knew those statements he provided the tax preparer were false, and

---

[32] Contrary to the government's assertion, Government Exhibit 1033 (ROA.6980, 13618) shows that 86 of the 214 cashier's checks were purchased in 2015 and then either cancelled and deposited back into the account of the issuing bank or converted to new cashier's checks (with new payees) *in 2015* (not 2016). In other words, not "all" of the 214 cashier's checks were "redeposited" in "a new tax year." Eighty six of the 214 were not.

that the tax preparer would use those false statements to prepare tax returns for the pharmacies and David Nourian. Imtiyazuddin also testified to Rydberg's instructions that certain of these transactions be classified as business expenses, which lowered the overall taxes owed by the pharmacies – and, by extension, David Nourian – at the end of year. (*Id.* at 52, 56, 72; Sept. 29, 2023 Tr., Vol. 8, at 77.)  As Adam Little testified, this conduct by Rydberg and his coconspirators led to an attempt to defraud the United States of nearly $24 million in owed taxes. (Nov. 6, 2023 Tr., Vol. 21, at 79; GX 1027.)

ROA.13044-45.

The government overstates what its evidence at trial proved.  It only proved that (1) appellant was the remitter of 214 cashier's checks for various payees of the pharmacies (e.g., pharmaceutical supply companies) in 2015 and later redeposited or converted 60 percent of them in a new tax year (2016) without providing them to the original payees; and (2) on occasions when the pharmacy owners were unable to do so, appellant provided bank records (which reflected the original cashier's checks among many other transactions) or other financial information to a tax return preparer but did not provide instructions on how to characterize any expenses in the tax returns for tax year 2015.  *See* ROA.6053-54, 6059, 6062-63, 6078-79, 6108-09, 6111 (testimony of tax accountant, Mohammed Imtiyazuddin); ROA.5353, 5355 (testimony of CPA Jamie Allen).

Contrary to the government's assertion quoted above,[33] the government did not prove that appellant instructed any tax preparer specifically how to

---

[33] The government based its assertion on the following testimony by Imtiyazuddin:

Q. Who did you communicate with in preparing the 2015 tax return for Industrial and Family Pharmacy?

A. We communicate always with the business owner or the stockholder; right, and sometimes if we can't get ahold of them, I would always call Christopher Rydberg to provide me the information or pass on if I have any questions to the business owners. We do that. That is normal rule.

Q. Understood. Did you understand that Chris Rydberg was authorized to speak on Mr. David Nourian's behalf for Industrial and Family Pharmacy?

A. Yes, that is correct; yes.

***

Q. Who did you ask for how to classify those transactions?

A. Normally, we always go to the business owners. That's the rule. So it has been a few years since we had done this work, but that is our general rule. We go to the owners of the business and ask them those questions. We always do that.

Q. Okay, for this particular return, who was that?

A. That would Mr. Dehshid Nourian.

Q. And if you couldn't get ahold of Mr. David Nourian, would you reach out to Mr. Rydberg?

A. I would definitely reach out to Mr. Christopher Rydberg, yes.

***

Q. Other than what the client provided you, did you have any other information to use in preparing Industrial and Family Pharmacy's tax returns for 2015?

A. No, I did not.

Q. And who provided you the information you used here?

A. Mr. Dehshid Nourian or Christopher Rydberg.

Q. Did you trust that the information David Nourian and Christopher Rydberg provided you was accurate?

A. Yes, I did.

"characterize" pharmacy expenses – including how to characterize the 214 cashiers' checks reflected in the bank records – nor was there evidence that appellant reviewed the final tax returns, signed them, or approved them for filing. ROA.5353, 5355 (testimony of CPA Jamie Allen); ROA.6111 (testimony of Imtiyazuddin); ROA.7061-62 (testimony of Agent Little).[34]

The government offered no evidence of what appellant knew about the 214 cashier's checks (other than the fact that they were cancelled or converted to

---

   \*\*\*

Q. Other than what the client provided you, did you have any other information to use in preparing Park Row's tax returns?

A. No.

Q. Who provided you the information here?

A. Either Mr. Ali Khavarmanesh [the nominal owner of Park Row Pharmacy] or Christopher Rydberg would deliver the bank statements as well for this entity.

Q. Did you trust the information Mr. Khavarmanesh and Christopher Rydberg provided you was accurate?

A. Yes, I did.

ROA.6059, 6062-63, 6079.

[34] Imtiyazuddin testified as follows:

Q. Do you recall telling the agents and the prosecutors that Chris Rydberg with respect to these 2015 tax returns never gave you any instructions about how to characterize expenses?

A. That is correct.

ROA.6111.

49

different payees). Agent Little admitted in his testimony that he did not have any information about what appellant was told by anyone else about the 214 cashier's checks or what appellant's intent was in taking out and then cancelling the cashier's checks or changing their payees:

> Q. Agent Little, you don't know one way or the other whether an owner of the [pharmacy] business[es] told Chris Rydberg to take out those cashier's checks, do you?
>
> A. My scope in this exam, I don't have information personally on nature of discussions, how arrangements were made. I reviewed the records and the bank – the business records and the bank records, so I don't have personal knowledge of their discussions on how decisions were made.
>
> Q. You are not offering testimony or evidence on what Chris Rydberg knew or believed when he took out these cashier's checks?
>
> A. I believe some of my testimony does touch on Chris Rydberg's knowledge. I don't have testimony, however, on his intent.

ROA.7058. No other prosecution witness offered any testimony or evidence about what appellant was told or what he knew about the 214 cashier's checks or how the tax preparers treated them on the tax returns.

