No. 25-10365

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

DEHSHID NOURIAN; CHRISTOPHER RYDBERG,
Defendants-Appellants.

---

Appeal from the United States District Court
for the Northern District of Texas
Case No. 3:17-cr-00155-L

---

BRIEF OF APPELLANT DEHSHID NOURIAN

---

David Gerger
Ashley Kaper
GERGER HENNESSY MARTIN &
PETERSON LLP
700 Louisiana Street, Suite 2300
Houston, Texas 77002
713.224.4400
Attorneys for Appellant Dehshid Nourian

CERTIFICATE OF INTERESTED PARTIES

Undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. Counsel provides this list so that the judges of this court may evaluate possible disqualification or recusal.

1.    The Honorable Sam A. Lindsay, United States District Judge

2.    Dehshid Nourian, Defendant–Appellant

3.    Sentencing and Appellate Counsel for Defendant-Appellant Dehshid Nourian:
       David Gerger and Ashley Kaper, Gerger Hennessy Martin & Peterson LLP

4.    Trial Counsel for Defendant–Appellant Dehshid Nourian:
       Thomas M. Melsheimer, Scott C. Thomas, Dion J. Robbins, and Alexander Nowakowski, Winston & Strawn LLP

5.    Forfeiture Counsel for Defendant-Appellant Dehshid Nourian:
       Diane M. Kozub

6.    Appellate Counsel for Defendant-Appellant Christopher Rydberg:
       Brent E. Newton

7.    Trial Counsel for Defendant-Appellant Christopher Rydberg:
       Andrew O. Wirmani, Joshua M. Russ, and Margaret Terwey, Reese Markatos LLP; and Michael D. Payma, Payma Kuhnel & Smith, PC

8.    United States of America, Plaintiff–Appellee

i

9.  Appellate Counsel for Plaintiff–Appellee:
    Jeremy R. Sanders, U.S. Department of Justice
    Stephen S. Gilstrap, Assistant United States Attorney, Northern
    District of Texas

10. Trial Counsel for Plaintiff–Appellee
    Ethan Womble, Alexander Pogozelski, and Edward E.
    Emokpae, U.S. Department of Justice

/s/ David Gerger
David Gerger

ii

REQUEST FOR ORAL ARGUMENT

Defendant-Appellant Dehshid Nourian respectfully requests oral argument. This case arose from a lengthy trial and involves a number of fact-intensive issues including claims of insufficient evidence. Oral argument would assist this Court's decisional process.

TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PARTIES ......................................................... i

REQUEST FOR ORAL ARGUMENT .................................................................. iii

TABLE OF CONTENTS ....................................................................................... iv

TABLE OF AUTHORITIES .................................................................................. vii

JURISDICTION .....................................................................................................1

STATEMENT OF THE ISSUES ............................................................................2

STATEMENT OF THE CASE ...............................................................................3

    A.    Overview. .........................................................................................3

    B.    The Pharmacies and how they operated. .......................................5

    C.    The charges and additional facts relevant thereto. .......................9

        1.    The healthcare-fraud charges. ..............................................9

        2.    The money-laundering charges. ..........................................11

    D.    Proceedings below. .......................................................................14

SUMMARY OF THE ARGUMENT ......................................................................15

ARGUMENT ..........................................................................................................20

I.    The evidence was insufficient to support David Nourian's convictions. ........20

    A.    Standard of review. .......................................................................20

    B.    The evidence was insufficient to sustain David Nourian's convictions. ....................................................................................21

        1.    Healthcare fraud conspiracy (Count One) and substantive healthcare fraud and aiding and abetting (Counts Two through Nine). ................................................................21

        2.    Money laundering conspiracy (Count Ten) and substantive money laundering and aiding and abetting (Counts Eleven through Twelve and Fourteen through Sixteen). .......................29

3.      Conspiracy to defraud the United States by impeding the functions of the IRS in assessing and collecting income taxes (Count Seventeen)................................................................36

C.      If the Court reverses some, but not all, of David Nourian's convictions, the Court should also vacate his sentence on the remaining counts and remand for resentencing. ...................................38

II.   David Nourian was deprived of a fair trial by the "three monkeys" slide and associated argument used by the government in closing argument, in derogation of the district court's ruling denying a "deliberate ignorance" instruction. ...............................................................................40

A.      Standard of review.............................................................................40

B.      Factual background. ..........................................................................41

C.      This Court should reverse David Nourian's convictions and remand for a new trial, because the "three monkeys" slide and argument deprived him of a fair trial. ....................................................43

III.  The district court reversibly erred in applying a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) for an offense involving more than 10 victims. ...............................................................................................49

A.      Standard of review.............................................................................49

B.      Factual background. ..........................................................................49

C.      The district court misapplied the Guidelines by applying a two-level enhancement for 10 or more victims under USSG § 2B1.1(b)(2)(A)(i) because the Guideline commentary supporting that enhancement conflicts with the text of the Guideline itself and thus should be disregarded. ............................................................50

D.      The government cannot carry its "heavy burden" of showing this Guideline application error to be harmless because it cannot "convincingly demonstrate" that the district court would have imposed the same sentence even in the absence of the error. ...............53

IV.   The district court reversibly erred by relying on David Nourian's perceived lack of remorse in sentencing him.......................................57

A.      Standard of review.............................................................................57

B.      Factual background. ..........................................................................57

C.    The district court reversibly erred in relying on David Nourian's perceived lack of remorse in sentencing him. ......................................58

V.    The district court reversibly erred by ordering forfeiture of the entirety of the *4516 brokerage account because the government failed to prove that the account "facilitate" any money-laundering offense by David Nourian. ..................................................................................................64

A.    Standard of review.................................................................................64

B.    Factual background. ..............................................................................64

C.    The district court erred in ordering forfeited the portion of the *4516 account corresponding to the Alon and Twitter stock acquired pre-offense. ...............................................................................66

VI.    David Nourian preserves for possible further review the currently foreclosed contention that the Constitution requires that restitution awards under the MVRA must be found by a jury beyond a reasonable doubt. ...........................................................................................................70

A.    Standard of review.................................................................................70

B.    Factual background. ..............................................................................70

C.    David Nourian preserves for possible further review the currently foreclosed contention that the Fifth and Sixth Amendments to the Constitution require that restitution awards under the MVRA must be found by a jury beyond a reasonable doubt. ...........................71

CONCLUSION...................................................................................................73

CERTIFICATE OF SERVICE ..........................................................................74

CERTIFICATE OF COMPLIANCE..................................................................75

## TABLE OF AUTHORITIES

Page

**Cases**

*Alleyne v. United States*,
570 U.S. 99 (2013) ................................................................70

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) ........................................................ 70, 71

*City of El Paso, Tex. v. City of Socorro, Tex.*,
917 F.2d 7 (5th Cir. 1990) ....................................................39

*Gall v. United States*,
552 U.S. 38, 49 (2007) ..........................................................52

*Grimes v. United States*,
379 F.2d 791 (5th Cir. 1967) .................................................26

*Hester v. United States*,
586 U.S. 1104 (2019) ...................................................... 19, 71

*Holguin-Hernandez v. United States*,
589 U.S. 169 (2020) ..............................................................56

*Kisor v. Wilkie*,
[588 U.S. 558] (2019).............................................................50

*Mitchell v. United States*,
526 U.S. 314 (1999) ...............................................................57

*Pinkerton v. United States*,
328 U.S. 640 (1946) ........................................................ *passim*

*Rimlawi v. United States*,
145 S.Ct. 518 (2025) ....................................................... 19, 71

*Southern Union Co. v. United States*,
567 U.S. 343 (2012) ...............................................................70

*State v. Mussall,*
  823 So. 2d 1305 (La. 1988) ................................................................20

*Stinson v. United States,*
  508 U.S. 36 (1993) ........................................................ 17, 49, 50, 51

*Tapia v. United States,*
  564 U.S. 319 (2011) ..........................................................................61

*Thomas v. Texas Dep't of Criminal Justice,*
  297 F.3d 361 (5th Cir. 2002) ............................................................51

*United States v. Aguilar,*
  645 F.3d 319 (5th Cir. 2011) ...................................................... 46, 47

*United States v. Ainabe,*
  938 F.3d 685 (5th Cir. 2019) ...................................................... 49, 51

*United States v. Alvarez,*
  755 F.2d 830 (11th Cir. 1985) ..........................................................27

*United States v. Barson,*
  845 F.3d 159 (5th Cir. 2016) ................................................. 49, 50, 51

*United States v. Blankenship,*
  382 F.3d 1110 (11th Cir. 2004) ........................................................32

*United States v. Brown,*
  186 F.3d 661 (5th Cir. 1999) ...................................................... 20, 36

*United States v. Castañeda,*
  9 F.3d 761 (9th Cir. 1993) ................................................................27

*United States v. Colorado Cessa,*
  785 F.3d 165 (5th Cir. 2015) ...................................................... 30, 66

*United States v. DeBruhl-Daniels,*
  118 F.4th 735 (5th Cir. 2024) ...........................................................37

*United States v. Dennis,*
  41 F.4th 732, 745-46 (5th Cir. 2022) ...............................................63

viii

*United States v. Escalante-Reyes*,
  689 F.3d 415 (5th Cir. 2012) .............................................................61

*United States v. Flores-Chapa*,
  48 F.3d 156 (5th Cir. 1995) ...............................................................43

*United States v. Fuchs*,
  467 F.3d 889 (5th Cir. 2006) ...................................................... 30, 31

*United States v. Ganji*,
  880 F.3d 760 (5th Cir. 2018) ................................................ 20, 22, 24

*United States v. Green*,
  47 F.4th 279 (5th Cir. 2022) ...............................................................36

*United States v. Hanafy*,
  124 F. Supp. 2d 1028 (N.D. Tex. 2000) ....................................... 28, 31

*United States v. Hudson & Goodwin*,
  11 U.S. (7 Cranch) 32 (1812) .............................................................26

*United States v. Ibarra-Luna*,
  628 F.3d 712 (5th Cir. 2010) ...................................................... 52, 53, 54

*United States v. Kalu,*
  936 F.3d 678 (5th Cir. 2019) ...................................................... 49, 51

*United States v. Kirilyuk,*
  29 F.4th 1128 (9th Cir. 2022) .................................................... 51, 52

*United States v. Laca*,
  499 F.2d 922 (5th Cir. 1974) ...................................................... 58, 59

*United States v. Lara-Velasquez*,
  919 F.2d 946 (5th Cir. 1991) ...............................................................45

*United States v. Lombardi*,
  138 F.3d 559 (5th Cir. 1998) ...................................................... 23, 25

*United States v. Lopez-Benitez*,
  No. 98-50936, 1999 WL 1067557 (5th Cir. Oct. 15, 1999) ................................43

*United States v. Luna Caudillo*,
110 F.4th 808 (5th Cir. 2024)................................................................71

*United States v. Martiarena*,
955 F.2d 363 (5th Cir. 1992)................................................................25

*United States v. Martinez*,
531 Fed. Appx. 407 (5th Cir. 2013) .....................................................37

*United States v. McCann*,
613 F.3d 486 (5th Cir. 2010)................................................................39

*United States v. Moreno*,
185 F.3d 465 (5th Cir. 1999)................................................................46

*United States v. Moreno*,
588 F.2d 490 (5th Cir. 1979)................................................................27

*United States v. Murray*,
988 F.2d 518 (5th Cir. 1993)......................................................... 25, 34

*United States v. Nora*,
988 F.3d 823 (5th Cir. 2021)................................................. 22, 23, 25

*United States v. Perez-Macias*,
335 F.3d 421 (5th Cir. 2003)................................................................69

*United States v. Polk*,
56 F.3d 613 (5th Cir. 1995)..................................................................25

*United States v. Read*,
710 F.3d 219 (5th Cir. 2012)................................................................71

*United States v. Real Property Located at 1407 North Collins Street, Arlington, Texas*,
901 F.3d 268 (5th Cir. 2018)................................................................66

*United States v. Riccardi*,
989 F.3d 476 (6th Cir. 2021)................................................................52

*United States v. Ritchey*,
117 F.4th 762 (5th Cir. 2024)...............................................................54

x

*United States v. Rosbottom,*
    763 F.3d 408 (5th Cir. 2014) ....................................................................71

*United States v. Roussel,*
    705 F.3d 184 (5th Cir. 2013) ....................................................................53

*United States v. Saldaña Rodriguez,*
    136 F.4th 258 (5th Cir.) ..................................................................... 56, 59

*United States v. Tencer,*
    107 F.3d 1120 (5th Cir. 1997) .................................................................66

*United States v. Tomblin,*
    46 F.3d 1369 (5th Cir. 1995) ....................................................................44

*United States v. Trujillo,*
    714 F.2d 102 (11th Cir. 1983) .................................................................43

*United States v. Valdez,*
    726 F.3d 684 (5th Cir. 2013) ...................................................... *passim*

*United States v. Vargas,*
    74 F.4th 673 (5th Cir. 2023) ............................................................. 48, 50

*United States v. Waskom,*
    179 F.3d 303 (5th Cir. 1999) ....................................................................53

*United States v. Whitfield,*
    590 F.3d 325, 366 (5th Cir. 2009) ...........................................................37

*United States v. Willett,*
    751 F.3d 335 (5th Cir. 2014) ....................................................................22

*United States v. Williams,*
    985 F.2d 749 (5th Cir. 1993) ....................................................................23

*Warner v. Talos ERT, L.L.C.,*
    133 F.4th 412 (5th Cir. 2025) ..................................................................39