"Circumstantial evidence that income has been disguised as non-taxable proceeds is not sufficient; the government must also show statements of co-conspirators manifesting a desire to impede the IRS." *United States v. Kottwitz*, 614 F.3d 1241, 1265 (11th Cir.), *modified on other grounds on rehearing*, 627 F.3d 1383, 1384 (11th Cir. 2010); *see also United States v. Plezia*, 115 F.4th 379, 391

50

(5th Cir. 2024) (discussing *Kottwitz*).[35] In addition, there must be sufficient evidence of appellant's "willfulness" *mens rea* – i.e., his understanding that the pharmacy owners' cashier's checks were being used in a manner that violated the tax laws. *See Kottwitz*, 614 F.3d at 1265. The government's circumstantial evidence failed to prove the required *mens rea*.

Although the government can rely on circumstantial evidence, it "must do more than pile inference upon inference upon which to base a conspiracy charge." *United States v. Mackay*, 33 F.3d 489, 494 (5th Cir. 1994). Without direct evidence of appellant's knowledge, intent, or willfulness, the government's position would require multiple inferences not sufficiently grounded in the evidence to prove appellant's *mens rea beyond a reasonable doubt*. The circumstantial evidence is simply insufficient to make these leaps.

For all these reasons, there is insufficient evidence to prove appellant's *mens rea*. *Cf. United States v. Williams*, 809 F.2d 1072, 1094-95 (5th Cir. 1987) (reversing a conviction for conspiracy to submit false tax returns where the only evidence against one of the conspirators was that he had made a "cash check

---

[35] In addition, even assuming *arguendo* that there is sufficient evidence for a rational jury to conclude beyond a reasonable doubt that appellant knew about the tax treatment of the 214 cashier's checks before the filing of the 2015 tax returns, such knowledge by itself is insufficient to support the conspiracy conviction. *See United States v. Chandler*, 586 F.2d 593, 602 (5th Cir. 1978) ("Mere knowledge, approval, or acquiescence in the object or purpose of a conspiracy is insufficient to prove participation in it."); *accord United States v. Edwards*, 488 F.2d 1154, 1158 (5th Cir. 1974).

swap;" holding that the evidence of the transaction did not support the inference that the defendant "knowingly made the exchange with the expectation that [another conspirator] would use it to file a false tax return").

Therefore, this Court should reverse appellant's conviction of the offense charged in Count 17 and remand with instructions to enter a judgment of acquittal.

**Issue Four: Appellant Was Deprived of a Fair Trial by the "Three Monkeys" Slide and Associated Argument Made by the Government in Summation, in Derogation of the District Court's Ruling Denying a "Deliberate Ignorance" Instruction.**

Pursuant to Federal Rule of Appellate Procedure 28(i), Appellant Ryberg adopts the portion of Appellant Nourian's opening brief that addresses this same issue (at pages 39-47). Appellant's trial counsel preserved this issue for appeal, ROA.7948-7949, and Appellant Nourian's analysis of the error applies equally to Appellant Rydberg. The government cannot show that this error – which reduced the government's burden of proof on the *mens rea* elements of the charges – was harmless beyond a reasonable doubt. Therefore, this Court should reverse all of appellant's convictions and remand for a new trial to occur.

**Issue Five: The District Court Committed Plain Error by Applying a Two-Level Enhancement Under USSG § 2B1.1(b)(2)(A)(i) for an Offense Involving More than 10 Victims.**

Pursuant to Federal Rule of Appellate Procedure 28(i), Appellant Ryberg adopts the portion of Appellant Nourian's opening brief that addresses this same

issue (at pages 48-55). Appellant Nourian's opening brief's analysis of the issue applies equally to Appellant Rydberg with respect to the district court's misapplication of the sentencing guidelines. Although – unlike Appellant Nourian – Appellant did not preserve this issue for appeal, the district court committed the same error at Appellant Rydberg's sentencing. ROA.16940. If this Court finds merit in Appellant Nourian's argument and vacates his sentence, then the error in Appellant Rydberg's case would become plain on appeal and, furthermore, would warrant the same result on appeal in the interests of justice under Federal of Criminal Procedure 52(b). *See Henderson v. United States*, 568 U.S. 266 (2013) (plainness of error assessed under law in effect at time of appeal); *see also* 18 U.S.C. § 3553(a)(6) (stressing "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

53

## CONCLUSION

For the forgoing reasons, this Court should reverse all of appellant's convictions and remand with instructions to the district court to enter a judgment of acquittal. Alternatively, this Court should reverse appellant's convictions and remand for a new trial. At the very least, this Court should vacate appellant's sentence and remand for resentencing.

Dated:  October 10, 2025                    Respectfully submitted,

                                            /s/ *Brent Evan Newton*

                                            Brent Evan Newton
                                            Attorney at Law
                                            Texas Bar No. 00788115
                                            19 Treworthy Road
                                            Gaithersburg, MD 20878
                                            (202) 975-9105
                                            brentevannewton@gmail.com

                                            **Attorney for Appellant**
                                            **Christopher Rydberg**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Appellant's Opening Brief has been served by the Fifth Circuit electronic filing system on all counsel of record, on this 10th day of October, 2025.

/s/ *Brent Evan Newton*

Brent Evan Newton

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,593 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word version 14.0 in Times New Roman 14 point font.

3.      This brief and the accompanying electronic copy of this brief comply with 5TH CIR. R. 31.1 because they have been converted into Portable Document File (PDF) format.

4.      The undersigned understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Fifth Circuits  Rule 32.2.7, may result in the Court's striking the brief and imposing sanctions against the undersigned counsel.

/s/ *Brent Evan Newton*

Brent Evan Newton