**Statutes, Rules and Guidelines**

18 U.S.C. § 1347 ................................................................ 15, 21, 28, 31

18 U.S.C. § 1349 ............................................................................ 21, 22

18 U.S.C. § 1956 ........................................................................................31

18 U.S.C. § 1956(a)(1)(B)(i) ................................................................ 29, 30

18 U.S.C. § 1956(h) ..................................................................................29

18 U.S.C. § 1957 .................................................................................. 30, 31

18 U.S.C. § 2 ......................................................................................... 21, 29

18 U.S.C. § 3663A ................................................................................. 2, 69

18 U.S.C. § 371 ..........................................................................................35

18 U.S.C. § 3742(a)(1) ................................................................................1

18 U.S.C. § 982 ..........................................................................................65

18 U.S.C. § 982(a)(1) ........................................................................... 63, 65

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 2461(c) ...................................................................................63

Fed. R. App. P. 28(i) .................................................................................28

Fed. R. App. P. 32(a)(5) ...........................................................................74

Fed. R. App. P. 32(a)(6) ...........................................................................74

Fed. R. App. P. 32(a)(7)(B) ......................................................................74

Fed. R. App. P. 32(a)(7)(B)(iii) ...............................................................74

Fed. R. App. P. 4(b)(1)(A)(i) & (2) ...........................................................1

Fifth Circuit Local Rule 28.2.1 .................................................................. i

USSG § 2B1.1 ............................................................................................50

USSG § 2B1.1(b)(2)(A)(i) .................................................................. passim

**Other Authorities**

Judge Jon O. Newman, *Beyond "Reasonable Doubt*," 68 N.Y.U. L. Rev. 979 (1993)..................................................................................................20

Mark Noferi, *Towards Attenuation:  A "New" Due Process Limit on* Pinkerton *Conspiracy Liability*, 33 Am. J. Crim. L. 91 (2006)...........................................27

Mark W. Bennett & Ira P. Robbins, *Last Words:  A Survey and Analysis of Federal Judges' Views on Allocution in Sentencing*, 65 Ala. L. Rev. 735, 752 (2014)....60

Michael Manning, Comment, *A Common Law Crime Analysis of* Pinkerton v. United States*:  Sixty Years of Impermissible Judicially-Created Criminal Liability*, 67 Mont. L. Rev. 89 (2006) ................................................................26

JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The judgment of conviction and sentence (ROA.3148-3156) was entered on the docket on February 25, 2025 (ROA.58), and Defendant-Appellant Dehshid Nourian filed a timely notice of appeal (ROA.3176-3177) from that judgment on March 6, 2025.  *See* Fed. R. App. P. 4(b)(1)(A)(i).

## STATEMENT OF THE ISSUES

I.      Whether the evidence was insufficient to support David Nourian's convictions.

II.     Whether David Nourian was deprived of a fair trial by the "three monkeys" slide and associated argument used by the government in closing argument, in derogation of the district court's ruling denying a "deliberate ignorance" instruction.

III.    Whether the district court reversibly erred in applying a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) for an offense involving more than 10 victims.

IV.     Whether the district court reversibly erred by relying on David Nourian's perceived lack of remorse in sentencing him.

V.      Whether the district court reversibly erred by ordering forfeiture of the entirety of the *4516 brokerage account because the government failed to prove that the account "facilitate" any money-laundering offense by David Nourian.

VI.     Whether the Constitution requires that restitution awards under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, must be found by a jury beyond a reasonable doubt.  (FORECLOSED ISSUE)

STATEMENT OF THE CASE[1]

A.     Overview.

Dehshid ("David") Nourian was born in Iraq in 1964 to Hossein Nourian and Ashraf ("Sherri") Mofid.  ROA.8988 (¶ 129).   Besides his parents, Mr. Nourian's birth family – very important to an understanding not just of Mr. Nourian himself but also this case – consists of two older brothers (Jamshid ("James") Noryian,[2] and Farshid Nourian) and a younger sister, Leyla Nourian.  ROA.8991 (¶ 138).   Also part of the family is James's stepson, Christopher ("Chris") Rydberg, who also served a sort of "Man Friday" to James in all of James's business dealings. ROA.5743-5744, 8511.

David Nourian was educated and licensed as a pharmacist (ROA.8993-8994 (¶¶ 146-147)), but, like his oldest brother James, his mother, and his sister, he also invested in and managed real estate holdings often through holding companies. ROA.8994 (¶¶ 148-149). In fact, James's umbrella company, Noryian & Associates, had several different holding companies including Queen Shiva, Ace King, Ace Queen, HJLM, Jade and Joy, and Bandoola.  ROA.3995.  James was not the legal owner of the holding companies; some were in Sherri Mofid's name, some were in

---

[1] The electronic record on appeal is cited by page number in the following manner:  ROA.[page number].

[2] James spells his last name differently from the rest of the family.

Leyla Nourian's name, and some were in David's name. ROA.3995. But James controlled the holding companies, and he and Chris Rydberg handled the money and signed the paperwork for the holding companies. ROA.3996. The Nourians' business dealings were thus heavily enmeshed, with James ultimately calling the shots in his position as the *de facto* patriarch and head of the family. James played a dominant and domineering role in David's life.

The present case began when James decided to make a foray into the world of compounded medicine – particularly compounded pain creams/lotions. The government alleged that, over a period of about three years, James, David Nourian, Chris Rydberg, and others conspired to defraud Blue Cross Blue Shield ("BCBS") and the federal government by seeking reimbursement for prescriptions that were fraudulent because (1) they had been induced by kickbacks to the prescribing medical providers and/or (2) they were not medically necessary. This activity was alleged to involve three pharmacies: principally Ability Pharmacy in Fort Worth, Texas, but also Industrial and Family Pharmacy, in Fort Worth, as well as Park Row Pharmacy in Arlington, Texas. ROA.263-276. (These will be collectively referred to as "the Pharmacies" throughout this brief.)

The medical providers allegedly providing medically unnecessary prescriptions were Dr. Michael Taba, Dr. Leslie Benson, Dr. Kevin Williams, and physician's assistant Nicolas Aguilar. ROA.271-273. The last two of these ended

up testifying for the government. Dr. Benson died before trial, and Dr. Taba proceeded to trial with James, David, and Chris Rydberg.

The government also alleged various money-laundering violations arising from the shifting of healthcare-fraud proceeds among various financial accounts. ROA.279-282. And, finally, the government charged James, David, Chris, and Ali Khavarmanesh with conspiracy to defraud the United States by impairing the collection and assessment of income taxes from the Pharmacies and the defendants personally. ROA.283-286.

This appeal challenges David Nourian's convictions and the resulting sentence.

B.   <u>The Pharmacies and how they operated.</u>

Around 2013, James Noryian began to discuss starting a compounding[3] pharmacy. ROA.5713. According to his former romantic partner, Dr. Marjaneh Hedayat, James said that a pharmacist friend of his had developed compound creams for pain and scarring, for which he could seek lucrative reimbursement. ROA.5713-5714.

---

[3] The superseding indictment alleged that "[i]n general, 'compounding' is a practice in which a licensed pharmacist, or other licensed practitioners, pursuant to valid prescriptions issued by medical practitioners, combines, mixes, or alters ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient." ROA.267.

Ability Pharmacy was originally formed in October of 2006 with Robert Ritter as its president and sole director. ROA.2267-2287 (certificate of formation). Beginning on November 7, 2013, James partnered with Ritter to fill compound pain cream prescriptions through Ability. ROA.5714. Ritter was the pharmacist at Ability (ROA.3975), but James was in charge of everyone and running everything on a day-to-day basis. ROA.3976, 4060, 4192, 4223-4224. Once in a while, David would come to fill in at Ability if the regular pharmacist was out, but most of the time, if David came in, it was just to chat. ROA.4452. Ability's Texas state certificate of formation was, on August 19, 2014, amended to add David as president and to remove Ritter from the certificate. ROA.2279-2280. David was a 30% owner of Ability, with the balance of shares owned by Ritter and his wife Julie. ROA.6992.

The office of Noryian & Associates (James's property management firm) was in the same building as Ability. ROA.3957-3958. According to Noryian & Associates employee Kimberly McCoy Necessary, Chris Rydberg, who also worked at the firm, signed checks for Ability. ROA.3960-3961, 3973. James kept careful tabs on the money coming in through the pharmacy, sometimes checking the running daily total several times a day. ROA.4203-4204, 4205-4206, 4423-4424.

Dr. Hedayat testified that James looked for and recruited doctors who would prescribe the creams in exchange for part of the insurance reimbursements. ROA.5716-5717. James targeted pain and scarring specialists, and particularly those

who saw workers' compensation patients and patients from the Department of Labor's ("DOL's") Federal Employee Compensation Act ("FECA") program. ROA.4202-4203, 5715. These included codefendants Dr. Michael Taba and Dr. Leslie Benson, as well as government witness Dr. Kevin Williams. ROA.4202-4203.

At some point, James said that he feared that a BCBS audit of Ability was going to halt operations, so he began to scout out other pharmacies to continue processing prescriptions. ROA.4224. In 2015, James opened a new pharmacy, also in Fort Worth, named Industrial & Family Pharmacy ("I & F"). ROA.3982-3983. On paper, David Nourian owned 100% of I & F (ROA.4419, 4447, 6998-6999), but the pharmacist in charge was Rey Moreno and, as at Ability, James actually ran everything at I & F. ROA.3983, 4061, 4446-4447. In September of 2015, Robert Ritter retired, Ability closed, and all of Ability's employees except one transferred to I & F. ROA.3983, 4419, 4446.

Also in 2015, Park Row Pharmacy was acquired as a going, apparently legitimate pharmacy from its previous owners. According to government witness Dr. Kevin Williams, James acquired Park Row in order to process compound medication prescriptions for Williams's patients in Georgia. ROA.4955, 5033-5034. The owner of Park Row was Ali Khavarmanesh (ROA.3727), although in a document dated July 28, 2015, David Nourian was listed as manager and president.

7

ROA.4890.  Although David was putatively the manager of Park Row, he at least once received a rebuke from James for not being at Park Row when James visited. ROA.3984.  James was the one who paid the employees at Park Row.  ROA.3984.

There was evidence that James paid Drs. Benson, Taba, and Williams for their compound prescriptions processed through the Pharmacies.  And the government produced evidence that these prescriptions were not medically necessary, although that evidence was contradicted, with respect to Dr. Taba's patients, by Dr. Taba's expert witness Daniel Buffington.  ROA.7374, 7381 7384, 7456-7457.  But, so far as this record reflects, David Nourian had absolutely no contact with Drs. Benson, Taba, or Williams; indeed, there is no evidence that he knew of their existence, or they of his.

That brings us to the fourth medical provider who prescribed the compound pain creams – physician's assistant Nicolas Aguilar.  Aguilar worked at the Park Row Clinic in Arlington Texas, close to the Park Row Pharmacy.  ROA.4532, 4534. Aguilar claimed that David introduced him to James and that he had a verbal agreement with James and David that he would be paid for compound pain prescriptions.  ROA.4537-4538.  Aguilar claimed that David gave him preprinted prescription pads with the compound creams already listed out (ROA.4540-4541), and that he would mostly just sign empty or prefilled prescriptions within the Park Row Pharmacy itself.  ROA.4541-4542, 4639.  However, in cross-examination,

Aguilar had to concede that at least some of the actually filled compound cream prescriptions were *not* on the preprinted prescription pads that David had given him. ROA.4617-4624.

Moreover, Aguilar conceded that he never saw David fill out any of the prescriptions he signed. ROA.4627. And, it was always James who paid Aguilar; David never paid Aguilar. ROA.4628-4629. Although Aguilar sent some unrelated, undisputedly legitimate prescriptions to be filled at Park Row Pharmacy (ROA.4507-4510), the compound cream prescriptions were all filled at Ability, and were principally for employees of the Pharmacies whom he had never physically examined and whose case files he had never reviewed. ROA.4541, 4543-4544.

An investigation into these matters commenced in January of 2016. ROA.8969 (¶ 49). That investigation (ROA.8969-8970 (¶¶ 49-57)), which included several warranted searches, ultimately culminated in a two-count indictment on March 22, 2017. ROA.65-89. A 17-count superseding indictment, on which the case proceeded to trial, was handed up on September 11, 2019. ROA.263-292.

C.     The charges and additional facts relevant thereto.

1.     The healthcare-fraud charges.

David Nourian and others were charged with eight substantive healthcare-fraud counts corresponding to eight compound cream prescriptions. All of these prescriptions were filled at Ability. Three of them were prescribed by Aguilar

(Counts Two, Three, and Four); two of them were prescribed by Dr. Benson (Counts Five and Six); and three of them were prescribed by Dr. Taba:

| Ct. No. | Defendants charged | Allegations |
|---------|--------------------|-------------|
| Two | James Noryian, **David Nourian** | Fraudulent claim to BCBS, filed 2/2/2015 ($5,584.48 billed; $4,693.01 paid) – beneficiary = Megan Marines; prescriber = Aguilar |
| Three | James Noryian, **David Nourian** | Fraudulent claim to BCBS, filed 2/2/2015 ($5,584.48 billed; $4,693.01 paid) – beneficiary = Amoret (Mona) Guadian; prescriber = Aguilar |
| Four | James Noryian, **David Nourian** | Fraudulent claim to BCBS, filed 2/2/2015 ($5,584.48 billed; $4,693.01 paid) – beneficiary = Rey Moreno; prescriber = Aguilar |
| Five | James Noryian, **David Nourian**, Benson | Fraudulent claim to FECA, filed 1/23/2015 ($3,531.22 billed; $2,845.21 paid) – beneficiary = Mary Mitchell (formerly Mary Carpenter); prescriber = Benson |
| Six | James Noryian, **David Nourian**, Benson | Fraudulent claim to FECA, filed 4/8/2015 ($3,550.01 billed; $2,860.33 paid) – beneficiary = Laraine Scully; prescriber = Benson |
| Seven | James Noryian, **David Nourian**, Taba | Fraudulent claim to FECA, filed 7/7/2015 ($3,676.42 billed; $2,860.33 paid) – beneficiary = Rhonda Clark; prescriber = Taba |
| Eight | James Noryian, **David Nourian**, Taba | Fraudulent claim to FECA, filed 6/10/2015 ($3,676.42 billed; $2,860.33 paid) – beneficiary = Linda Burks; prescriber = Taba |
| Nine | James Noryian, **David Nourian**, Taba | Fraudulent claim to FECA, filed 7/1/2015 ($3,676.42 billed; $2,860.33 paid) – beneficiary = Jo Adkins(-Grisby); prescriber = Taba |

ROA.277-278.  In Count One of the superseding indictment, James, David, Chris Rydberg, and others were charged with conspiracy to commit healthcare fraud. ROA.275-276.

### 2. The money-laundering charges.

In Count Ten of the superseding indictment, James, David, and Chris Rydberg were charged with conspiracy to commit money laundering.  ROA.279-280.  They were also charged with six substantive counts of money laundering:

| Ct. No. | Defendants charged | Allegations |
|---|---|---|
| Eleven | James Noryian, **David Nourian**, Rydberg | Transfer of $3,500,000 from Wells Fargo account *0302 (Industrial & Family) to JP Morgan Chase account *9863 (Industrial & Family), January 22, 2016 |
| Twelve | James Noryian, **David Nourian**, Rydberg | Transfer of $3,500,000 from JP Morgan Chase account *9863 (Industrial & Family) to JP Morgan Chase account *3462 (Jade and Joy), January 27, 2016 |
| Thirteen | James Noryian, Rydberg | Transfer of $3,500,000 from JP Morgan Chase account *3462  (Jade and Joy) to Scotttrade investment account *1793 (Sherri Mofid), January 27, 2016 |
| Fourteen | James Noryian, **David Nourian**, Rydberg | Transfer of $5,266,000 from Prosperity Bank account *9542 (Ability) to JP Morgan Chase account *2280 (Ability), January 11, 2016 |
| Fifteen | James Noryian, **David Nourian**, Rydberg | Transfer of $5,266,000 from JP Morgan Chase account *2280 (Ability) to JP Morgan Chase account *3462 (Jade and Joy), January 12, 2016 |
| Sixteen | James Noryian, **David Nourian**, Rydberg | Transfer of $5,266,000 from JP Morgan Chase account *3462 (Jade and Joy) to Wells Fargo account *6032 (**David Nourian**), January 12, 2016 |

11

ROA.281-282.

At the time of the transactions at issue, the signatories on the accounts from which the transfers were made were as follows:

- Wells Fargo *0302 (I & F) => Chris Rydberg and David Nourian (ROA.6658)

- JP Morgan Chase *9863 (I & F) => Chris Rydberg[4]

- JP Morgan Chase *3462 (Jade and Joy) => Chris Rydberg, Leyla Nourian, and John Botts (Leyla's husband) (ROA.6660, 6668-6669)

- Prosperity *9542 (Ability) => Chris Rydberg and David Nourian (ROA.6522, 6665-6666)

- JP Morgan Chase *2280 (Ability) => Chris Rydberg, David Nourian, and Afsanti Ramati (ROA.6666)

- Wells Fargo *6032 => David Nourian and Leyla Nourian (ROA.6674)

Government witness Mark Burrell, an investigative analyst specialist with the Inspector General of the United States Postal Service, testified that he could not say that David Nourian conducted any of the charged transactions and that there were some that he knew for sure that David did not conduct (namely, the ones involving accounts as to which David was not a signatory). ROA.6811-6814, 6817-6820. Nor

---

[4] Mark Burrell initially testified that both Rydberg and David Nourian were signatories on this account. ROA.6523-6524, 6658. However, on cross-examination, it was revealed that, on the date of the transfer charged in Count Twelve (January 27, 2016), David was *not* a signatory on the account because he was not added as a signatory until October 14, 2016. ROA.6810-6811.

had he seen any evidence that David had directed someone else to conduct the transactions. ROA.6825.

3.    <u>Conspiracy to defraud the United States charge.</u>

In Count Seventeen of the superseding indictment, the government charged James, David, Chris Rydberg, and Ali Khavarmanesh with conspiracy to defraud the United States by impairing the Internal Revenue Service's ("IRS's") lawful functions of assessing and collecting income taxes from the Pharmacies and from involved individuals. ROA.283-284. The gravamen of this count was as follows: (1) money was withdrawn from the Pharmacies' accounts via cashier's checks that purported to be for business expenses; (2) those expenses were used to lower taxable income; and then (3) the unused cashier's checks were converted into new cashier's checks payable to individuals or related business entities, or they were redeposited into the account from which they had been drawn. ROA.6940-6941. 214 cashier's checks totaling approximately $60 million were used in this way. ROA.6941-6942. The cashier's checks transactions were apparently handled by Chris Rydberg. ROA.6943. Chris Rydberg was also the contact to deliver information to accountant Mohammed Imtiyazuddin for the purposes of preparing the Schedule K-1 forms used by stockholders to demonstrate the income earned by the S corporations of which they were stockholders. ROA.6053-6054.

D.    <u>Proceedings below.</u>

After the first trial in this case resulted in a mistrial (ROA.1103-1107, 8961 (¶ 15)), James, David, Chris Rydberg, and Dr. Taba proceeded to trial again, with jury selection beginning on September 11, 2023. ROA.8962 (¶ 18). During the trial, James became ill, and the district court declared a mistrial as to James and severed him out of the case due to his medical condition (ROA.10439-10461), but required the remaining defendants to remain in trial. ROA.8963 (¶ 18). On November 14, 2023, the jury retired to deliberate (ROA.7954), and on November 16, 2023, the jury returned its verdict convicting David, Chris Rydberg, and Dr. Taba of all the counts against them. ROA.1631-1634, 7979-7981.

On February 21, 2025, the district court sentenced David Nourian to 210 months' imprisonment, two years' supervised release, restitution under the MVRA in the amount of $115,389,128.20, and a total mandatory special assessment of $1,600. ROA.3148-3155, 8091-8096. The district court also ordered forfeiture of money and various pieces of real and personal property. ROA.3178-3180. David Nourian filed his timely notice of appeal on March 6, 2025. ROA.3176-3177.

SUMMARY OF THE ARGUMENT

I.      The evidence was insufficient to support David Nourian's convictions. With respect to his convictions for healthcare-fraud conspiracy and substantive healthcare fraud, the evidence was insufficient to show he had the requisite guilty knowledge or specific intent to defraud because the evidence failed to show either that he knew that paying commissions for prescriptions was illegal or that the prescriptions were medically unnecessary (the government's two theories of fraud). The evidence was also insufficient to sustain the substantive healthcare fraud convictions on Counts Five through Nine because David Nourian was not a principal in those counts, and the evidence failed to show the requisite active participation for conviction on an aiding-and-abetting theory.   (The evidence was likewise insufficient to sustain conviction under a theory of vicarious liability.)  Finally, the evidence on Counts Five through Nine was insufficient because FECA is not a "health care benefit program" as that term is used in 18 U.S.C. § 1347.

With respect to David Nourian's convictions for money-laundering conspiracy and substantive money laundering, those counts should fall if the predicate healthcare fraud counts fall.  Additionally, but relatedly, there was insufficient evidence that David Nourian knew that the allegedly laundered funds came from the "specified unlawful activity" of healthcare fraud.  Furthermore, there was insufficient evidence to support the concealment prong of substantive money

15

laundering because there was no evidence that David Nourian knew that the purpose of the bank transfers was to conceal the origin of the funds, nor much less was there any evidence of intent to conceal on his part. Finally, the evidence was insufficient to sustain the substantive money-laundering convictions because David Nourian was not a principal in those counts, and the evidence failed to show the requisite active participation for conviction on an aiding-and-abetting theory. (The evidence was likewise insufficient to sustain conviction under a theory of vicarious liability.)

Finally, the evidence was also insufficient to sustain David Nourian's conviction for conspiracy to defraud the United States of tax revenue. David Nourian did not conduct any of the cashier's check transactions that were central to the government's theory on this count, and there was no evidence that he knew that the cashier's checks were being used to avoid tax liability.

II.    Before the jury was instructed in this case, the government requested, but the court refused, a "deliberate ignorance"/"willful blindness" instruction. Notwithstanding the district court's ruling on this point, the government, in the rebuttal portion of its closing argument, showed the jury a PowerPoint slide depicting three monkey emojis in the familiar "See no evil, hear no evil, speak no evil" pose and made an argument suggesting that, to the extent David Nourian and Chris Rydberg claimed ignorance of the culpable facts, they would have had to blind themselves to the obvious.

16

David Nourian was deprived of a fair trial by the "three monkeys" slide and associated argument. The government's conduct was improper because, as the district court found, it ran afoul of the district court's ruling refusing to instruct the jury on deliberate ignorance. Furthermore, the government's conduct affected David Nourian's substantial rights because (1) the prejudice from that conduct was great, given that David Nourian's chief defense was a lack of guilty knowledge/intent; (2) the district court's cautionary instruction was inadequate because it addressed only the slide itself and not the associated deliberate-ignorance argument; and (3) the evidence of David Nourian's guilt was far from overwhelming. Accordingly, this Court should vacate David Nourian's convictions and remand for a new trial.

III.    The district court reversibly erred in applying a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) for an offense involving more than 10 victims. The Guideline application note countertextually expands the Guideline term "victims" to include patients for whom allegedly fraudulent prescriptions were issued; and, under *Stinson v. United States*, 508 U.S. 36, 28 (1993), Guideline commentary should be disregarded where it is "plainly erroneous or inconsistent" with the Guideline itself. Even though David Nourian received a sentence below even the correct Guideline range, and even though the district court stated that it would impose the same sentence even if it had made any errors in calculating the Guidelines, the government cannot, under the circumstances of this case, meet its heavy burden of showing that

17

the error did not have an effect on David Nourian's sentence. Accordingly, this Court should vacate David Nourian's sentence and remand for resentencing.

IV.    The district court reversibly erred by relying at sentencing on David Nourian's protected right to silence to infer a lack of remorse on David's part. Because this was an irrelevant or improper factor, and because the district court gave significant weight to it, it renders David Nourian's sentence substantively unreasonable. Accordingly, this Court should vacate David Nourian's sentence and remand for resentencing.

V.    The district court reversibly erred by ordering forfeiture of the entirety of the *4516 brokerage account because the government failed to prove that the account "facilitated" any money-laundering offense by David Nourian. Particularly, the district court erred in forfeiting the portion of the brokerage account corresponding to stock in two companies (Twitter and Alon) purchased before the criminal activity in this case, based on the theory that the brokerage account commingled tainted funds and untainted funds.

But under Fifth Circuit law, mere commingling is not enough. Rather, the commingling must have been committed with the ***design*** or ***purpose*** to disguise the nature and source of tainted funds. Here, the district court did not explicitly make such a finding; and, even if it had, it would have been wrong on the facts of this case.

18

Accordingly, this Court should vacate the forfeiture order against David Nourian and remand for further proceedings.

VI.    Acknowledging that under current law there is no right to a jury determination, beyond a reasonable doubt, of restitution awards under the MVRA, David Nourian preserves for further review his contention that the failure to submit the question of restitution to the jury violated his Fifth Amendment right to due process and Sixth Amendment right to jury trial, and precludes any award of restitution in this case.  As two Justices have recognized, there is a substantial argument that the question of restitution under the MVRA should be submitted to a jury and proved beyond a reasonable doubt.  *See Rimlawi v. United States*, 145 S.Ct. 518, 518-19 (2025) (Gorsuch, J., dissenting from denial of certiorari); *Hester v. United States*, 586 U.S. 1104, 1105-07 (2019) (Gorsuch, J., joined by Sotomayor, J., dissenting from denial of certiorari).  Moreover, if this question were to be decided in David Nourian's favor, the government could not meet its burden of showing the error to be harmless beyond a reasonable doubt.  Accordingly, David Nourian preserves the issue for possible further review.

<u>ARGUMENT</u>

I.    The evidence was insufficient to support David Nourian's convictions.

A.    <u>Standard of review.</u>

"Appellate review [of the sufficiency of the evidence] is highly deferential to the jury's verdict, and a verdict is affirmed unless, viewing the evidence[5] and reasonable inferences in [the] light most favorable to the verdict, no rational jury could have found the essential elements of the offense to be satisfied beyond a reasonable doubt."[6]    *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (internal quotation marks and citations omitted).    "Nevertheless, a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference upon inference."    *Id.* (internal quotation marks and citation omitted).

---

[5] The appellate court must, however, consider **all** of the facts in the trial record, not just those facts that favor the government.  *See United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999) ("We consider 'the countervailing evidence as well as the evidence that supports the verdict' in assessing sufficiency of the evidence.") (citation omitted).  This is because, even after viewing all of the evidence in the light most favorable to the prosecution, there might be evidence that simply does not favor the prosecution and that a rational trier of fact could not ignore in its determination of guilt or innocence.  *See, e.g., State v. Mussall*, 823 So. 2d 1305, 1311-1312 (La. 1988) (Dennis, J.) (evidence viewed in light most favorable to prosecution included not only eyewitness's testimony that defendant committed the crime, but also uncontradicted evidence of eccentricities, unusual coincidences, and lack of corroboration that could not be ignored).

[6] It cannot be overemphasized that the evidence, even viewed in the light most favorable to the government, must be sufficient to support a finding of guilt **beyond a reasonable doubt**.  As Second Circuit Judge Jon Newman has said, it is not enough that there be merely "some evidence" of guilt; rather, the reviewing court should "conscientiously assess whether the evidence suffices to permit a finding by the high level of persuasion required by the 'reasonable doubt' standard."  Judge Jon O. Newman, *Beyond "Reasonable Doubt*," 68 N.Y.U. L. Rev. 979, 993 (1993).

"Although the jury may make factually based inferences, a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *Id.* (internal quotation marks and citation omitted). And, because David Nourian timely moved for judgment of acquittal, this Court's review of this issue is *de novo. See id.*

B. The evidence was insufficient to sustain David Nourian's convictions.

    1. Healthcare fraud conspiracy (Count One) and substantive healthcare fraud and aiding and abetting (Counts Two through Nine).

        a. Charges and elements.

Counts Two through Nine of the indictment charged David Nourian and others with substantive healthcare fraud and aiding and abetting in violation of 18 U.S.C. §§ 1347 and 2;[7] and Count One of the indictment charged David Nourian and others with healthcare fraud conspiracy in violation of 18 U.S.C. § 1349. ROA.275-278.

"To prove health care fraud, in violation of 18 U.S.C. § 1347, the Government must show that the defendant knowingly and willfully executed 'a scheme or artifice – (1) to defraud any health care benefit program; or (2) to obtain by means of false or fraudulent pretenses, representations, or promises,' any health care benefit program's money in connection with the delivery of or payment for health care

---

[7] Counts Two through Four involved prescriptions written by physician assistant Nicolas Aguilar; Counts Five and Six involved prescriptions written by physician Dr. Leslie Benson; and Counts Seven, Eight, and Nine involved prescriptions written by physician Dr. Michael Taba. All were filled at Ability Pharmacy.

21

services." *Ganji*, 880 F.3d at 777 (citations omitted). "[This] charge[ ] requires proof of knowledge and specific intent to defraud," *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014), meaning that the act was committed voluntarily or purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law. *See, e.g., United States v. Nora*, 988 F.3d 823, 830 (5th Cir. 2021).

"Neither conspiracy nor aider and abettor liability lowers this *mens rea* requirement." *Id.* "To prove a conspiracy to commit health-care fraud in violation of 18 U.S.C. § 1349, 'the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health-care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *Willett*, 751 F.3d at 339 (citations omitted). "Conspiracy 'has two intent elements – intent to further the unlawful purpose and the level of intent required for proving the underlying substantive offense." *Nora*, 988 F.3d at 830 (citations omitted). It "require[s] proof of knowledge and specific intent to defraud." *Willett*, 751 F.3d at 339 (citation omitted).

"To be convicted of aiding and abetting, the defendant must have (1) associated with a criminal venture, (2) participated in the venture, and (3) sought by action to make the venture successful. Moreover, to aid and abet, a defendant must

22

share in the intent to commit the offense as well as play an active role in its commission." *United States v. Lombardi*, 138 F.3d 559, 561 (5th Cir. 1998) (citations omitted). "In other words, an aider and abettor must share the same level of intent as the principal." *Nora*, 988 F.3d at 830 (citing *United States v. Williams*, 985 F.2d 749, 755 (5th Cir. 1993)). A defendant must be shown to have aided and abetted each and every element of the charged offense. *See Lombardi*, 138 F.3d at 561 (citing *Williams*, 985 F.2d at 753).

> b.    <u>The evidence is insufficient to show that David Nourian had the requisite guilty knowledge or specific intent to defraud necessary for conviction under Counts One through Nine.</u>

The government's theory of the case was that the prescriptions were fraudulent because (1) they were induced by the payment of commissions (kickbacks, in the government's telling) to the healthcare providers who wrote the prescriptions; and (2) they were for medically unnecessary medications (sometimes for persons whom the provider had not even examined). ROA.269 (Superseding Indictment) (¶¶ 30-32); ROA.7753-7758 (government's closing argument). But the government's evidence was insufficient to prove fraudulent intent on the part of David Nourian under either of these theories.

Start first with the supposed lack of medical necessity for the compounded prescriptions in question. There was no evidence that David Nourian even knew of three of the medical providers at issue (Drs. Benson, Williams, and Taba), let alone

23

evidence that David Nourian knew that the prescriptions issued by these doctors – issued for patients whom the doctors had examined and often had pre-existing relationships with – were not medically necessary.  Indeed, in order to prove lack of medical necessity for these patients, the government had to engage a medical expert to review the files of the patients in question – information that David Nourian obviously would not have had.  And, even as to physician's assistant Nicolas Aguilar, who apparently neither examined the persons he prescribed for, nor even reviewed their files, there is no evidence that David Nourian knew that Aguilar was going to violate his professional oath by doing so.  *Cf. Ganji*, 880 F.3d at 777-78 (evidence of healthcare fraud insufficient where no evidence that defendant knew that allegedly fraudulently obtained medical care was not medically necessary).

The government's kickback theory fares no better.  With respect to Drs. Benson, Williams, and Taba, there is no evidence that David Nourian even knew of their existence, let alone that they were being paid commissions for the compounded prescriptions they sent to be filled.  More importantly, there is no evidence that David Nourian knew that it was illegal to pay healthcare providers commissions for prescriptions they issued.[8]  Without proof that David Nourian *knew* his conduct to

---

[8] Although David Nourian was a licensed pharmacist, there was no evidence that David Nourian particularly, or pharmacists generally, ever received training on this point.  To charge him with such knowledge based solely on his status as a pharmacist would be impermissible speculation.

be illegal, his convictions on Counts One through Nine cannot stand. *See Nora*, 988

F.3d at 831-34 (reversing convictions on this basis).

        c.      <u>The evidence is insufficient to show that David Nourian had the requisite level of active participation necessary for aiding and abetting the substantive healthcare frauds alleged in Counts Five through Nine. Nor can those counts be sustained under the vicarious-liability theory of *Pinkerton v. United States*.</u>

David Nourian was not involved as a principal in the substantive healthcare-

fraud offenses charged in Counts Five through Nine (he did not have any

involvement in billing either the federal government or BCBS), and the evidence

was not sufficient to sustain his convictions on those counts under an aiding-and-

abetting theory. In this regard, conviction as an aider and abettor requires active

participation in the criminal venture, "which means that the defendant engaged in

some affirmative conduct designed to aid the venture." *United States v. Murray*,

988 F.2d 518, 522 (5th Cir. 1993). This "active participation" requirement is far

from toothless: indeed, this Court has repeatedly reversed aiding-and-abetting

convictions for insufficient evidence based on the government's failure to prove

such active participation.[9]

---

[9] *See, e.g., Lombardi*, 138 F.3d 559, 561-62 (5th Cir. 1998) (evidence insufficient to support conviction for aiding and abetting the use of a juvenile in a drug offense where alleged aider-and-abettor, although involved in drug trafficking activity, ever had anything to do with the juvenile); *United States v. Polk*, 56 F.3d 613, 628-30 (5th Cir. 1995) (evidence insufficient to support two defendants' convictions for aiding and abetting substantive drug transactions; there was no evidence that defendants participated in, or were present at, those transactions, nor was there any evidence that they helped in any other way); *United States v. Martiarena*, 955 F.2d 363, 367 (5th Cir. 1992) (affirming district court's grant of judgment of acquittal to defendant convicted of aiding and abetting her father's failure to file a currency transaction report; the record failed to show that defendant participated in conduct that assisted or rewarded the failure to file);

With respect to Counts Five and Six (involving prescriptions by Dr. Benson) and Counts Seven, Eight, and Nine (involving prescriptions by Dr. Taba), this analysis is extraordinarily easy. There is absolutely no evidence that David Nourian knew (or even knew of the existence of) these two doctors, nor much less that he had anything to do with obtaining, filling, or billing for the prescriptions in question.

Nor can these convictions be sustained under the vicarious-liability theory of *Pinkerton v. United States*, 328 U.S. 640 (1946).[10] As he did below (ROA.2168 n.3), David Nourian preserves for possible further review his contention that *Pinkerton* was wrongly decided because *Pinkerton* is the functional equivalent of the judicial creation of a common-law crime, in violation of the bedrock principle that the definition of crimes is strictly the province of the legislative branch.[11] But besides this, there are other reasons why *Pinkerton* does not save the day for the government.

First, a defendant cannot be vicariously liable for substantive offenses when he is not guilty of the underlying conspiracy; and, as explained in this brief, the

---

*Grimes v. United States*, 379 F.2d 791, 795 (5th Cir. 1967) (evidence insufficient to support defendant's convictions for aiding and abetting the offenses of interstate travel in aid of unlawful activity and use of facilities in interstate commerce to facilitate unlawful activity, because no evidence that defendant counseled or assisted in the conduct underlying those offenses).

[10] The jury was instructed on *Pinkerton*. ROA.1628, 7744.

[11] *See United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32 (1812); *see generally* Michael Manning, Comment, *A Common Law Crime Analysis of* Pinkerton v. United States*: Sixty Years of Impermissible Judicially-Created Criminal Liability*, 67 Mont. L. Rev. 89 (2006).

evidence is insufficient to find David Nourian guilty of the underlying conspiracy. Moreover, even under the *Pinkerton* doctrine, a conspirator is vicariously liable for substantive offenses only where those offenses were done in furtherance of the conspiracy, were within the scope of the unlawful agreement, and were reasonably foreseeable. *See Pinkerton*, 328 U.S. at 647-48. Finally, due process bars conviction for a substantive offense under the *Pinkerton* principle where the relationship between the conspirator in question and the substantive offense is overly attenuated.[12] That is the case here: for the reasons described above, David Nourian's connection to the offenses in question is so attenuated that due process should bar his conviction solely on the basis of *Pinkerton*-type vicarious liability.

This Court should therefore reverse the convictions on these counts and remand for entry of a judgment of acquittal. Furthermore, because of the extremely prejudicial spillover effect of these counts (and the evidence presented in connection

---

[12] *See, e.g., United States v. Castañeda*, 9 F.3d 761, 766 (9th Cir. 1993) (collecting cases recognizing this possibility) & *id.* at 767-68 (finding that due process barred defendant's conviction, under *Pinkerton*, for use or carrying of a firearm in connection with a drug trafficking offense because connection was too attenuated); *see generally* Mark Noferi, *Towards Attenuation: A "New" Due Process Limit on* Pinkerton *Conspiracy Liability*, 33 Am. J. Crim. L. 91 (2006).

Although this Court has not reversed a conviction on this basis, it has at least recognized the possibility, *see United States v. Moreno*, 588 F.2d 490, 493 (5th Cir. 1979) ("Several of our judges have noted their concern that vicarious guilt may have due process limitations.") (citation omitted), as has the Eleventh Circuit relying at least in part on *Moreno*. *See United States v. Alvarez*, 755 F.2d 830, 850 (11th Cir. 1985) ("Furthermore, we are mindful of the potential due process limitations on the *Pinkerton* doctrine in cases involving attenuated relationships between the conspirator and the substantive crime.") (footnote omitted).

therewith), this Court should also vacate David Nourian's convictions on Count One and also Counts Two, Three, and Four.

> d. The evidence is insufficient to support the convictions under Counts Five through Nine because FECA is not a "health care benefit program" as that term is used in 18 U.S.C. § 1347.

Pursuant to Fed. R. App. P. 28(i), David Nourian hereby adopts by reference the portion of co-appellant Christopher Rydberg's opening brief arguing that, as a matter of law, FECA is not a "health care benefit program" as that term is used in 18 U.S.C. § 1347. David Nourian now explains what the consequences of such a holding would be for him particularly. First, the Court should reverse his convictions on Counts Five through Nine for insufficient evidence and remand for entry of judgment of acquittal on those counts, because they depend directly on the status of FECA as a "health care benefit program." Additionally, because this holding would render one of the bases for conspiratorial liability legally unavailable, this Court should vacate David Nourian's conviction on Count One. *See, e.g., United States v. Hanafy*, 124 F. Supp. 2d 1028-30 (N.D. Tex. 2000), *aff'd*, 302 F.3d 485 (5th Cir. 2002). Finally, because of the extremely prejudicial spillover effect of these counts (and the evidence presented in connection therewith), this Court should also vacate David Nourian's convictions on Counts Two, Three, and Four.

> 2. Money laundering conspiracy (Count Ten) and substantive money laundering and aiding and abetting (Counts Eleven through Twelve and Fourteen through Sixteen).

> a. Charges and elements.

Counts Eleven through Twelve and Fourteen through Sixteen of the indictment charged David Nourian and others with substantive concealment-type

money laundering and aiding and abetting in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2;[13] and Count Ten of the indictment charged David Nourian and others with money laundering conspiracy in violation of 18 U.S.C. § 1956(h). ROA.279-282.

Concealment-type money laundering under § 1956(a)(1)(B)(i) requires the government to prove the following elements:  (1) the defendant conducted a "financial transaction," (2) which he knew involved proceeds arising from a specified unlawful activity, (3) with the knowledge that the transaction's design was to conceal or disguise the nature or source of the illegal proceeds.  *See, e.g., United States v. Valdez*, 726 F.3d 684, 689 (5th Cir. 2013).  "To establish the design element, the government must demonstrate that the charged transactions had the purpose, not merely the effect, of making it more difficult for the government to trace and demonstrate the nature of the funds."  *Id.* at 690 (cleaned up; internal quotation marks and citations omitted).  Put another way, the transactions must evince "a specific intent to conceal the nature, location, source or ownership of the funds used."  *Id.*

"To establish conspiracy to commit money laundering, the government must prove (1) that there was an agreement between two or more persons to commit

---

[13] Count Thirteen of the indictment charged another such offense, but David Nourian was not charged in that count.

money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Colorado Cessa*, 785 F.3d 165, 173 (5th Cir. 2015) (internal quotation marks and citations omitted). To support a conviction for conspiracy to commit money laundering, there must be some additional evidence beyond the bare transaction itself to infer specific intent to join a conspiracy to commit financial-transaction money laundering. *See id.* at 178.

In this case, the indictment alleged a dual-object money laundering conspiracy to commit (1) concealment-type money laundering in violation of § 1956(a)(1)(B)(i) and (2) engaging in monetary transactions with criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. § 1957. In such cases, the evidence of the conspiracy will be sufficient if it was sufficient as to ***either*** of its objects. *See United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006).

"The crime of engaging in monetary transactions in property derived from specified unlawful activity in violation of § 1957(a) consists of three elements: (1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *Id.* at 907 (citations omitted).

31

As an initial matter, the "specified unlawful activity" underlying the counts is "healthcare fraud" under 18 U.S.C. § 1347. ROA.279-281. Where there is a failure of proof as to the "specified unlawful activity" allegedly underlying money-laundering counts, the proof on the money-laundering counts is also necessarily insufficient. *See, e.g., Hanafy*, 124 F. Supp. 2d at 1028. Therefore, if this Court finds the evidence insufficient to establish healthcare fraud, the Court should also reverse David Nourian's money-laundering convictions. But there are other reasons why the money-laundering convictions should be reversed for insufficient evidence.

> b.    <u>The evidence was insufficient to sustain David Nourian's money-laundering convictions because there was insufficient evidence that he knew the money in question came from "specified unlawful activity."</u>

Concealment-type money laundering under 18 U.S.C. § 1956 requires the government to prove, beyond a reasonable doubt, that the defendant knew that the financial transaction(s) in question "involved proceeds arising from a specified unlawful activity." *Valdez*, 726 F.3d at 689 (citations omitted). And money laundering under 18 U.S.C. § 1957 requires proof, beyond a reasonable doubt, of "the defendant's knowledge that the property was derived from [specified] unlawful activity." *Fuchs*, 467 F.3d at 907 (citations omitted). The charged specified unlawful activity was "health care fraud." ROA.279-281.

As explained in section I.B.1.b., *supra*, however, there was insufficient evidence that David Nourian knew the compounded prescriptions were fraudulent

32

or intended to perpetrate any fraud with respect to those convictions.   It necessarily follows that that there was also insufficient evidence that he knew that the proceeds from those prescriptions arose from the specified unlawful activity of health care fraud.   Accordingly, this Court should reverse David Nourian's money-laundering convictions.

> c. <u>The evidence was insufficient to sustain David Nourian's money-laundering convictions because there was insufficient evidence that the transactions in question were designed to conceal the origin of the funds involved or that he knew the transactions in question money were designed for that purpose.</u>

As an initial matter, at least the money-laundering convictions in Counts Eleven and Fourteen are unsupported by sufficient evidence of concealment on the part of *anyone*, because they involve transfers of money between accounts held by the *same account holder*.[14]   *See, e.g., Valdez*, 726 F.3d at 690 (transfer of money from defendant's operating account to investment accounts also in defendant's name was insufficient to show concealment-type money laundering); *United States v. Blankenship*, 382 F.3d 1110, 1128-31 (11th Cir. 2004) (evidence of concealment insufficient where money was transferred from an account with defendant's name on it to another account with defendant's name on it).   But there also is insufficient evidence that *David* Nourian knew that any of the transactions in question were

---

[14] Count Eleven involves a transfer of money from one I & F account to another I & F account; Count Fourteen involves a transfer of money from one Ability account to another Ability account.

33

designed to conceal the illicit origin of the funds or that he intended such concealment.

First, and again, as discussed above, there was insufficient evidence that David Nourian knew that the funds in question were the proceeds of healthcare fraud; therefore, there is insufficient evidence that he even believed that there was anything to conceal. In addition to this point, there is insufficient evidence that David Nourian even knew about the chain of transactions constituting the alleged money laundering in this case. Although David Nourian was a signatory on some of the accounts from which transfers were made, there was no evidence that he managed those accounts or generated any of the transfers. And there was certainly no evidence that he willfully joined in the shuffling of money through accounts, let alone that he did so with the intent to conceal where the money came from. Accordingly, this Court should reverse David Nourian's convictions on Counts Eleven through Twelve and Fourteen through Sixteen.

    d.    <u>The evidence was insufficient to sustain David Nourian's substantive money-laundering convictions because there was insufficient evidence of active participation by David Nourian so as to sustain those convictions under an aiding-and-abetting theory. Likewise, those convictions cannot be sustained under the vicarious-liability theory of *Pinkerton v. United States*.</u>

The evidence was unquestionably insufficient to convict David Nourian as a principal in any of the substantive money-laundering counts. Government witness Mark Burrell testified that he could not say that David Nourian conducted any of the

34

charged transactions and that there were some that he knew for sure that David did not conduct (namely, the ones involving accounts as to which David was not a signatory).  ROA.6811-6814, 6817-6820.  Nor had he seen any evidence that David had directed someone else to conduct the transactions.  ROA.6825.

Nor can those convictions be sustained under an aiding-and-abetting theory.  As discussed above, *see* Section I.B.1.c., *supra*, conviction as an aider and abettor requires, among other things, active participation in the criminal venture, "which means that the defendant engaged in some affirmative conduct designed to aid the venture."  *Murray*, 988 F.2d at 522.  The record is devoid of evidence that David Nourian engaged in any affirmative conduct designed to aid the alleged money laundering charged in those counts.  Indeed, the evidence showed nothing more than the fact that David Nourian was a signatory on some of the accounts from which the charged transfers were made; and as to two of those counts (Counts Twelve and Sixteen), the record did not even show that.

Likewise, based on the general principles set out in Section I.B.1.c., *supra*, David Nourian's convictions cannot be sustained on the basis of the vicarious-liability theory of *Pinkerton v. United States*.  First, there is insufficient evidence of David Nourian's guilt of the overarching money-laundering conspiracy that would be the predicate of such vicarious liability.  Nor is there sufficient evidence that David Nourian knew or reasonably foresaw the monetary transfers making up the

substantive money-laundering counts, or that these were within the scope of any agreement he had with other defendants. Finally, application of *Pinkerton* to sustain these convictions would violate due process, because David Nourian is simply too attenuated from these acts, for the reasons described above.

The Court should therefore reverse David Nourian's substantive money-laundering convictions.

3. <u>Conspiracy to defraud the United States by impeding the functions of the IRS in assessing and collecting income taxes (Count Seventeen).</u>

In Count Seventeen, the government charged James Noryian, David Nourian, Christopher Rydberg, and Ali Khavarmanesh with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, by impeding the functions of the IRS in assessing and collecting income taxes from the pharmacies at issue in this case and from the individuals themselves. ROA.283-286. The gist of this charge was that cashier's checks (1) had been purchased by Christopher Rydberg for bogus expenses for the Pharmacies; (2) were used as deductions from taxable income for the Pharmacies, thus fraudulently lowering the tax liability of the Pharmacies and their shareholders; and (3) then were later cancelled out and/or reissued for other purposes. ROA.283-286.

"To convict a defendant of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, the Government is required to prove beyond a reasonable doubt: '(1) an agreement between two or more persons to pursue an unlawful objective; (2)

36

the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.'" *United States v. Green*, 47 F.4th 279, 289 (5th Cir. 2022) (citation omitted). But David Nourian's conviction on this count founders on the second element, because there is insufficient evidence that he knew about the objective of defrauding the government of tax revenue or intended to join a conspiracy to defraud the government of tax revenue.

Government witness Mark Burrell testified that David Nourian did not conduct any of the cashier's check transactions (ROA.6819),[15] and there was no evidence that David Nourian knew that the cashier's checks were being improperly issued, voided, and switched out in this way. To the contrary, at least once, David Nourian told accountant Mohammed Imtiyazuddin, who prepared the allegedly fraudulent tax returns, that some business expenses were not properly categorized as such, thus, increasing tax liability. ROA.6072-6073. This countervailing evidence renders the government's case against David Nourian even weaker. *Cf. Brown*, 186 F.3d at 664 ("We consider 'the countervailing evidence as well as the evidence that supports the verdict' in assessing sufficiency of the evidence.") (citation omitted).

---

[15] Government witness Adam Little, a revenue agent with the IRS, testified that Rydberg appeared to handle the cashier's check transactions. ROA.6942.

For these reasons, this Court should reverse David Nourian's conviction on Count Seventeen.

C.     If the Court reverses some, but not all, of David Nourian's convictions, the Court should also vacate his sentence on the remaining counts and remand for resentencing.

For the foregoing reasons, the Court should reverse all of David Nourian's convictions and remand for entry of a judgment of acquittal.  If, however, the Court should reverse some, but not all of David Nourian's convictions, the Court should vacate his sentence on the remaining counts and remand for resentencing on those counts.

"The burden is on the Government to show a vacated conviction did ***not*** affect sentencing on another count."  *United States v. Martinez*, 531 Fed. Appx. 407, 408 (5th Cir. 2013) (unpublished) (emphasis in original and citing *United States v. Whitfield,* 590 F.3d 325, 366 (5th Cir. 2009)).  "[R]esentencing is warranted if other counts were 'bundled to the reversed counts,' were part of a 'sentencing package,' and all ran concurrently."  *United States v. DeBruhl-Daniels*, 118 F.4th 735, 749 (5th Cir. 2024) (citations omitted).  Here, as in *DeBruhl-Daniels*, "the district court explicitly bundled [the] counts of conviction [under the Guidelines, *see* ROA.8984 (¶¶ 103-105)] and ordered [David Nourian's] sentence on each count to run concurrently [ROA.3149]. . . ."  *Id.*  "The counts are thus sufficiently 'interrelated or independent' to warrant resentencing *in toto*."  *Id.*  (We note also that,

independently of the prison sentence(s) imposed, reversal of some, but not all, convictions may have implications for the restitution and forfeiture components of sentencing.)

II. David Nourian was deprived of a fair trial by the "three monkeys" slide and associated argument used by the government in closing argument, in derogation of the district court's ruling denying a "deliberate ignorance" instruction.

A.   Standard of review.

"[This Court] review[s] assertions of prosecutorial misconduct in two steps." *United States v. McCann*, 613 F.3d 486, 494 (5th Cir. 2010) (citation omitted). This Court reviews the propriety of the government's conduct *de novo*, but "review[s] the question of whether the defendant's substantial rights were affected under the abuse of discretion standard." *Id.* (citations omitted). "Th[e abuse-of-discretion] standard does not preclude an appellate court's correction of a district court's legal or factual error. A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Warner v. Talos ERT, L.L.C.*, 133 F.4th 412, 428 n.12 (5th Cir. 2025) (internal quotation marks and citations omitted). The phrase "abuse of discretion" "sounds worse than it really is and is not intended as a criticism of the district court." *City of El Paso, Tex. v. City of Socorro, Tex.*, 917 F.2d 7, 9 n.3 (5th Cir. 1990) (internal quotation marks and citations omitted). "It merely reflects a difference of opinion . . . ." *Id.*

B.    Factual background.

At trial, government counsel requested a "deliberate ignorance" instruction,[16] but the district court, after a colloquy with the parties in which it found that there was no factual predicate for such an instruction (ROA.7684-7690), properly refused that instruction.  ROA.7690.

Notwithstanding the district court's ruling, the government, during its rebuttal closing argument, published a slide for the jury that included three monkey emojis depicting the familiar "See no evil, hear no evil, speak no evil" poses.  In connection with this slide, the government made the following argument:

> But part of the way to think about this is with David Nourian and James Noryian. ***They really want you to think, their lawyers want you to think that the brother of James Noryian [David Nourian], the pharmacist, Christopher Rydberg, the loyal stepson, they were just on an island of purity that is surrounded by a sea corruption. They didn't see anything. They didn't know anything. They didn't talk to anyone about anything.*** And I know this might strike some as slightly cheesy, but it is late in the day and I perhaps lighten the mood a little bit before we go into some more of this. But when I was thinking about their defenses, this was truly first thing that jumped to my mind. . . .

---

[16] The government's proposed instruction read as follows:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself or herself to the existence of a fact.

ROA.1322.

41

> Again, I know this is cheesy. I am not trying to make light of a very serious situation. ***But the first thing I could think about when I saw the defenses*** that were coming from the owner of two of the pharmacy [*sic*], a pharmacist, someone who his brother trusted [referring to David Nourian], may not have thought he was smart enough to run the entire operation but certainly parts of the operation, ***I just thought about this idea that you are closing your eyes, closing ears, closing your mouth. That is just not believable. And the same applies to Christopher Rydberg.***

ROA.7933-7934 (emphasis added).

Shortly thereafter, immediately upon the conclusion of the government's argument, but before the jury was excused to deliberate, David Nourian and Christopher Rydberg objected to the slide and the government's argument. ROA.7948-7949. After hearing a response from the government, the district court asked why the government's actions were not contrary to the court's ruling that it would not give a deliberate-ignorance instruction. ROA.7949-7950. The district court concluded that the government's actions "crossed the line" because they "crossed the Court's ruling and decision of its instructions." ROA.7950. The district court found that "the essence of what [the government] did ran afoul of what the Court viewed and requested of deliberate [ignorance], and the Court said it was not going to do that." ROA.7951. The district court then said that it was "going to instruct the jury [who were still in the courtroom] to disregard that portion of the government's argument." *Id.* In the event, however, the district court did not give this instruction; rather, it simply instructed the jury "to completely disregard th[e

42

"three monkeys"] slide and not take it into consideration during the course of your deliberations," without any mention of the argument accompanying that slide. ROA.7952.

In a timely motion for new trial, David Nourian asserted that the government's "three monkeys" slide and argument warranted a new trial. ROA.2180-2184 (motion); ROA.2248-2250 (reply). The district court adhered to its prior view that these were improper, but held that they did not affect David Nourian's substantial rights so as to justify a new trial. ROA.2961-2968.

C.     <u>This Court should reverse David Nourian's convictions and remand for a new trial, because the "three monkeys" slide and argument deprived him of a fair trial.</u>

As noted above, the district court had, before closing argument, ruled that it was not going to instruct the jury on deliberate ignorance. ROA.7690. But the phrase "See no evil, hear no evil, speak no evil," and the associated image of three monkeys covering eyes, ears, and mouth respectively, have come, in popular culture, to stand for the concepts of willful blindness or deliberate ignorance. As Wikipedia explains, "[t]he proverb and the image are often used to refer to a lack of moral responsibility on the part of people who refuse to acknowledge impropriety, looking the other way, or feigning ignorance."[17]

---

[17] "Three wise monkeys," Wikipedia, https://en.wikipedia.org/wiki/Three_wise_monkeys (note omitted) (last visited Sept. 28, 2025).

It is axiomatic that "[i]n arguing the law to the jury, counsel is confined to principles that [have been] incorporated and charged to the jury." *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983) (citation omitted).  The district court thus correctly found that the government's conduct was improper, because, as the district court found, "the essence of what [the government] did was something that ran afoul of the court's prior decision to not include the Government's requested deliberate ignorance instruction in the jury charge."  ROA.2961 (cleaned up; record citation omitted).  Particularly, said the district court, the "three monkeys" slide and argument "ran afoul of the court's prior ruling ***to the extent that it came dangerously close to suggesting or implying*** that Defendants were deliberately hiding their heads in the sand to avoid knowledge of the illegal conduct," ROA.2961 (emphasis in original); and the slide and argument were "also improper to the same extent . . . ."  ROA.2961.  This Court has previously found prosecutorial tactics that violate prior court rulings to constitute improper prosecutorial conduct.  *See, e.g., United States v. Flores-Chapa*, 48 F.3d 156, 159-61 (5th Cir. 1995) (finding reversible plain error in government's use, in closing argument, of evidence that the district court had previously excluded); *United States v. Lopez-Benitez*, No. 98-50936, 1999 WL 1067557, at *4-*7 (5th Cir. Oct. 15, 1999) (unpublished) (reversing conviction where prosecution questioned defendant about his post-arrest silence in violation of the district court's *in limine* order prohibiting same).

44

Moreover (and contrary to the district court's determination), the government's improper conduct affected David Nourian's substantial rights. "To determine whether the argument affected the defendant's substantial rights, [this Court] examine[s] (1) the magnitude of the [improper argument's] prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995) (citations omitted).

Take first the magnitude of the prejudice occasioned by the government's improper insertion of the concept of deliberate ignorance into this case. Throughout the trial, David Nourian's defense was principally to attempt to demonstrate that he lacked the knowledge and intent necessary for guilt of the charged offenses. The centrality of lack of knowledge/intent to David Nourian's defense was cast into sharp relief in his closing (ROA.7817-7852), which was replete with arguments that he did not know of, or was not involved in, illegal conduct.[18] And, indeed, in closing,

---

[18] ROA.7825-7826 (". . . James kept David on the outside."); ROA.7826 (". . . David wasn't involved and [ ] he didn't know."); ROA.7826 (no text messages "referenced or implied in any[ ]way that David was on the inside and knew what James was doing."); ROA.7836 (arguing that money-laundering counts could not stand "if David was not involved and didn't know about the healthcare fraud, just like Mr. Jossa said"); ROA. 7840 (arguing that there was "not a single text message or email where David Nourian instructed, heard about, or was involved in any way in the cashier's check swap"); ROA.7841 (David Nourian had "no involvement in any wrong[]doing"); ROA.7842 (David Nourian "wasn't involved"); ROA.7842 (David Nourian "wasn't involved in the kickback scheme"); ROA.7843 (David "didn't know about any of these paybacks to doctors, wasn't involved according to Mr. Jossa . . . ."); ROA.7844 ("There is no evidence at all that David knew the proceeds of these transactions . . . [were] from criminal activity."); ROA.7844 (". . . he didn't know about unlawful activity."); ROA.7844-7845 ("There is no evidence at all that David

45

David Nourian's counsel took pains in closing to try to prevent the jury from convicting on an impermissible deliberate ignorance/willful blindness theory of liability (or even worse, an impermissible "should have known" theory of liability); particularly, counsel argued:

> You may think David should have asked more questions. Maybe he should have asked more questions of his brother about what is going on over there. What are you doing? What are you up to? You can honestly think that, but that is not what he is charged with doing wrong.

ROA.7848.

As this Court has noted, the deliberate-ignorance theory "poses the risk that a jury might convict the defendant on a lesser negligence standard — the defendant **should** have been aware of the illegal conduct." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1991) (citations omitted; emphasis in original). As such, the government's improper use of the "three monkeys" slide and accompanying argument dealt a crippling blow to David Nourian's central defense of lack of knowledge/intent. Moreover, inasmuch as the improper argument occurred in the rebuttal portion of the government's argument, the defense had no opportunity to make any counter-argument. Given the centrality of the issue of David Nourian's knowledge and intent to this case, the magnitude-of-prejudice factor cuts in favor of reversal of David Nourian's convictions. *Cf., e.g., United*

---

Nourian was involved in that cashier's check exchange at all."); ROA.7849 ( " . . . whatever was going on, James Noryian knew about it, but David did not know about it . . . .").

*States v. Aguilar*, 645 F.3d 319, 325 (5th Cir. 2011) ("Because the agents' testimony and their credibility were so critical, the prosecutor's improper bolstering of their credibility renders the prejudice high on the magnitude scale.").

With respect to the second factor – "the effect of any cautionary instructions given," *id.* – this factor does not, under the circumstances of this case, insulate David Nourian's convictions from reversal. As an initial matter, this Court has rightly observed that "a sustained objection followed by a curative instruction is not a panacea." *United States v. Moreno*, 185 F.3d 465, 474 (5th Cir. 1999). This is precisely such a case.

In this regard, it is significant that there was a big difference between how the district court **said** it was going to instruct the jury during the bench conference and how the district court **actually instructed** the jury. At the bench, the district court said that it was "going to instruct the jury [who were still in the courtroom] to disregard that portion of the government's argument." ROA.7951. But when the bench conference ended, the district court did not give this instruction; rather, it simply instructed the jury "to completely disregard th[e "three monkeys"] slide and not take it into consideration during the course of your deliberations," without any mention of the argument accompanying that slide. ROA.7952.

The district court's cautionary instruction was thus incomplete because it told the jury only to disregard the "three monkeys" slide and not the equally damaging

argument that also invoked the notion of deliberate ignorance/willful blindness. Even if *some* cautionary instruction could have unrung the terribly prejudicial bell of the government's conduct, this instruction was inadequate to the task.[19]

Finally, the strength of the evidence of David Nourian's guilt was far from overwhelming. Indeed, we have argued above that the evidence was constitutionally insufficient to support his convictions. But even if the Court does not believe the evidence to be constitutionally insufficient, there is enough question about what David Nourian knew and did not know, that the government's conduct should be held to warrant reversal of David Nourian's convictions. Accordingly, the Court should vacate his convictions and remand for a new trial.

---

[19] In its order denying David Nourian's motion for a new trial, the district court, in finding no effect on David Nourian's substantial rights from the government's conduct, also pointed to its general instructions on knowledge, as well as the general instructions that jurors were required to follow the law as given to it by the court and that attorney arguments are not evidence. ROA.2967. But, as this Court has observed, "general instructions only moderately reduce the degree of prejudice of highly improper remarks." *Aguilar*, 645 F.3d at 325 (footnote omitted). Moreover, nothing in the district court's instructions prohibited, with sufficient specificity, a conviction on the basis of imputed knowledge due to deliberate ignorance/willful blindness.

III.   The district court reversibly erred in applying a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) for an offense involving more than 10 victims.

A.     Standard of review.

"[This Court] review[s] a district court's interpretation of the Sentencing Guidelines *de novo*." *United States v. Vargas*, 74 F.4th 673, 679 (5th Cir. 2023) (*en banc*) (citation omitted), *cert. denied*, 144 S. Ct. 828 (2024).

B.     Factual background.

After the jury returned its verdict, the district court ordered the Probation Office to prepare a presentence report ("PSR"). ROA.1637, 7983. In calculating David Nourian's Guidelines, the PSR applied a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) on the ground that the offenses involved "more than 10 victims." ROA.8985 (¶ 106). Conceding that the governmental entities in this case did not qualify as "victims," the PSR nevertheless individually counted the claimants and/or patients in this case as "victims" under the authority of Application Note 4(E) to USSG § 2B1.1, which says that "[f]or purposes of subsection (b)(2), in a case involving means of identification[,] 'victim' means . . . any individual whose means of identification was used unlawfully or without authority." ROA.8985 (¶ 106).

David Nourian objected to this enhancement, arguing that because the commentary of Application Note 4(E) conflicted with the text of the Guideline itself, the Application Note should not be followed. ROA.9014-9015. The district court,

however, overruled that objection on the ground that "the Fifth Circuit previously approved application of this victim enhancement under similar circumstances in: *United States v. Barson*, 845 F.3d 159, 167 (5th Cir. 2016); *United States v. Kalu,* 936 F.3d 678, 683 (5th Cir. 2019); and *United States v. Ainabe*, 938 F.3d 685, 689 (5th Cir. 2019)." ROA.10678; *see also* ROA.8002-8003.

Without this enhancement, David Nourian would have been subject to a Guideline imprisonment range of 235 to 293 months (total offense level of 38, Criminal History Category of I). With the enhancement, David Nourian was subject to a Guideline imprisonment range of 292 to 365 months, and that was the Guideline range applied by the district court. ROA.8007, 8063. The district court, however, varied downward from that range to a prison sentence of 210 months. ROA.8091-8092.

C. The district court misapplied the Guidelines by applying a two-level enhancement for 10 or more victims under USSG § 2B1.1(b)(2)(A)(i) because the Guideline commentary supporting that enhancement conflicts with the text of the Guideline itself and thus should be disregarded.

There is currently a division of authority as to the standard for determining when Guideline commentary is inconsistent with the Guideline text. For many years, that inquiry was unquestionably governed by the standard set out in *Stinson v. United States*, 508 U.S. 36 (1993). Some courts "contend that the Supreme Court replaced *Stinson*'s highly deferential standard with a less deferential one in *Kisor v.*

50

*Wilkie*, [588 U.S. 558] (2019)." *Vargas*, 74 F.4th at 678 (footnote with citations omitted). "Others disagree and continue to apply *Stinson*." *Id.* (footnote with citations omitted). In *Vargas*, this Court, sitting *en banc*, placed itself in the latter (*Stinson*) camp. *See Vargas*, 74 F.4th at 678, 680-83. In light of the division of authority on this point, David Nourian preserves for possible further review his contention that challenges of this sort should be governed by *Kisor*, not *Stinson*; but he acknowledges that that point is foreclosed.

Not foreclosed, however, is David Nourian's contention that, even under the standard of *Stinson*, Application Note 4(E) to USSG § 2B1.1 is inconsistent with the text of Guideline § 2B1.1(b)(2)(A)(i). Under *Stinson*, commentary that does not violate the Constitution or a federal statute should be disregarded where it is "plainly erroneous or inconsistent" with the Guideline itself. *See Stinson*, 508 U.S. at 38. Because the Guideline itself refers only to "victims," the Guideline commentary's idiosyncratic inclusion of individual patients as "victims" under the Guideline commentary is an impermissible expansion of the Guideline itself even under the test of *Stinson*.

As Judge Jones trenchantly noted in her separate opinion in *Barson*, "th[is] [commentary] interpretation is inconsistent with the plain meaning of the term 'victim,'" *Barson*, 845 F.3d at 169 (Jones, J., concurring in part and dissenting in part), and hence "is plainly erroneous." *Id.; see also id.* at 168-69. She wrote:

51

"Applying the application of the term 'victims' here verges on the Orwellian." *Id.* at 169. She also opined that this interpretation "is inconsistent with the Guideline's definition of victims." *Id.* at 169; *see also id.* at 169-70; *see also Ainabe*, 938 F.3d at 694 (Dennis, J., specially concurring) (agreeing with Judge Jones on this point).

And, with all due respect, the district court erred by overruling David Nourian's objection on this point as foreclosed by *Barson*, *Kalu*, and *Ainabe*. ROA.10678. In *Barson*, the majority – unlike Judge Jones – did ***not*** address a *Stinson* challenge to the Application Note; they merely applied the Application Note as written, with little discussion. *See Barson*, 845 F.3d at 167. And *Kalu* and *Ainabe* did not do so either; indeed, they did nothing more than rotely apply *Barson* as binding precedent. *See Kalu*, 936 F.3d at 683; *Ainabe,* 938 F.3d at 689. Because none of these cases addressed a *Stinson* challenge to Application Note 4(E), they do not foreclose such a challenge in this case. *See Thomas v. Texas Dep't of Criminal Justice*, 297 F.3d 361, 370 n.11 (5th Cir. 2002) ("Where an opinion fails to address a question squarely, we will not treat it as binding precedent.") (citations omitted); *see also, e.g., United States v. Kirilyuk,* 29 F.4th 1128, 1134-35 (9th Cir. 2022) (finding that defendant's *Stinson* challenge was not foreclosed by prior decisions construing the meaning of, and applying, the Guideline commentary in question without discussing *Stinson*).

In sum, because "'*Stinson* requires that commentary interpret the guidelines, not contradict or add to them,'" *Kirilyuk*, 29 F.4th at 1138 (footnote omitted) (quoting *United States v. Riccardi*, 989 F.3d 476, 493 (6th Cir. 2021) (Nalbandian, J., concurring)), Application Note 4(E) is void, and this Court should disregard the commentary's reference to "intended loss" and find the § 2B1.1(b)(2)(A)(i) enhancement in this case erroneous.

D.　　<u>The government cannot carry its "heavy burden" of showing this Guideline application error to be harmless because it cannot "convincingly demonstrate" that the district court would have imposed the same sentence even in the absence of the error.</u>

Even though the Sentencing Guidelines are advisory, "the Supreme Court has instructed that, 'as a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark' in every case." *United States v. Ibarra-Luna*, 628 F.3d 712, 717 (5th Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). This means that "a district court should begin all sentencing proceedings by **correctly** calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49 (emphasis added; citation in original). Improperly calculating the Guidelines range is a "significant procedural error." *Id.* at 51.

"As a result, an incorrect Guidelines calculation will usually invalidate the sentence, even when the district court chose to impose a sentence outside the Guidelines range." *Ibarra-Luna*, 628 F.3d at 717. In order to prove that a Guideline

calculation is harmless, the government has the "burden to convincingly demonstrate that the court would have imposed the very same sentence if it had not made an erroneous calculation." *Id.* at 719. In *Ibarra-Luna*, this Court described the burden of proving harmlessness variously as a "high hurdle," *id.* at 714, a "heavy burden," *id.* at 717-18 (footnote omitted), and a "difficult burden." *Id.* at 718.

As an initial matter, the fact that the district court downwardly varied to a 210-month sentence does not, *ipso facto*, render the Guideline application error here harmless. *See, e.g., United States v. Roussel*, 705 F.3d 184, 202-03 (5th Cir. 2013); *United States v. Waskom*, 179 F.3d 303, 312 (5th Cir. 1999). This is so because

> [e]ven when the district court ultimately decides to impose a sentence outside the Guidelines range, an error in its Guidelines calculation may still taint the non-Guidelines sentence. For instance, the district court might settle upon a particular non-Guidelines sentence by doubling the maximum Guidelines range, or by starting with the Guidelines range and adding or subtracting a fixed number of years. In such cases, it may be clear that the district court's reasons for rejecting a sentence in the Guidelines range are unaffected by the error, but the error nevertheless is not harmless because the district court would not have imposed the very same sentence.

*Ibarra-Luna*, 628 F.3d at 718.

To be sure, after imposing its prison sentence, the district court did say, "Now, let me move on to a few other things -- and oh, by the way, if the Court has made any mistake with respect to the calculation or determination of the advisory guidelines, regardless of the objections that the defendant made to the presentence report, it would impose the same sentence, because as I stated before, there's several

54

categories of cases whereby the guidelines, frankly speaking, can be excessive." ROA.8092. But, as this Court has repeatedly held, "it is not enough for the district court to say the same sentence would have been imposed but for the error. The government must point to evidence in the record that convincingly demonstrates the district court would impose the *same* sentence for the *same* reasons." *United States v. Ritchey*, 117 F.4th 762, 767-68 (5th Cir. 2024) (cleaned up; emphasis in original; citations omitted).

But, here, the district court did not explain why it selected a sentence of 210 months, of all the many options available to it; and, as this Court has said, "[t]he burden of showing that a particular sentence was not derivative of the Guideline calculation is a difficult burden if the district court fails to indicate why it selected a sentence of a particular length." *Ibarra-Luna*, 628 F.3d at 718. Moreover, there were affirmative indications that the district court started with the erroneous Guideline range of 292 to 365 months and then simply applied a "discount" to that range to account for the circumstances warranting a variance in David Nourian's case. After announcing the 210-month prison sentence, the district court said the following:

> Now, I've heard a gasp and other things, this [sentence] is substantially less than 24 years and four months [*i.e.*, 292 months, the low end of the erroneous Guideline range]. And the top of that range of the guidelines is 30 years and five months [*i.e.*, 365 months]. There's a substantial variance. I realize the defense believes there should be more, the government prob -- should be more of a variance, and the

55

government probably does not think there should be this level of variance.

ROA.8091.

It is also significant that 210 months is the exact bottom of the Guideline range (210 to 262 months) produced by a three-level reduction of the Guideline range found by the Court. The fact that the district court selected a number of months that did not represent an even number of years, but rather was the bottom end of another Guideline range strongly suggests that the Guidelines had some influence on the district court's decision.

Finally, it should be noted that the difference between the incorrect Guideline range (292 to 365 months) and the correct Guideline range (235-293 months) is considerable – at least 63 months, or more than five years. It is hard to believe that a district court would not be swayed by such a large differential when crafting its sentence.

For all these reasons, the district court's error in applying the two-level enhancement of USSG § 2B1.1(b)(2)(A)(i) was not harmless. Accordingly, this Court should vacate David Nourian's sentence and remand for resentencing.

IV. The district court reversibly erred by relying on David Nourian's perceived lack of remorse in sentencing him.

A. Standard of review.

This Court has treated a challenge of this type as a challenge to the substantive reasonableness of the sentence imposed, which is reviewed "'under an abuse-of-discretion standard.'" *United States v. Saldaña Rodriguez*, 136 F.4th 258, 269 (5th Cir.) (citation omitted), *cert. denied*, 145 S. Ct. 2861 (2025).[20] A sentence overcomes the presumption of reasonableness and is substantively unreasonable if it "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *Id.* (internal quotation marks and citations omitted).

B. Factual background.

After hearing from counsel and David Nourian, the district court began explaining the reasons for the sentence it was about to impose. It referenced the fact that it intended to vary downward based upon David Nourian's age and his family

---

[20] A defendant preserves the right to make an appellate challenge to the substantive reasonableness of his sentence by asking for a specific, lower sentence than that ultimately imposed by the district court. *See Holguin-Hernandez v. United States*, 589 U.S. 169, 171, 173-75 (2020); *see also, e.g., Saldaña Rodriguez*, 136 F.4th at 269 (noting, in a case raising a similar challenge to the one raised here that "[t]he parties agree that Martinez-Montelongo preserved his sentencing challenge by seeking a below-Guidelines sentence before the district court"). David Nourian did that here by requesting a sentence of three to five years' imprisonment (ROA.8054), well below the 210-month prison sentence ultimately imposed.

ties and responsibilities, although it would not do so to the extent requested by the defense, due to the serious nature of, and high loss amount associated with, the offenses of conviction. ROA.8081-8082, 8084-8085, 8087-8089. Then, right before pronouncing the 210-month prison sentence, the district court made the following comments:

> And while the Court believes that Mr. Dehshid Nourian has learned his lesson, he did not say he was sorry, he did not say he learned his lesson, but the Court has tried and sentenced a number of individuals in the 26-plus years it's been here. The Court has a pretty good feel when someone is sorry. And the reason, frankly speaking, but I believe he did not say he was sorry to the Court because he believes that that would be an admission of guilt, and he doesn't want to do anything to hurt his chances on appeal.
>
> I like to speak frankly, so I'll just say, if the appellate court does not like what I say, then they can do what they need to do to correct. But that's been my experience in the 26 years plus. I think he also realizes now the effect that it has on his family, and frankly, the effect that it has on him.

ROA.8090.

C.   <u>The district court reversibly erred in relying on David Nourian's perceived lack of remorse in sentencing him.</u>

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. A criminal defendant retains his privilege against self-incrimination at sentencing. *See Mitchell v. United States*, 526 U.S. 314, 325-27 (1999).

Over 50 years ago, this Court held that it violates the Fifth Amendment privilege against self-incrimination for a sentencing court to infer a lack of remorse from the silence of a defendant about his guilt of the offense of which he was convicted after a not-guilty plea and then to take that perceived lack of remorse into account at sentencing. *See United States v. Laca*, 499 F.2d 922, 927-28 (5th Cir. 1974). In that case, "[t]he sentencing court stated:

> 'This is a very serious offense with very aggravated circumstances. You jeopardized not only your lives, but the lives of these officers. This was in a regular gangster style that this was put on. None of you have shown any inclination toward repentance or trying to cooperate with the authorities to clear up any of these matters.'
>
> '. . . The attorneys can file motions for reduction and if your attitude changes and if you try to clear up these matters the Court can re-consider, but at this time I have no intention of re-considering this sentence because as I said, it is very aggravated and there is no showing of repentance on the part of any of you. It is an organized effort on your part to disobey the law in a very aggravated way.'

*Laca*, 499 F.2d at 927 (ellipsis in original).

This Court held that "[t]he above quotation clearly reflect[ed] that the court based the sentences in part on the fact that the defendants had not shown 'any inclination towards repentance,'" *id.*; and "'[r]epentance' use in the context of these comments cannot be read in any way but to mean confession." *Id.* Thus, said the Court, "[i]t is clear that the court took into account in sentencing that these defendants had pleaded not guilty, were convicted, and still refused to confess or repent of their crimes." *Id.*

59

This Court further held that, "by opining that these defendants had not shown an inclination towards repentance, the [sentencing] court erred by predicating the length of these sentences on whether the defendants had confessed their crimes. This conditioning of sentences on defendants' confessions violated their right to avoid self-incrimination under the Fifth Amendment." *Id.* The Court thus vacated the defendants' sentences and remanded for resentencing.

The district court here committed the same error as in *Laca*: that is, it factored into David Nourian's sentence the fact that he "did not say he was sorry, he did not say he learned his lesson," ROA.8090, which, as a practical matter could only have been accomplished by waiving his Fifth Amendment privilege and admitting guilt. And, significantly, the district court itself realized that what it was saying might be problematic. After commenting on David Nourian's perceived lack of remorse, the district court added this: "I like to speak frankly, so I'll just say, if the appellate court does not like what I say, then they can do what they need to do to correct." ROA.8090.

On this record, it is clear that, in sentencing David Nourian, the district court "g[ave] significant weight to an irrelevant or improper factor," and, as a consequence, committed "a clear error of judgment in balancing the sentencing factors." *Saldaña Rodriguez*, 136 F.4th at 269 (internal quotation marks and citations omitted). First, empirically speaking, a 2014 survey of federal district

judges indicated that "genuine remorse" was the characteristic judges were most impressed by in a defendant's sentencing allocution. *See* Mark W. Bennett & Ira P. Robbins, *Last Words: A Survey and Analysis of Federal Judges' Views on Allocution in Sentencing* [hereinafter "*Last Words*"], 65 Ala. L. Rev. 735, 752 (2014).[21]    "Given the importance that judges assign to sincerity and genuine remorse," *id.* at 770 (footnote omitted), it stands to reason that a lack of sincere or genuine remorse would be a significant negative factor at sentencing.

The sentencing in this case bears out that proposition. In the process of pronouncing sentence, the district court started by saying that it intended to vary downward from the Guideline range based upon David Nourian's age and his family ties and responsibilities. ROA.8081-8082. The district court stated, however, that it would not vary downward to the extent requested by the defense. ROA.8081. In support of this assertion, the district court cited the serious nature of, and high loss amount associated with, the offenses of conviction. ROA.8081, 8085, 8087. Then the district court cited what it obviously viewed as another aggravating factor, namely, David Nourian's supposed lack of remorse, which the district court inferred

---

[21] Despite the importance judges assign to this factor, studies show that judges may not be as adept at determining the sincerity or genuineness of a defendant's remorse as they believe, *see Last Words*, 65 Ala. L. Rev. at 770; and, "if judges cannot accurately determine general remorse in allocution, how can they properly weigh it in sentencing?" *Id.* at 770-71.

from David Nourian's refusal to confess his guilt of the crimes of which he was convicted. ROA.8090.

The district court's consideration of this improper factor warrants resentencing. In this respect, this case is like this Court's *en banc* decision in *United States v. Escalante-Reyes*, 689 F.3d 415 (5th Cir. 2012) (*en banc*). In *Escalante-Reyes*, the defendant contended that the district court had committed reversible plain error by basing his sentence, at least in part, on his need for anger management – in violation of *Tapia v. United States*, 564 U.S. 319 (2011), which held, as a matter of statutory interpretation, that sentences could not be imposed or lengthened in order to promote rehabilitation.

As relevant here, this Court held that this error affected the defendant's substantial rights, given the district court's emphasis on the need for the defendant to undergo treatment for anger management. *See Escalante-Reyes*, 689 F.3d at 424-25. Notably, in *Escalante-Reyes*, as here, the district court had actually imposed a sentence below the Guideline range it found applicable. *See id.* at 425. Nevertheless, the Court found that "the court's mercy was . . . 'tempered' by the desire to have [the defendant] receive anger management training." *Id.*

The same is true here. Even though the district court varied downward to a 210-month prison sentence, the record indicates that the district court's clemency was tempered by its perception that David Nourian was not remorseful for his crimes

– a perception improperly derived from David Nourian's failure to confess guilt for those crimes. Accordingly, this Court should vacate David Nourian's sentence and remand for resentencing.

V.    The district court reversibly erred by ordering forfeiture of the entirety of the *4516 brokerage account because the government failed to prove that the account "facilitate" any money-laundering offense by David Nourian.

A.    Standard of review.

This Court "review[s] the district court's legal conclusions as to the propriety of a forfeiture order *de novo*, the district court's findings of facts under the clearly erroneous standard, and 'the question of whether those facts constitute legally proper forfeiture *de novo*.'" *United States v. Dennis*, 41 F.4th 732, 745-46 (5th Cir. 2022) (footnote with citation omitted).

B.    Factual background.

The superseding indictment gave notice of forfeiture of property (ROA.287-289), including, as relevant here, "any property real or personal involved in [the charged money-laundering offenses] and any property traceable to [those offenses]." ROA.287.  The basis for this forfeiture was alleged to be 18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461(c).  ROA.287.

In a post-trial motion for a preliminary order of forfeiture (ROA.1722-1757), the government asked for forfeiture of the funds contained in TD Ameritrade (later Charles Schwab) brokerage account number ending in 4516 (hereinafter "the *4516 account"), which account was in the name of David Nourian and his ex-wife, Larisa Nourian.  ROA.1753.  Although none of the  substantive money-laundering charges

64

in Counts Eleven through Sixteen were tied to this account, the government alleged that the account was "involved in" the money-laundering conspiracy charged in Count Ten, and that, under a commingling theory, the forfeiture of the *4516 account should encompass all of the funds in the account, not just those that constituted proceeds of the charged specified unlawful activity.  ROA.1751-1753.

In response, David Nourian contended that the *4516 account's 7,000 shares of Alon USA Energy Inc. Com stock[22] and 4,000 shares of Twitter stock – purchased before the criminal activity alleged in this case – should not be included in the forfeiture in this case.  ROA.2050-2053.  (It was later acknowledged that the number of Alon shares should be only 6,000, not 7,000.  ROA.2138.)  He calculated that the forfeiture amount should be reduced by the amounts later gleaned from the sale of that Alon and Twitter stock, for a total reduction of forfeiture of $402,831.89.  ROA.13641-13642 (proposed findings 15, 17, and 19).

The government's motion was referred to the magistrate judge for findings, conclusions, and a recommended disposition.  As relevant here, the magistrate judge rejected David Nourian's argument about the Alon and Twitter stock, finding that, because of commingling of proceeds and non-proceeds in the *4516 account, that account was forfeitable in its entirety.  ROA.2900-2901.

---

[22] Although Alon was acquired by Delek US Holdings Inc. in 2017 (ROA.2050), this stock will be referred to as "the Alon stock" in this brief.

David Nourian objected to the recommended inclusion of the Alon/Twitter stock in the forfeiture amount (ROA.2920-2923), but the district court overruled the objection (ROA.3015) and entered a preliminary order of forfeiture including the entirety of the *4516 account. ROA.3012-3017; *see also* ROA.3160-3166 (amended preliminary order of forfeiture). At sentencing, David Nourian renewed this objection (ROA.8056-8060), but the district court adhered to its previous ruling and orally made the preliminary order of forfeiture a final order of forfeiture and part of David Nourian's sentence. ROA.8098. Consistently therewith, the forfeiture was incorporated into the written judgment of conviction and sentence (ROA.3156), and a written final order of forfeiture was entered. ROA.3178-3180.

C.   <u>The district court erred in ordering forfeited the portion of the *4516 account corresponding to the Alon and Twitter stock acquired pre-offense.</u>

As noted, the government's legal basis for forfeiture of the Alon and Twitter stock was under 18 U.S.C. § 982, which, in relevant part, provides:

> The court, in imposing sentence, on a person convicted of any offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

18 U.S.C. § 982(a)(1). The government contended that the *4516 account was "involved in" the § 1956 conspiracy charged in Count Ten of the superseding

66

indictment, and was forfeitable in its entirety because that account commingled both unlawfully obtained funds and lawfully obtained funds.

"Property is 'involved' with money laundering if it is used to 'facilitate' the laundering." *United States v. Real Property Located at 1407 North Collins Street, Arlington, Texas*, 901 F.3d 268, 274 (5th Cir. 2018) (citations omitted). "Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *Id.* (internal quotation marks and citations omitted). Importantly, "merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture" in its entirety. *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997). Rather, "untainted funds are forfeitable [only] if a defendant commingled them with tainted funds to disguise the nature and source of his scheme." *1407 North Collins*, 901 F.3d at 275 (citing *Tencer*, 107 F.3d at 1134-35; internal quotation marks omitted). As with other statutorily prescribed forfeitures, the government has the burden of making this showing by a preponderance of the evidence. *See, e.g., United States v. Colorado Cessa*, 872 F.3d 267, 273 (5th Cir. 2017).

As an initial matter, neither the magistrate judge in her recommendation, nor the district court in its preliminary order of forfeiture, ever made a specific finding that David Nourian commingled tainted funds with untainted funds in the*4516 account for the purpose of disguising the nature and source of the tainted funds. *See*

ROA.2900-2901 (portion of magistrate judge's recommendation dealing with this issue); ROA.3163-3164 (portion of amended preliminary order dealing with this issue).  To the contrary, both the magistrate judge and the district court at times seemed to indicate that mere commingling was enough for forfeiture of the whole account, which is clearly contrary to this Court's law.[23]

In any event, however, even if such a finding had been made, it would have been wrong because there was no evidence that David Nourian's depositing funds into the *4516 account was done for the purpose of disguising the nature and source of those funds; and, in fact, there was countervailing evidence that the district court did not acknowledge.  First, the *4516 account was opened by David Nourian and his then-wife Larisa Nourian in *2002* – long before any of the alleged criminal activity in this case.  *See* Gov't Exh. 596, at 1-2.  Furthermore, there was a consistent history of legitimate trading on that brokerage account.  *See* Gov't Exh. 596.  Moreover, the allegedly tainted money transferred into the *4516 account came from another account in David Nourian's name (Wells Fargo *6032), and this Court has

---

[23] For example, the magistrate judge wrote:

> The Government . . . argues that the Alon and Twitter stocks . . . are subject to forfeiture . . . because the funds in the brokerage account, even non-fraud amounts, were commingled and, thus, were involved in the grander money laundering scheme.  The Court agrees.

ROA.2900 (record citations omitted).  And the district court noted that this Court had rejected arguments like David Nourian's "because there was evidence of commingling."  ROA.3163 (citations omitted).

held that the mere act of transferring money between accounts both of which are in one's own, true name is insufficient evidence of concealment.[24] *See Valdez,* 726 F.3d at 690.

In fact, the record shows nothing more than the fact that David Nourian chose to put the money in a long-held brokerage account because money must be put **somewhere**. And, at least at to some of the funds deposited therein, the evidence showed that David Nourian deposited funds to meet a margin call on the account – a purpose that government witness Mark Burrell conceded was a legitimate business reason for making the transaction. ROA.6914-6915.

In sum, the government failed to meet its burden of proving that David Nourian deposited money into the *4516 account for the purpose of disguising the nature and source of those funds. It was therefore wrong to order forfeiture of the entirety of that account, including the funds attributable to the Alon and Twitter stock. Accordingly, this Court should vacate the forfeiture order against David Nourian and remand for further proceedings in connection therewith.

---

[24] Indeed, government witness Mark Burrell testified that this was the reason why David Nourian was not charged with substantive money laundering for transfers between these two accounts. ROA.6815.

VI.　David Nourian preserves for possible further review the currently foreclosed contention that the Constitution requires that restitution awards under the MVRA must be found by a jury beyond a reasonable doubt.

A.　Standard of review.

This Court reviews constitutional questions *de novo*. *See, e.g., United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

B.　Factual background.

After the jury returned its verdict, the district court ordered the Probation Office to prepare a presentence report ("PSR"). ROA.1637, 7983. The PSR contended that, under the Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, David Nourian was jointly and severally liable for $115,389,128.20 in restitution. ROA.9001 (¶ 167).

As relevant here, David Nourian objected to the PSR's recommendation on restitution on the ground that the failure to submit the question of restitution to the jury violated his Fifth Amendment right to due process and Sixth Amendment right to jury trial, and precluded any award of restitution. ROA.9016-9017. (He acknowledged, however that this objection was foreclosed under Fifth Circuit law.) The district court overruled that objection (ROA.10679) and proceeded to order restitution as proposed by the PSR. ROA.3152, 3154-3155, 8094-8096.

C.    <u>David Nourian preserves for possible further review the currently foreclosed contention that the Fifth and Sixth Amendments to the Constitution require that restitution awards under the MVRA must be found by a jury beyond a reasonable doubt.</u>

Acknowledging that under current law there is no right to a jury determination, beyond a reasonable doubt, of restitution awards under the MVRA, David Nourian preserves for further review his contention that the failure to submit the question of restitution to the jury violated his Fifth Amendment right to due process and Sixth Amendment right to jury trial, and precludes any award of restitution in this case.

Over 25 years ago, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).[25]  And the rule of *Apprendi* is not limited to confinement-type penalties.  In *Southern Union Co. v. United States*, 567 U.S. 343, 346, 348-60 (2012), the Supreme Court held that facts that raise the statutory maximum fine must be submitted to a jury for decision beyond a reasonable doubt.  Nevertheless, this Court has found the rule of *Apprendi* inapplicable to restitution determinations under the MVRA, holding that the MVRA

---

[25] In *Alleyne v. United States*, 570 U.S. 99, 108 (2013), the Supreme Court extended the rule of *Apprendi* to include facts that raise the statutory minimum sentence as well as those that raise the statutory maximum sentence.  When we refer to "the rule of *Apprendi*" in our briefing in this appeal, we include the gloss that *Alleyne* added to *Apprendi* itself.

does not set either a statutory maximum or a statutory minimum triggering the requirement for a jury determination beyond a reasonable doubt.[26]

As two Justices have recognized, there is a substantial argument that restitution should be subject to the rule of *Apprendi – i.e.,* submitted to a jury and proved beyond a reasonable doubt. *See Rimlawi v. United States*, 145 S.Ct. 518, 518-19 (2025) (Gorsuch, J., dissenting from denial of certiorari); *Hester v. United States*, 586 U.S. 1104, 1105-07 (2019) (Gorsuch, J., joined by Sotomayor, J., dissenting from denial of certiorari). Moreover, if this question were to be decided in David Nourian's favor, the government could not meet its burden of showing the error to be harmless beyond a reasonable doubt. Accordingly, while recognizing that the issue is presently foreclosed in this Court, David Nourian preserves the issue for possible further review.[27]

---

[26] *See, e.g., United States v. Luna Caudillo*, 110 F.4th 808, 811-12 (5th Cir. 2024); *United States v. Rosbottom*, 763 F.3d 408, 420 (5th Cir. 2014); *United States v. Read*, 710 F.3d 219, 231 (5th Cir. 2012).

[27] In *Rimlawi*, Justice Gorsuch expressed the "hope that federal and state courts will continue to consider carefully the Sixth Amendment's application to criminal restitution orders." *Rimlawi*, 145 S. Ct. at 518-19 (Gorsuch, J., dissenting from denial of certiorari). David Nourian respectfully suggests that, in accordance with Justice Gorsuch's hope, *en banc* consideration of this question may be warranted, for the reasons laid out by Justice Gorsuch in *Rimlawi* and *Hester*.

## CONCLUSION

This Court should reverse David Nourian's convictions and remand for entry of judgment of acquittal. In the alternative, this Court should vacate David Nourian's convictions and remand for a new trial. Further in the alternative, this Court should vacate David Nourian's sentence and remand for resentencing.

Respectfully submitted,

/s/ David Gerger
David Gerger
Ashley Kaper
GERGER HENNESSY MARTIN &
PETERSON, LLP
700 Louisiana, Suite 2300
Houston, Texas 77002
713.224.4400 – Telephone
713.224.5153 – Fax

*Counsel for Defendant-Appellant*
*Dehshid Nourian*

## CERTIFICATE OF SERVICE

I certify that today, October 10, 2025, the foregoing brief for appellant Dehshid Nourian was served upon all counsel of record by notice of electronic filing with the Fifth Circuit CM/ECF system.    The appellate record is available electronically.

/s/ David Gerger
David Gerger

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 16,699 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as indicated by the word count in the word-processing system used to prepare this brief; and the Court has granted David Nourian leave to file a brief not exceeding 16,800 countable words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font in the body and Times New Roman 12-point font in the footnotes.

3.      This brief and the record excerpts were filed electronically, in native Portable Document File (PDF) format, via the Fifth Circuit's CM/ECF system.

/s/ David Gerger
David Gerger