No. 25-10365

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

DEHSHID NOURIAN & CHRISTOPHER RYDBERG,
*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, NO. 3:17-CR-155 (HON. SAM A. LINDSAY)

APPELLEE'S BRIEF FOR THE UNITED STATES OF AMERICA

A. TYSEN DUVA
   Assistant Attorney General

ETHAN WOMBLE
EDWARD EMOKPAE
   Attorneys, Fraud Section
   Criminal Division

JOSH A. GOLDFOOT
   Deputy Assistant Attorney
   General

JAVIER A. SINHA
   Attorney, Appellate Section
   Criminal Division
   U.S. Department of Justice
   950 Pennsylvania Ave. NW,
   Suite 1264
   Washington, DC 20530
   (202) 353-1787
   javier.sinha@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

Although the facts and legal arguments are adequately presented in the briefs and record, the United States does not oppose the defendants' request for oral argument.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF AUTHORITIES....................................................vi

STATEMENT OF JURISDICTION ........................................1

STATEMENT OF THE ISSUES............................................1

STATEMENT OF THE CASE ...............................................2

    I.     Statement of facts ......................................................3

        A.     The defendants and their family own and operate pharmacies used to commit fraud. ...............................3

        B.     The defendants engage in a scheme to pay kickbacks and defraud the federal government and Blue Cross Blue Shield. ....................................5

        C.     The defendants work together to launder the proceeds from their healthcare fraud. .........................14

        D.     The defendants defraud the United States to avoid paying taxes. ...........................................19

    II.    Procedural history.................................................23

    III.   Rulings under review ...........................................24

SUMMARY OF ARGUMENT .................................................25

ARGUMENT ...........................................................29

    I.     Sufficient evidence supports Nourian's and Rydberg's convictions. ...........................................29

        A.     Standard of review ......................................29

        B.     Background .................................................30

C. Sufficient evidence supports the defendants' convictions for healthcare-fraud conspiracy and substantive healthcare fraud. ........................ 30

    1. There is sufficient evidence of Nourian's knowledge and intent to defraud. ....................... 32

    2. There is sufficient evidence of Rydberg's knowledge and intent to defraud. ....................... 44

    3. FECA is a health care benefit program under 18 U.S.C. § 1347. ................................... 49

D. Sufficient evidence supports the defendants' convictions for money-laundering conspiracy and substantive money laundering. ................... 58

    1. Sufficient evidence shows that the funds in question derived from unlawful activity and that the defendants were aware of that fact. ..... 59

    2. There is sufficient evidence of Nourian's guilt for conspiring to launder money. ....................... 60

    3. There is sufficient evidence of Nourian's guilt for substantive money laundering. ..................... 66

    4. There is sufficient evidence of Rydberg's guilt for conspiring to launder money and substantive money laundering. ........................ 70

E. Sufficient evidence supports the defendants' convictions for conspiring to defraud the United States by impeding the functions of the IRS. .............. 72

II. The government's rebuttal argument was neither improper nor prejudicial. .................................. 78

A. Background ........................................... 78

B.   Legal background and standard of review .................83

C.   The government's closing rebuttal was proper. ..........85

III.  The district court did not err in sentencing Nourian and Rydberg. ..........................................................................91

A.   Background .................................................................91

B.   The district court correctly determined that there were more than ten victims of Nourian and Rydberg's fraud. ...........................................................93

    1.   Facts .................................................................93

    2.   Standard of review .............................................94

    3.   The court properly determined that Nourian and Rydberg's offense affected more than 10 victims. ............................................................95

    4.   Any procedural error caused no prejudice........103

C.   The district court properly considered Nourian's perceived lack of remorse in sentencing him. ...........105

    1.   Facts .............................................................105

    2.   Standard of review ..........................................106

    3.   Analysis.........................................................109

D.   The district court properly found that the entirety of the 4516 brokerage account was subject to forfeiture.................................................................113

    1.   Facts .............................................................113

    2.   Standard of review ..........................................117

    3.   Analysis.........................................................117

E.    The district court properly found facts relating to the restitution award under the Mandatory Victims Restitution Act............................................. 122

CONCLUSION ............................................................................... 124

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Federal Bureau of Prisons,*
552 U.S. 214 (2008) ........................................................................ 51, 52

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) ............................................................................ 123

*Holguin-Hernandez v. United States,*
589 U.S. 169 (2020) ............................................................................ 108

*Indigenous Peoples of Coastal Bend v. United States Army Corps
of Eng'rs*, 132 F.4th 872 (5th Cir. 2025) ............................................ 71

*Jacobs v. Nat'l Drug Intel. Ctr.,*
548 F.3d 375 (5th Cir. 2008) ............................................................. 123

*Kisor v. Wilkie,*
588 U.S. 558 (2019) .............................................................. 97, 101, 102

*Maracich v. Spears,*
570 U.S. 48 (2013) ................................................................................ 57

*Mitchell v. United States,*
526 U.S. 314 (1999) ...................................................................... 110, 113

*Molina-Martinez v. United States,*
578 U.S. 189 (2016) ..................................................................... 103, 104

*Ocasio v. United States,*
578 U.S. 282 (2016) .............................................................................. 57

*Pinkerton v. United States,*
328 U.S. 640 (1946) .............................................................................. 42

*Puckett v. United States,*
556 U.S. 129 (2009) .............................................................................. 85

*Rhode Island Insurers' Insolvency Fund,*
  80 F.3d 616 (1st Cir. 1996) ............................................................. 96

*Rosemond v. United States,*
  572 U.S. 65 (2014) ..................................................................... 42, 69

*Standefer v. United States,*
  447 U.S. 10 (1980) ........................................................................... 39

*Stinson v. United States,*
  508 U.S. 36 (1993) ..................................................................... 97, 99

*United States v. Ainabe,*
  938 F.3d 685 (5th Cir. 2019) ..................................................... 94, 96

*United States v. Alaniz,*
  726 F.3d 586 (5th Cir. 2013) ........................................................... 29

*United States v. Anderson,*
  980 F.3d 423 (5th Cir. 2020) ............................................ 51, 52, 53, 56

*United States v. Barkers-Woode,*
  136 F.4th 496 (3d Cir. 2025) ........................................................... 99

*United States v. Barnes,*
  979 F.3d 283 (5th Cir. 2020) ................................... 31, 34, 36, 46, 83

*United States v. Barson,*
  845 F.3d 159 (5th Cir. 2016) ................................... 31, 94, 95, 96, 98

*United States v. Bishop,*
  264 F.3d 535 (5th Cir. 2001) ........................................................... 75

*United States v. Bourrage,*
  138 F.4th 327 (5th Cir. 2025) ......................................................... 94

*United States v. Brown,*
  553 F.3d 768 (5th Cir. 2008) ........................................................... 66

*United States v. Burden,*
 964 F.3d 339 (5th Cir. 2020) ............................................................... 89

*United States v. Burns,*
 162 F.3d 840 (5th Cir. 1998) ........................................................ 62, 65

*United States v. Canales,*
 744 F.2d 413 (5th Cir. 1984) ............................................................... 84

*United States v. Casilla,*
 20 F.3d 600 (5th Cir. 1994) ................................................................. 41

*United States v. Castro-Alfonso,*
 841 F.3d 292 (5th Cir. 2016) ............................................................. 104

*United States v. Cessa,*
 872 F.3d 267 (5th Cir. 2017) ............................................................. 119

*United States v. Chiasson,*
 90 F.4th 832 (5th Cir. 2024) ............................................................. 109

*United States v. Christian,*
 404 F. App'x 989 (6th Cir. 2010) ...................................................... 107

*United States v. Collins,*
 774 F.3d 256 (5th Cir. 2014) ............................................................... 52

*United States v. Cook,*
 No. 21-10387, 2022 WL 175546 (5th Cir. Jan. 18, 2022) ................. 104

*United States v. Curry,*
 125 F.4th 733 (5th Cir. 2025) ........................................................... 109

*United States v. D'Amato,*
 39 F.3d 1249 (2d Cir. 1994) ................................................................ 74

*United States v. Davis,*
 490 F.3d 541 (6th Cir. 2007) ............................................................... 77

*United States v. Diaz,*
  585 F.2d 116 (5th Cir. 1978) .................................................................. 90

*United States v. Doggett,*
  230 F.3d 160 (5th Cir. 2000) ................................................................ 107

*United States v. Douglas,*
  569 F.3d 523 (5th Cir. 2009) .............................................107, 110, 112

*United States v. Duran-Munez,*
  539 F. App'x 407 (5th Cir. 2013) ............................................. 107, 112

*United States v. Fields,*
  483 F.3d 313 (5th Cir. 2007) .................................................................. 84

*United States v. Fierro,*
  38 F.3d 761 (5th Cir. 1994) .................................................................... 88

*United States v. Fuchs,*
  467 F.3d 889 (5th Cir. 2006) .................................................................. 58

*United States v. Gallo,*
  927 F.2d 815 (5th Cir. 1991) .................................................................. 64

*United States v. Ganji,*
  880 F.3d 760 (5th Cir. 2018) .................................................................. 76

*United States v. Gasanova,*
  332 F.3d 297 (5th Cir. 2003) ................................................................ 119

*United States v. Gonzales,*
  520 U.S. 1 (1997) .................................................................................... 51

*United States v. Gonzales,*
  841 F.3d 339 (5th Cir. 2016) .................................................................. 70

*United States v. Grant,*
  683 F.3d 639 (5th Cir. 2012) .................................................................. 30

*United States v. Green,*
  47 F.4th 279 (5th Cir. 2022) ........................................................ 72, 73

*United States v. Griffin,*
  324 F.3d 330 (5th Cir. 2003) .............................................................. 60

*United States v. Griffith,*
  118 F.3d 318 (5th Cir. 1997) .............................................................. 89

*United States v. Hasson,*
  333 F.3d 1264 (11th Cir. 2003) ......................................................... 65

*United States v. Hill,*
  80 F.4th 595 (5th Cir. 2023) .............................................................. 90

*United States v. Hitt,*
  473 F.3d 146 (5th Cir. 2006) .............................................................. 89

*United States v. Hott,*
  866 F.3d 618 (5th Cir. 2017) ............................................................ 104

*United States v. Iriele,*
  977 F.3d 1155 (11th Cir. 2020) ......................................................... 42

*United States v. Isgar,*
  739 F.3d 829 (5th Cir. 2014) .............................................................. 29

*United States v. Ismoila,*
  100 F.3d 380 (5th Cir. 1996) ........................................................ 36, 76

*United States v. Jimenez,*
  77 F.3d 95 (5th Cir. 1996) .................................................................. 77

*United States v. Jones,*
  136 F.4th 272 (5th Cir. 2025) ............................................................ 97

*United States v. Kalu,*
  936 F.3d 678 (5th Cir. 2019) ........................................................ 94, 96

*United States v. Kippers*,
685 F.3d 491 (5th Cir. 2012) ............................................................. 112

*United States v. Kurns*,
129 F.4th 589 (9th Cir. 2025) ........................................................... 107

*United States v. Laca*,
499 F.2d 922 (5th Cir. 1974) .............................................. 110, 111, 113

*United States v. Lage*,
183 F.3d 374 (5th Cir. 1999) ............................................................... 29

*United States v. Lee*,
966 F.3d 310 (5th Cir. 2020) ............................................................... 86

*United States v. Lopez-Monzon*,
850 F.3d 202 (5th Cir. 2017) ............................................................... 37

*United States v. Mares*,
402 F.3d 511 (5th Cir. 2005), *abrogated on other grounds by*
*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) .......................... 84

*United States v. Martinez*,
588 F.3d 301 (6th Cir. 2009) ............................................................... 55

*United States v. May*,
No. 21-10308, 2022 WL 152506 (5th Cir. Jan. 14, 2022) ................. 104

*United States v. Mendoza*,
522 F.3d 482 (5th Cir. 2008) ............................................................... 87

*United States v. Meza*,
701 F.3d 411 (5th Cir. 2012) ............................................................... 54

*United States v. Moreno*,
588 F.2d 490 (5th Cir. 1979) ............................................................... 44

*United States v. Mubayyid*,
658 F.3d 35 (1st Cir. 2011) .......................................................... 75, 77

*United States v. Munoz-Canellas,*
  695 F. App'x 748 (5th Cir. 2017)......................................................103

*United States v. Murra,*
  879 F.3d 669 (5th Cir. 2018)............................................................88

*United States v. Navarro-Jusino,*
  993 F.3d 360 (5th Cir. 2021).................................................. 107, 112

*United States v. Odiodio,*
  244 F.3d 398 (5th Cir. 2001)............................................................37

*United States v. Odom,*
  694 F.3d 544 (5th Cir. 2012)............................................................94

*United States v. Olano,*
  507 U.S. 725 (1993)..............................................................85, 103

*United States v. Pardo-Oseguera,*
  844 F. App'x 739 (5th Cir. 2021)....................................................104

*United States v. Parkerson,*
  984 F.3d 1124 (5th Cir. 2021)........................................................107

*United States v. Pendleton,*
  761 F. App'x 339 (5th Cir. 2019)......................................................61

*United States v. Perlaza-Ortiz,*
  869 F.3d 375 (5th Cir. 2017)..........................................................103

*United States v. Peters,*
  732 F.2d 1004 (1st Cir. 1984) ..........................................................77

*United States v. Portillo,*
  969 F.3d 144 (5th Cir. 2020)............................................................70

*United States v. Potts,*
  644 F.3d 233 (5th Cir. 2011)............................................................84

*United States v. Quiroz-Hernandez,*
  306 F. App'x 155 (5th Cir. 2009)..........................................................90

*United States v. Ramirez,*
  979 F.3d 276 (5th Cir. 2020)...................................................95, 96

*United States v. Real Prop. Located at 1407 N. Collins St.,*
  *Arlington, Texas,*
  901 F.3d 268 (5th Cir. 2018)............................. 117, 118, 119, 120, 122

*United States v. Reed,*
  908 F.3d 102 (5th Cir. 2018)........................................................ 117

*United States v. Rice,*
  607 F.3d 133 (5th Cir. 2010)..........................................................85

*United States v. Robinson,*
  741 F.3d 588 (5th Cir. 2014)........................................................ 112

*United States v. Rodgers,*
  855 F. App'x 229 (5th Cir. 2021)................................................... 104

*United States v. Rodriguez,*
  136 F.4th 258 (5th Cir. 2025) ...........................................107, 112, 113

*United States v. Rodriguez,*
  660 F.3d 231 (5th Cir. 2011)........................................................ 106

*United States v. Rodriguez,*
  831 F.3d 663 (5th Cir. 2016)..........................................................47

*United States v. Rojas,*
  812 F.3d 382 (5th Cir. 2016)..........................................................34

*United States v. Ronquillo,*
  508 F.3d 744 (5th Cir. 2007)................................................. 108, 112

*United States v. Rosbottom,*
  763 F.3d 408 (5th Cir. 2014).........................................................123

*United States v. Sanders,*
  952 F.3d 263 (5th Cir. 2020).................................................. 41, 50, 68

*United States v. Sanjar,*
  876 F.3d 725 (5th Cir. 2017)................................................. 30, 43, 69

*United States v. Scales,*
  599 F.2d 78 (5th Cir. 1979).............................................................86

*United States v. Scott,*
  892 F.3d 791 (5th Cir. 2018).........................................................39

*United States v. Sepulveda,*
  64 F.4th 700 (5th Cir. 2023) ........................................... 107, 108, 112

*United States v. Simmons,*
  470 F.3d 1115 (5th Cir. 2006).........................................................37

*United States v. Simpson,*
  796 F.3d 548 (5th Cir. 2015).................................................. 107, 111

*United States v. Smith,*
  553 F. App'x 130 (3d Cir. 2014) ....................................................108

*United States v. Stanley,*
  739 F.3d 633 (11th Cir. 2014)....................................................... 112

*United States v. Sudeen,*
  434 F.3d 384 (5th Cir. 2005).........................................................95

*United States v. Tencer,*
  107 F.3d 1120 (5th Cir. 1997)................................................. 65, 118

*United States v. Valencia,*
  600 F.3d 389 (5th Cir. 2010)...................................................... 83, 87

*United States v. Vargas,*
  74 F.4th 673 (5th Cir. 2023) (*en banc*) ................................ 97, 98, 101

*United States v. Vasquez,*
  766 F.3d 373 (5th Cir. 2014)......................................................64, 70

*United States v. Ways,*
  832 F.3d 887 (8th Cir. 2016)............................................................62

*United States v. Westbo,*
  746 F.2d 1022 (5th Cir. 1984)....................................................41, 42

*United States v. Whitson,*
  77 F.4th 452 (6th Cir. 2023) ..........................................................108

*United States v. Willett,*
  751 F.3d 335 (5th Cir. 2014)......................................................35, 45

*United States v. Willey,*
  57 F.3d 1374 (5th Cir. 1995).......................61, 62, 64, 65, 66, 120, 122

*United States v. Wilson,*
  105 F.3d 219 (5th Cir. 1997)............................................................43

*United States v. Yoon,*
  128 F.3d 515 (7th Cir. 1997)............................................................74

*United States v. Zarco-Beiza,*
  24 F.4th 477 (5th Cir. 2022) ..........................................................109

*White v. United States,*
  143 F.3d 232 (5th Cir. 1998)............................................................50

## Statutes and Rules

5 U.S.C. § 8102 ................................................................................50

5 U.S.C. § 8103 ..........................................................................50, 55

5 U.S.C. § 8149 ................................................................................50

10 U.S.C. § 1071 ..............................................................................53

18 U.S.C. § 24 ............................................................ 49, 50, 51, 53, 54, 56

18 U.S.C. § 371 ............................................................................ 3, 24, 72

18 U.S.C. § 982 .............................................................. 113, 114, 117, 118

18 U.S.C. § 1347 ............................................................ 2, 24, 26, 30, 49

18 U.S.C. § 1349 ...................................................................... 2, 3, 23, 49

18 U.S.C. § 1956 ........................................................ 2, 3, 24, 58, 59, 117

18 U.S.C. § 1957 ................................................................................ 58, 59

18 U.S.C. § 3231 ........................................................................................ 1

18 U.S.C. § 3553 ................................................................................... 110

18 U.S.C. § 3742 ........................................................................................ 1

18 U.S.C. § 3771 ..................................................................................... 99

28 U.S.C. § 1291 ........................................................................................ 1

42 U.S.C. § 1320a-7b .................................................................... 38, 56

42 U.S.C. § 1395 ..................................................................................... 53

42 U.S.C. § 1396 ..................................................................................... 53

20 C.F.R. § 10.1 ....................................................................................... 50

20 C.F.R. § 10.2 ....................................................................................... 50

20 C.F.R. § 10.310 ................................................................................. 50

Fed. R. Crim. P. 32.2 ......................................................................... 114

U.S.S.G. § 1B1.3 ................................................................................... 100

U.S.S.G. § 1B1.7 ................................................................................... 102

U.S.S.G. § 2B1.1 ..................................................... 91, 93, 95, 96, 99, 100

U.S.S.G. App. C, Amend. 726 (effective Nov. 1, 2009) ................. 100, 102

**Other Authorities**

Black's Law Dictionary (9th ed. 2009) ................................................... 99

Congressional Research Service, The Federal Employees'
    Compensation Act (FECA): Workers' Compensation for Federal
    Employees (March 10, 2025) ........................................................... 53

Webster's New World College Dictionary (4th ed. 2007) ....................... 99

## STATEMENT OF JURISDICTION

Defendant-appellants Dehshid Nourian and Christopher Rydberg appeal from final judgments of conviction in a criminal case. Final judgment for Nourian was entered on February 25, 2025, ROA.57-58, 3148,[1] and Nourian timely filed a notice of appeal on March 6, 2025, ROA.3176-3177. Final judgment for Rydberg was entered on March 21, 2025, ROA.10736, 13976, and Rydberg timely filed a notice of appeal on April 1, 2025, ROA.13997. The district court (Lindsay, J.) had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

1.    Whether sufficient evidence supports the defendants' convictions. (Nourian Issue I; Rydberg Issue I-III)

2.    Whether comments during the government's rebuttal closing argument constituted improper argument. (Nourian Issue II; Rydberg Issue IV)

3.    Whether the district court erred in sentencing the defendants:

---

[1] "ROA." refers to the Record on Appeal. "Nourian Br." refers to Nourian's initial brief. "Rydberg Br." refers to Rydberg's initial brief.

1

A.　　Whether the district court erred in determining that there were more than ten victims of the defendants' fraud. (Nourian Issue III; Rydberg Issue V)

B.　　Whether the district court properly considered Nourian's perceived lack of remorse at sentencing. (Nourian Issue IV)

C.　　Whether the district court properly found that the entirety of Nourian's brokerage account was subject to forfeiture. (Nourian Issue V)

D.　　Whether the district court properly found facts relating to the restitution award. (Nourian Issue VI)

## STATEMENT OF THE CASE

Following a jury trial in the United States District Court for the Northern District of Texas, Nourian and Rydberg were convicted on multiple counts.

Nourian was convicted of one count of conspiring to commit healthcare fraud, in violation of 18 U.S.C. § 1349; eight counts of healthcare fraud, in violation of 18 U.S.C. § 1347; one count of conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h); five counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

and one count of conspiring to defraud the United States, in violation of 18 U.S.C. § 371. ROA.3148.

Rydberg was convicted of one count of conspiring to commit healthcare fraud, in violation of 18 U.S.C. § 1349; one count of conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h); six counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and one count of conspiring to defraud the United States, in violation of 18 U.S.C. § 371. ROA.13976.

The district court sentenced Nourian to a below-Guidelines sentence totaling 210 months, followed by three years of supervised release, ROA.3149-3150, 8084, 8091, and sentenced Rydberg to a below-Guidelines sentence totaling 180 months, to be followed by three years of supervised release, ROA.13977-13978, 16944.

## I.    Statement of facts

### A.    The defendants and their family own and operate pharmacies used to commit fraud.

1.    The scheme here involved multiple members of the defendants' family: Nourian's mother, Sherri Mofid; his brother, Jamshid

"James" Noryian; and his sister, Leyla Nourian.[2] ROA.3995, 4028, 4360-4361, 4534; *see also* ROA.3522. Rydberg is James's stepson and Nourian's step-nephew. ROA.3958, 4036.

2.    James told others that "he had found a loophole in the pharmacy laws where he could charge as much as he wanted for . . . prescription creams and the insurance companies would have to pay for it." ROA.5713-5714. James, accordingly, came up with a plan to find doctors to provide prescriptions for his pharmacy, and, in return, "he would give them part of the insurance imbursements." ROA.5714-5716.

James particularly wanted prescriptions for patients who were covered by the Department of Labor (DOL). ROA.4971. The DOL operates the Federal Employee Compensation Act (FECA), which is a federally funded program that provides payment of workers' compensation benefits to federal employees who are injured in the performance of duty. ROA.3584-3585. These benefits include coverage for medically necessary pharmaceuticals prescribed by a doctor. ROA.3585,

---

[2] Because Nourian shares similar last names with members of his family, they will be referred to by their first names, James and Leyla.

4

3636. FECA is administered by the DOL Office of Workers' Compensation Programs (OWCP). ROA.3584-3585.

James wanted prescriptions for FECA beneficiaries because DOL "was paying very high amounts for" compound drugs, ROA.4971, which are custom-made drugs created in a pharmacy, ROA.3586-3587, 5443. In fact, DOL paid "about two to three times more than the commercial" businesses. ROA.4202. The products cost only about $50 to make, but DOL reimbursed around $10,000 to $15,000. ROA.4234-4235.

**B.   The defendants engage in a scheme to pay kickbacks and defraud the federal government and Blue Cross Blue Shield.**

1.   To implement their plan, the conspirators used Ability Pharmacy in Fort Worth, Texas. ROA.3628, 3974. In August 2014, Nourian was the president and 30% owner of Ability. ROA.4889, 6992. Another part owner was Ali Khavarmanesh, who also owned another pharmacy connected to James and Nourian. ROA.7023, 7061. Although James was not the president or the owner, he oversaw Ability and the people who worked there. ROA.3975-3976, 4077; *see also* ROA.4192-4193, 4231. Rydberg was essentially James's "assistant," ROA.4032, and they worked in close proximity, ROA.3974. Rydberg handled the "taxes"

and "transfers of money." ROA.5743-5744. When James was gone, Rydberg was in charge. ROA.4077.

2.    a.    Around 2014, James and Ability began working with Dr. Leslie Benson, who operated clinics throughout Texas. ROA.4702, 4705, 4721.

After James approached him, Dr. Benson began prescribing pain creams for his FECA-beneficiary patients and sending those prescriptions to Ability in exchange for kickbacks. ROA.3991, 4721, 4706-4707, 4972. To prescribe these creams, Dr. Benson used the prescription pads provided by the pharmacies. ROA.3991.

James paid Dr. Benson in cash or by check, either directly or by giving the money to Dr. Benson's son. ROA.4208-4209, 4724. When James gave Dr. Benson a $5,000 check, for example, Dr. Benson's office manager told him that it was a kickback, but Dr. Benson just "shrugged his shoulders." ROA.4724, 4730, 4732.

b.    Around that same time, James also began working with Dr. Michael Taba. ROA.4900, 6780. Dr. Taba, too, began sending prescriptions to Ability for FECA beneficiaries in exchange for kickbacks. ROA.4900, 5044. For example, James once sent two of his employees to

6

Dr. Taba's office, where Dr. Taba's office manager gave them a "stack of prescriptions and a stamp of Dr. Taba's signature" and "told [them] to stamp each one." ROA.3985-3987. These prescriptions were for pain and wound creams. ROA.3990.

The scheme similarly paid Dr. Taba kickbacks using checks and cashier's checks. ROA.6780-6787. These checks came mostly from Rydberg and Mofid and included the word "Loan" on the memo lines. *See* ROA.2791-2792.

c.    In late 2014, Dr. Kevin Williams, a surgeon in Texas, was working with patients that Dr. Benson referred to him, so he called Ability to see if he could also write prescriptions there in exchange for kickbacks. ROA.4933-4934, 4966-4967. Dr. Williams and James agreed Ability would pay 30% in kickbacks for the prescriptions Dr. Williams sent to Ability. ROA.4969; *see* ROA.4937, 4944. Once the deal was struck, James told Rydberg "to write him a check," and Dr. Williams began sending Ability prescriptions for compound creams. ROA.3991-3992.

To write these prescriptions, Dr. Williams went to Ability, where he met with Rydberg. ROA.4972-4973. There he received pre-filled prescription pads with certain creams, and James told him to "[j]ust circle

7

the formulations that you want the patient to receive." ROA.4974, 4976-4977. Twice Dr. Williams signed prescription pads that were prefilled by someone at Ability with the patients' names and prescriptions. ROA.5036-5038. Dr. Williams prescribed these medications because they were "highly reimbursable" even though they were not medically necessary. ROA.4978, 4987.

When it was time to get paid, Dr. Williams contacted Rydberg, who would write him a check. ROA.3992-3993, 4990, 5000, 5012, 5021-5022, 5024. Dr. Williams would then meet with Rydberg or James to collect it. ROA.4990-4991, 5000, 5003, 5011, 6425. On one day that Dr. Williams planned to pick up his check at Ability, James asked a clerical employee at Ability to leave before Dr. Williams arrived. ROA.3992. But Rydberg and James stayed to meet with the doctor. ROA.3992-3993.

The checks were sometimes written from the account of Bandoola Pharmaceutical, LLC, a holding company registered to Mofid and Rydberg. ROA.3995, 4891, 4999-5000, 5021, 5024, 6514. Rydberg was a signatory for Bandoola's bank accounts. ROA.6524-6525. The checks, given to Dr. Williams by James or Rydberg, sometimes said "[m]arketing" or "commission" in the memo line, even though Dr. Williams did no

marketing for the pharmacies. ROA.5004, 5012-5015, 5017, 5019; *see also* ROA.2793, 6791.

3.    a.    At some point, Ability was audited by Blue Cross Blue Shield (BCBS), a health insurance company. ROA.4083, 4224, 4485-4486. Because of this, James had to use other pharmacies to bill for prescriptions. ROA.4224. In late 2015, Ability closed, all its employees moved to Industrial & Family Pharmacy, and the billing for the prescriptions shifted from Ability to Industrial & Family. ROA.3742, 3982-3983, 4418-4419.

Nourian owned and was the sole director of Industrial & Family, but, as with Ability, James was in charge of the pharmacy and its employees. ROA.3983, 4419, 4889, 6058, 6998-6999. Nourian was listed as the contact person on paperwork submitted to the DOL enabling Industrial & Family to bill OWCP for FECA beneficiaries. ROA.3629-3631. And Nourian signed Industrial & Family's provider enrollment contract that provided BCBS medical insurance to its employees. ROA.4107-4109.

Besides the location, there was little difference between Ability and Industrial & Family. ROA.4419.

9

b.      At one point, around late 2015 or early 2016, Dr. Williams mentioned to James that he had the opportunity to expand his practice to patients in Atlanta. ROA.4954-4955, 5034. James "and his group" then began to use another pharmacy, Park Row Pharmacy, to process those prescriptions from Dr. Williams. ROA.4955, 5033-5034.

Park Row, like Ability, was a compounding pharmacy in Texas. ROA.3984, 4060; *see* ROA.4534. Ali Khavarmanesh owned Park Row. ROA.6076-6077, 7003; *see* ROA.7061. As of July 2015, Nourian was the president, manager, and pharmacist-in-charge of Park Row. ROA.4534, 4890. James, however, still controlled much of what happened at Park Row. ROA.3984. For example, James paid the Park Row employees, and James once visited Park Row when Nourian was not there, causing James to angrily call Nourian, ROA.3984.

c.      While working at Park Row, Nourian met Nicolas Aguilar, a physician's assistant. ROA.4532, 4534. Eventually, Aguilar made an agreement with James and Nourian: "if [he] sent them medicines or prescriptions, they would reimburse [him] with money." ROA.4537-4538. Nourian provided Aguilar with a prescription pad containing Park Row's address. ROA.4540-4541.

10

To sign prescriptions, Aguilar met with Nourian at Park Row behind a locked door. ROA.4543, 4640. Aguilar signed prescriptions for patients that he saw at the clinic, but, more commonly, he signed either empty prescription pads that would be filled in later or prefilled prescription pads from Nourian. ROA.4541; *see, e.g.*, ROA.4620. With the blank and prefilled pads, Aguilar prescribed medications for patients he never evaluated. ROA.4541, 4544-4550. Nourian told Aguilar that most of the purported patients included in the prefilled prescription pads were employees of Ability and Industrial & Family, who were insured by BCBS. ROA.4093, 4107-4109, 4421-4422, 4543-4544. Indeed, Aguilar signed at least one prescription for Rydberg, although Rydberg was not one of his patients. ROA.4504-4505, 4546-4547.

Aguilar received a total of $20,000 in kickbacks. ROA.4550. James paid him using two checks from Bandoola containing Mofid's name. ROA.4550-4551, 4554. One check suggested that Aguilar was being paid for consulting or marketing, but Aguilar never did either of those things for Bandoola or Mofid. ROA.4553.

4.    a.    James paid doctors 30% of the money the pharmacies made from their prescriptions. ROA.4213. Drs. Taba, Benson, and

11

Williams sent around 95% of all the prescriptions Ability and Industrial & Family filled. ROA.4419. At Ability, for example, prescriptions signed by Drs. Benson, Taba, and Williams were "all over the office," ROA.3985, and the pharmacies contained printed reports tracking the amount of money the pharmacies had billed the DOL by prescribing doctor, ROA.4879-4885. Patients sometimes called Ability or Industrial & Family and complained about receiving medications from the pharmacy, either because they did not remember being prescribed this medication or because they were receiving too much. ROA.4420.

James frequently admitted that he paid kickbacks to doctors, explaining that "he would use cashier's checks . . . to pay the doctors for the scripts that they provided to his pharmacy." ROA.4207, 4212. For example, James admitted his kickback scheme to one of his marketers, Robbie Jossa, and once paid a kickback to Dr. Benson's son in front of Jossa. ROA.4208-4209, 4212-4213. Similarly, James explained the scheme to his girlfriend at the time, and she responded that his plan "sounded like kickbacks and insurance fraud." ROA.5716. And James spoke to Dr. Benson's office manager and offered her $300 for every prescription she sent to his pharmacies, which she refused. ROA.4723.

12

James, moreover, frequently joked in front of Rydberg and others about how he flooded the pharmacy (which had only paper files) during a prior audit to destroy the evidence. ROA.4228-4229.

Jossa eventually got into an altercation with James and quit his marketing job at Ability. ROA.4226. After he left, he told Rydberg that he was "a better man than this," and Rydberg responded, "I am loyal." ROA.4227.

b.     Not only were these compound medications being prescribed for kickbacks, but many—if not all—of them were not medically necessary. *See* ROA.5493, 5516, 5530, 5539; *see also* ROA.4549-4550.[3] Compound medications should be individualized, ROA.4539, 4939, but many of the prescriptions signed by these doctors were not individualized to the patient, ROA.5493, 5502, 5504, 5513, 5516, 5530, 5539. Indeed, the prefilled prescription pads allowed very little room for individualization. ROA.5510.

---

[3] Testimony at trial specifically explained that the eight prescriptions involved in Counts 2-9 were not medically necessary. ROA.4555-4556 (Counts 2-4), ROA.5493 (Count 5), ROA.5504 (Count 6), ROA.5516 (Count 7), ROA.5530 (Count 8), ROA.5539 (Count 9).

13

5.    Ability, Industrial & Family, and Park Row all billed DOL's OWCP. ROA.3641. A single compound medication could be billed to DOL for "anywhere [from] $3,000 up to $28,000," and there was little variation in the types of compound medications billed by these three pharmacies— the drugs billed were "nearly all the same or substantially similar compound medications." ROA.3642, 3755. DOL would not have paid for prescriptions obtained through kickbacks. ROA.3637.

Between April 2014 and December 2016, DOL paid the pharmacies over $90.8 million. ROA.3756. And between September 2014 and March 2015, BCBS paid Ability about $470,000 for medications prescribed by Aguilar and $207,000 for those prescribed by Dr. Taba. ROA.4497, 4501.

## C.    The defendants work together to launder the proceeds from their healthcare fraud.

1.    Between May 2014 and September 2016, the pharmacies received $82,499,043 from DOL. ROA.6637-6638. Once the pharmacies received the fraud proceeds, the conspirators moved the money through several holding companies and accounts before the money reached the co-conspirators' accounts. *See generally* ROA.2847, 2851 (government demonstrative exhibits). James was not the legal owner of the holding companies, the owners of which included Mofid, Leyla, and Nourian.

14

ROA.3995. Yet James controlled these holding companies, and James and Rydberg together signed the paperwork for these companies and handled their money. ROA.3996, 5855.

a.    For example, over the course of two days in 2016, the conspirators used two pharmacy accounts, a holding-company account, and a personal brokerage account to move over $5 million in DOL fraud proceeds into Nourian's personal account. ROA.6666-6669, 6679; *see generally* ROA.2847 (government demonstrative exhibit).

First, from October through December of 2015, Rydberg withdrew over $5 million, using 29 cashier's checks, from Ability's Prosperity Bank account ending in 9452, which were then all endorsed "not used for purpose intended," and Rydberg then redeposited that money on January 8, 2016, back into that account. ROA.6664-6665.

Then, on January 11, 2016, $5,266,000 was transferred from Ability's Prosperity Bank account to Ability's Chase account ending in 2280.[4] ROA.6665-6667; *see also* ROA.6521-6522. Because this transfer involved commingled funds, only $5,218,481 was DOL funds. ROA.6665-

---

[4] This transfer underlies Count 14. ROA.6663.

6666. The next day, that $5.26 million was transferred to a Chase account ending in 3462 registered to Jade and Joy Holdings, a company owned by the husband of James's sister Leyla. ROA.4893, 6668-6669.[5]

That same day, the $5.26 million was transferred from Jade and Joy to Nourian's Wells Fargo account ending in 6032. ROA.6669, 6674, 6678.[6] Finally, that same day, Nourian used three checks to transfer nearly $11 million of DOL funds from his Wells Fargo account into his personal TD Ameritrade account. ROA.6676-6677; *see* ROA.6259-6261, 6815. All these accounts commingled DOL funds with other funds. ROA.6680.

Rydberg and Nourian were signers for Ability's 9452 account and 2280 account. ROA.6521-6522, 7014-7015, 7069. Rydberg and Leyla were signers on the Jade and Joy account. ROA.6525. Signers were authorized to make transactions for an account and can view any transactions involving those accounts. ROA.6942, 7071.

b.    Similarly, over the course of six days in 2016, the conspirators used two pharmacy accounts, a holding-company account, and a personal

---

[5] This transfer underlies Count 15. ROA.6668.

[6] This transfer underlies Count 16. ROA.6669.

brokerage account to move over $3 million in DOL fraud proceeds into Mofid's personal account. ROA.6662; *see generally* ROA.2851 (government's demonstrative exhibit).

First, in December of 2015, Rydberg purchased four cashier's checks for over $887,000 from Industrial & Family's Wells Fargo 0302 account, and then those cashier's checks were endorsed "Not used for purpose intended," and Rydberg redeposited that money into the account. ROA.6638-6642.

Then, on January 22, 2016, $3,500,000 was moved from that Industrial & Family's Wells Fargo account to Industrial & Family's 9863 Chase account.[7] ROA.6658, 6811. Because both these accounts were commingled, over $3.48 million of the $3.5 million transferred were fraud proceeds. ROA.6658. Then, on January 27, 2016, that $3.5 million was transferred again to a Chase account ending in 3462 registered to Jade and Joy. ROA.6659-6660.[8] Finally, that same day, the $3.5 million was wired to a Scottrade account ending in 1793 in Mofid's name. ROA.6661.[9]

---

[7] This transfer underlies Count 11. ROA.6638.

[8] This transfer underlies Count 12. ROA.6659.

[9] This transfer underlies Count 13. ROA.6661.

17

All the accounts involved DOL funds commingled with other funds. ROA.6663. Rydberg was the common signer on all the accounts involved in this series of transactions. ROA.6523, 6525, 6660. James and Rydberg were authorized to trade on Mofid's Scottrade account. ROA.6795. And Leyla was a signer on the Jade and Joy Chase account. ROA.6525. On January 8, 2016—a few days before this series of transactions—Nourian added himself as a signatory to the Industrial & Family Wells Fargo account. ROA.6671, 7077, 7081. He became a signer on the Industrial & Family Chase account later that year, in October 2016. ROA.6809-6811.

2.     The co-conspirators also used fraud proceeds to buy personal and real property. ROA.6796-6798. For example, Rydberg purchased a BMW sedan using over $100,000 of DOL funds that had been moved to an account of HJLM Holdings, a company owned by Leyla and two others. ROA.6796-6797, 4891-4892, 5671, 5727, 5734. Similarly, $4.4 million in DOL funds was used to purchase property in Austin, Texas; nearly $230,000 was used to purchase property in Richland Hills, Texas; and nearly $468,000 was used to purchase property in Van Alstyne, Texas. ROA.6798.

In total, the conspirators spent nearly $55 million of DOL funds to purchase assets. ROA.6798.

3.    Given the large amount of money Nourian deposited into his TD Ameritrade account in January 2016, TD Ameritrade employees sent Nourian a "due diligence form" to have him "verify the validity of the funds that were deposited." ROA.6223-6225. During a call with a TD Ameritrade employee, Nourian stated that the money came from real estate investments. ROA.6225. Nourian filled out the form, listing "Walmart" as his employer, and listing his business as "Pharmacy" and "Real Estate." ROA.6235-6236; *see also* ROA.6678. He did not mention Industrial & Family, Ability, or Park Row as sources of income. ROA.6283-6284.

### D.    The defendants defraud the United States to avoid paying taxes.

Once proceeds from their fraud had been paid, the defendants used cashier's checks to minimize the profits they reported to the IRS for tax purposes. *E.g.*, ROA.6940-6941, 7013-7014.

1.    In 2015, Rydberg used the pharmacies' bank accounts to purchase 214 cashier's checks totaling approximately $60 million. ROA.6940-6942, 6945. Rydberg made each cashier's check payable to a

pharmaceutical supplier or to another payee that suggested a business expense for the pharmacy. *See* ROA.6672, 6945. Rydberg included memos on many of the cashier's checks such as "pharma supplies" and "[a]dvertising." ROA.5333, 6641.

Rydberg, however, did not pay any of the cashier's checks to the stated payees. ROA.6973, 6982. Instead, Rydberg redeposited many of these cashier's checks the next tax year into the same Ability, Industrial & Family, and Park Row bank accounts. ROA.6940-6941, 6944-6946, 6981-6982; *e.g.*, ROA.6959-6960. And on several occasions, the cashier's checks were exchanged for new cashier's checks in the same amount and deposited by Nourian into his personal Wells Fargo account the following tax year. *See* ROA. 6676-6677, 6961-6963, 6966.

For example, on December 16, 2015, Rydberg withdrew around $926,000 from Ability's bank account using three cashier's checks that were written to pharmaceutical companies, McKesson, Cardinal Health, and Amerisource. ROA.6958-6960, 6962, 6964. These three checks were voided, marked "[n]ot used for intended purpose," and signed by Rydberg. ROA.6961, 6963, 6965-6966; *see* ROA.5346. These cashier's checks were then reissued in January 2016—a new tax year—in identical amounts to

20

Nourian, who signed and deposited them into his bank account. ROA.6960, 6962-6964, 6967.

2.    As a result of the cashier's check transactions, each pharmacy's 2015 bank records reflected Rydberg's cashier's check purchases but did not reflect the subsequent redeposits or transfers in 2016. ROA.6984-6985. Nourian, Rydberg, and Khavarmanesh provided these records to the pharmacies' tax return preparers and instructed them to deduct the cashier's check transactions as business expenses to reduce the pharmacies' 2015 taxable income. *E.g.*, ROA.4890, 6067, 6078.

a.    Nourian and Rydberg worked with Mohammed Imtiyazuddin, a tax preparer, to prepare the tax return for Industrial & Family. ROA.6054.

Imtiyazuddin used the bank statements—which included more than $12.5 million in fictitious business expenses created by the cashier's checks, ROA.6059, 6067—provided by either Nourian or Rydberg. ROA.6059, 6067. When Imtiyazuddin was unable to classify transactions in those bank records for tax purposes, Imtiyazuddin reached out to Nourian or, if he was unavailable, Rydberg. ROA.6060-6063. They told him to classify them as business expenses. ROA.6067. Once Imtiyazuddin

21

prepared Industrial & Family's 2015 tax return, which contained $12.5 million in false expense deductions attributable to Rydberg's cashier's check purchases, Nourian reviewed and signed the tax return and confirmed that it was accurate. ROA.6063-6064, 6074-6075, 7001-7002, 7006.

Nourian provided the preparers of his individual tax returns "with all of the information used to prepare the tax returns," ROA.5295-5297, assuring them that the information was accurate, ROA.5298-5299. Nourian reviewed and signed his 2015 tax return, which reported his income tax liability as $10,863,962 less than it should have been. ROA.5300, 5304, 6054, 7013-7014.

b.    Imtiyazuddin also prepared the tax returns for Park Row, ROA.6076-6077, where Nourian was manager, president, and pharmacist-in-charge. Either Rydberg or Khavarmanesh provided the bank statements to Imtiyazuddin, ROA.6078, and based on this information, Park Row also falsely classified Rydberg's cashier's check withdrawals as business expenses in a 2015 return signed by Khavarmanesh, ROA.2796, 6076-6077, 7007.

22

3.     The 2015 bank records gave the false appearance that the pharmacies actually paid funds to the cashier's check payees for business expenses, which lowered the apparent overall profits that the pharmacies would report. *E.g.*, ROA.6953-6955, 6969-6970, 6977-6979, 6984-6985. In total, the pharmacies and their shareholders avoided paying around $23.98 million in taxes in 2015 because the cashier's checks reduced taxable profits. ROA.7011.

Later, when preparing the 2016 tax returns for Industrial & Family and Park Row, Imtiyazuddin noted that both pharmacies had large deposits into their bank accounts in 2016. ROA.6090-6092. Both Nourian and Khavarmanesh told him that those deposits were loans. ROA.6090-6092.

## II.    Procedural history

In September 2019, a grand jury in the Northern District of Texas returned a superseding indictment charging James, Nourian, Rydberg, Mofid, Leyla, Dr. Benson, Dr. Taba, and Khavarmanesh with multiple counts relating to the scheme described above. *See* ROA.263-290. As relevant here, Nourian and Rydberg were charged with one count of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349;

one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. *See* ROA.263-290. Nourian was also charged with eight counts of healthcare fraud, in violation of 18 U.S.C. § 1347, and five counts of money laundering; and Rydberg was charged with six counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). ROA.278, 281-282.

James, Nourian, Rydberg, and Dr. Taba proceeded to trial. During the trial, James became ill, and the district court declared a mistrial as to James and severed his trial. ROA.10439-10461. In November 2023, the jury returned a guilty verdict on all counts against the remaining defendants. ROA.7979-7981.

## III. Rulings under review

Nourian and Rydberg challenge the district court's denial of their motions for judgment of acquittal, ROA.2939-2977, 13949-13971, the district court's failure to *sua sponte* declare a mistrial after an allegedly improper closing argument, ROA.7951-7952, and the district court's determinations regarding sentencing, ROA.8090, 10515-10516, restitution, ROA.8094-8097, and forfeiture, ROA.3015.

24

## SUMMARY OF ARGUMENT

1. Sufficient evidence supports Nourian's and Rydberg's convictions.

A.    Sufficient evidence supports the defendants' convictions for healthcare-fraud conspiracy and substantive healthcare fraud.

The evidence showed that Nourian was intimately involved in obtaining fraudulent prescriptions from Aguilar, was an owner and operator of the pharmacies used to carry out the scheme, worked closely with other members of the scheme, lied to conceal the scheme, and profited from it. Given this evidence, a rational jury could find Nourian guilty of conspiring to commit healthcare fraud, as well as the substantive healthcare fraud counts as a principal, as an aider and abettor, or under *Pinkerton*.

Similarly, sufficient evidence supported Rydberg's conviction for healthcare-fraud conspiracy because Rydberg played a significant role at the pharmacies and third-party companies involved in the scheme, worked closely with other co-conspirators, paid kickbacks, and worked to conceal those kickbacks.

25

Finally, contrary to the defendants' claims, FECA is a health care benefit program under 18 U.S.C. § 1347 because FECA refers not to the statute but to the plan the statute creates, and a health care benefit program includes "any" such plan.

B.    Sufficient evidence supports the defendants' convictions for money-laundering conspiracy and substantive money laundering. The evidence showed that the defendants were signatories on many of the accounts used to move fraud proceeds, that the proceeds were moved in complex and unusual ways using numerous accounts and cashier's checks, and that the proceeds were commingled with untainted funds. Given this evidence, a rational jury could find the defendants guilty of conspiring to launder money and of substantive money laundering as principals, as aiders-and-abettors, or under *Pinkerton*.

C.    Sufficient evidence supports the defendants' convictions for conspiring to defraud the United States by impeding the functions of the IRS. The defendants actively coordinated with others to engage in the financial transactions used to conceal profits, were signers on many of the accounts containing fraud proceeds, falsely told tax preparers that

millions of dollars were business expenses, and (in Nourian's case) signed tax returns that underreported taxable profits.

2. The government's rebuttal argument was neither improper nor prejudicial. The government's argument was proper because it did not ask the jury to convict based on deliberate ignorance. In any event, the argument was not prejudicial because any improper comments were isolated; the jury was instructed that it had to find actual knowledge, not deliberate ignorance; the jury received a curative instruction; and the evidence of guilt was overwhelming. Moreover, the court's curative instruction adequately instructed the jury to ignore an image used by the government related to the allegedly improper argument, and the jury would have understood that instruction as requiring it to disregard both the image and the argument.

3. The district court did not err in sentencing Nourian and Rydberg.

A. The court properly determined that Nourian and Rydberg's offense affected more than 10 victims. The Guidelines commentary defines "victim" to include any individual whose means of identification was used unlawfully or without authority, and, accordingly, this Court

has repeatedly treated as "victims" healthcare beneficiaries whose information is used to submit fraudulent healthcare claims.

B.   The district court properly considered Nourian's lack of remorse at sentencing because Nourian waived his Fifth Amendment privilege against self-incrimination by allocuting at sentencing. In any event, although the court remarked upon Nourian's lack of remorse, the record does not indicate that the court imposed a higher sentence because of it.

C.   The district court properly found that funds in Nourian's brokerage account that were not fraud proceeds were subject to forfeiture. Those funds were involved in money laundering because they were commingled with the fraud proceeds to help conceal the source and nature of those proceeds.

D.   The district court properly found facts relating to the restitution award under the Mandatory Victims Restitution Act because this Court has repeatedly held that the amount of restitution need not be charged in an indictment or proved to a jury.

## ARGUMENT

### I.    Sufficient evidence supports Nourian's and Rydberg's convictions.

Nourian and Rydberg contend (Nourian Br.20-39; Rydberg Br.21-52) that insufficient evidence supports their convictions. Those contentions lack merit.

#### A.    Standard of review

This Court reviews a preserved sufficiency challenge *de novo. See United States v. Alaniz,* 726 F.3d 586, 600 (5th Cir. 2013). In doing so, this Court "view[s] all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *Id.* (quotations omitted). This inquiry is "highly deferential to the verdict," asking only whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Isgar*, 739 F.3d 829, 835 (5th Cir. 2014) (quotations omitted). "[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999). "The jury retains the sole authority to weigh any conflicting evidence and to

evaluate the credibility of the witnesses." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quotations omitted).

## B.    Background

After the close of the government's case, Nourian and Rydberg moved for a judgment of acquittal. ROA.7089-7095, 7133-7146. The court reserved ruling. ROA.7111, 7175. At the close of all the evidence, the defendants renewed their motions. ROA.7629. The court again reserved ruling. ROA.7629-7630. After the jury returned a guilty verdict, the court denied the motions without prejudice. ROA.1675-1676. Nourian and Rydberg filed post-trial motions for a judgment of acquittal or for a new trial, ROA.2156-2190, 12977-13016, which the court denied, ROA.2939-2977, 13949-13971.

## C.    Sufficient evidence supports the defendants' convictions for healthcare-fraud conspiracy and substantive healthcare fraud.

To convict a defendant of substantive healthcare fraud, in violation of 18 U.S.C. § 1347, the government must prove that the defendant "knowingly and willfully executed a scheme to defraud a government health care program." *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017).

A conspiracy to commit healthcare fraud requires proof that "(1) two or more persons made an agreement to commit health care fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *United States v. Barnes*, 979 F.3d 283, 294 (5th Cir. 2020) (quotations omitted). The conspiratorial agreement "may be silent and informal," the defendant's voluntary participation and knowledge "may be inferred from surrounding circumstances," and the government may rely on "direct or circumstantial evidence to prove each element." *United States v. Barson*, 845 F.3d 159, 163-64 (5th Cir. 2016) (per curiam) (quotations omitted).

Nourian and Rydberg do not dispute the existence of a conspiracy to commit healthcare fraud as charged in Count 1 or the existence of a substantive healthcare-fraud scheme involving FECA and BCBS beneficiaries as charged in Counts 2-9. *See* ROA.275-278. Instead, Nourian and Rydberg contend only that there was insufficient evidence that they had the necessary knowledge and intent to defraud. Nourian Br.23-25; Rydberg Br.39-43. They are incorrect.

31

1. <u>There is sufficient evidence of Nourian's knowledge and intent to defraud.</u>

a.    Sufficient evidence shows that Nourian had the necessary knowledge and intent to defraud required to prove conspiracy to commit healthcare fraud as charged in Count 1.

First, Nourian was intimately involved in obtaining fraudulent prescriptions from Aguilar in exchange for kickbacks. Nourian personally recruited Aguilar into the conspiracy, having Aguilar "sen[d] them . . . prescriptions" for compound medications in exchange for "money." ROA.4537-4538. Aguilar regularly met with Nourian at Park Row, where Nourian provided Aguilar stacks of blank or pre-filled prescription pads and told Aguilar that the prescriptions were for employees of the pharmacy. ROA.4540-4544. Aguilar signed those prescriptions in front of Nourian for individuals Aguilar never saw, treated, or evaluated. ROA.4541-4542, 4544. James then paid Aguilar for signing those prescriptions, which the brothers used to defraud BCBS. ROA.4550-4551, 4554.

This evidence shows, contrary to Nourian's contention (Nourian Br.23-24), that there was sufficient evidence that he was aware that the prescriptions were not medically necessary, especially given that

32

Nourian had a medical background as a trained pharmacist and worked as a pharmacist at a large retail pharmacy chain. ROA.4534, 6678. Aguilar's conduct drastically deviated from the medical standard of care, which involves—at a minimum—seeing and evaluating patients before prescribing them medication. ROA.4539. Indeed, because Aguilar did not evaluate these patients, these prescriptions could not be individualized. *E.g.*, ROA.4539, 4939. A reasonable jury could find that Nourian knew that the stacks of blank and pre-filled prescriptions he provided Aguilar to sign without ever examining the patients were medically unnecessary and therefore unlawfully submitted.

Moreover, Nourian knew that Aguilar was signing these prescriptions for kickbacks. *See* ROA.4537-4538, 4549-4550. And Nourian, as a trained pharmacist, would have known that FECA would not have reimbursed for prescriptions that were the product of kickbacks. *See* ROA.4875-4877, 5716; *cf.* ROA.3637. The payment of kickbacks, moreover, created a perverse incentive for the prescriptions that supported an inference they were not based on medical necessity. Thus, a rational jury could infer from this knowledge that Nourian knew these prescriptions were not medically necessary. *See* ROA.4549-4550 (Aguilar

33

stating that he signed the prescriptions for money); *see also* ROA.5002, 5010, 5014, 5018, 5020, 5023, 5025 (Dr. Williams discussing that he submitted these prescriptions to get paid kickbacks, not for medical necessity).

Second, Nourian's involvement with Aguilar allowed a reasonable jury to infer that he was aware of and involved in the rest of the scheme, which operated in a similar way. *Cf. United States v. Rojas*, 812 F.3d 382, 401 (5th Cir. 2016) (explaining that co-conspirators' knowledge that drugs was headed to the United States as evidence that the defendants knew of the destination). The part of the scheme involving Aguilar required concerted action between the co-conspirators: Nourian and James together made the agreement with Aguilar, Nourian provided the prescription pads, and James paid Aguilar the kickbacks. *See Barnes*, 979 F.3d at 295 ("[T]he [g]overnment can use evidence of the conspirators' concerted actions to prove an agreement existed." (quotations omitted)).

Third, Nourian was a part owner of Ability and the sole owner of Industrial & Family. ROA.4419, 4889, 6058, 6992. He also had access to and control over every Ability and Industrial & Family bank account involved in the scheme, which together received more than $77 million in

34

fraud proceeds. *See* pp.16-18, *supra*; ROA.6636-6638. And Nourian would occasionally ask employees of Ability and Industrial & Family about prescriptions and the running of the pharmacy's daily business. ROA.4454. Nourian's leadership role in the pharmacies allowed a rational jury to find that Nourian was aware of and actively participated in the conspiracy.

Nourian also played an important role in supplying documents that were critical to carrying out the fraud, including being listed as the contact person on paperwork submitted to DOL enabling Industrial & Family to fraudulently bill more than $60 million and receive more than $32 million, ROA.3631, and signing Industrial & Family's provider enrollment contract for BCBS, in which Nourian "agree[d]" on behalf of Industrial & Family to "comply with all applicable Laws," ROA.4107-4108. *See United States v. Willett*, 751 F.3d 335, 339-41 (5th Cir. 2014) (knowledge of fraudulent upcoding attributable to defendant because of signature on company's Medicare provider application that obligated the company to adhere to Medicare's rules and regulations).

Fourth, Nourian's role meant that he worked closely with other members of the conspiracy and scheme. Although James essentially ran

35

the pharmacies, Nourian held high-ranking positions as an owner, president, manager and pharmacist-in-charge at those pharmacies. ROA.4419, 4534, 4889, 4890, 6992. Indeed, when Nourian was not at Park Row, James became irate over Nourian's absence. ROA.3984. Given Nourian's important role in the organizations and his close association with James, a reasonable jury could determine that he was aware of the scheme and willingly joined the conspiracy to further it.

Moreover, the conspiracy largely involved coordination between members of Nourian's family. Although "a conspiracy cannot be proven solely by a family relationship[,] . . . [w]hen inferences drawn from the existence of a family relationship or mere knowing presence are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction." *United States v. Ismoila*, 100 F.3d 380, 389 (5th Cir. 1996) (quotations omitted).

Fifth, for his role in the fraud, Nourian profited handsomely, depositing more than $20 million in fraud proceeds into his TD Ameritrade investment account. ROA.6224, 6679. *See Barnes*, 979 F.3d at 303 (financial motive is circumstantial proof of knowledge for healthcare fraud).

36

Finally, when questioned about the source of that $20 million in fraud proceeds, Nourian lied to cover up his and his co-conspirators' crimes, claiming the money came from "real estate" investments. ROA.6225. Nourian's lies demonstrate his consciousness of guilt and knowledge that the money was obtained by healthcare fraud. *See United States v. Odiodio*, 244 F.3d 398, 403 (5th Cir. 2001) (citing inconsistent and implausible statements about the source of funds as evidence of participation in a scheme to defraud); *e.g., United States v. Simmons*, 470 F.3d 1115, 1121 (5th Cir. 2006) ("[A] defendant's exculpatory statements which are shown by other evidence to be false may give rise to an inference of consciousness of guilt." (quotations omitted)); *United States v. Lopez-Monzon*, 850 F.3d 202, 207 (5th Cir. 2017) (noting that statements which are inconsistent with other evidence "are circumstantial evidence of knowledge").

Nourian contends that there is insufficient evidence that he was aware that the medical professionals were being paid kickbacks and that kickbacks were illegal. Nourian Br.24-25. At the outset, Nourian's knowledge of the kickbacks is not necessary to prove the crime charged. Nourian was not charged with conspiracy to violate the Anti-Kickback

37

Statute, 42 U.S.C. § 1320a-7b(b). Instead, proof of kickbacks can simply serve as evidence that the prescriptions were not medically necessary and that the defendants knew that fact. *See* ROA.7755-7759. But, in any event, there was sufficient evidence that Nourian knew that the prescribers were being paid kickbacks. He knew Aguilar was being paid kickbacks because he made the deal with Aguilar for these kickbacks. *See* pp.10-11, *supra.* And a rational jury could infer that he knew the other prescribers were also being paid kickbacks because, among other things, evidence of the prescriptions and kickbacks was found throughout the pharmacies; James often and openly spoke about the kickback scheme to others; and Nourian worked at, owned, or partially owned the pharmacies and worked closely with James and Rydberg, who paid the kickbacks. *See* pp.5-14, *supra.* Moreover, the jury heard substantial evidence from which it could rationally infer that Nourian knew paying kickbacks for prescriptions was illegal, including that Nourian was a trained pharmacist who worked at a large retail pharmacy, Nourian would lock the door when Aguilar came to Park Row to sign prescriptions, and Nourian lied about the source of the fraud proceeds. *See* pp.10-11, 19, *supra*; *see also* ROA.4875-4877, 5716.

b.    There was also sufficient evidence that Nourian had the necessary knowledge and intent to defraud required to prove substantive healthcare fraud as charged in Counts 2-9.

i.    A rational jury could find Nourian guilty as a principal or, at least, as an aider and abettor on the substantive counts.

A defendant is guilty as a principal if he is the one "who actually perpetrated the offense," *i.e.*, satisfied all the elements of the crime. *Standefer v. United States*, 447 U.S. 10, 15 (1980). To prove a defendant guilty as an aider and abettor, the government must establish "that the substantive offense occurred and that the defendant (1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed." *United States v. Scott*, 892 F.3d 791, 798 (5th Cir. 2018) (quotations omitted). "[A] defendant need not commit each element of the substantive offense, so long as he aided and abetted each element." *Id.* at 798-99.

Counts 2 through 4 involve fraudulent prescriptions that Aguilar signed. *See* ROA.278. As discussed above, Nourian was deeply involved in the aspects of the scheme involving Aguilar. *See* pp.10-11, 32-34, *supra.* Counts 5 through 9 involve fraudulent prescriptions written by

39

Drs. Benson and Taba. ROA.278. Nourian contends that he was not aware of the substantive healthcare fraud involving Drs. Benson, Taba, and Williams, Nourian Br.23-25, but the evidence discussed above belies that contention. Nourian was actively involved in the scheme as a part owner of Ability and a signatory on many of the Ability and Industrial & Family bank accounts involved in the scheme. *See* pp.34-35, *supra.* Indeed, all the fraudulent prescriptions underlying Counts 2-9—including those not prescribed by Aguilar—were for compound medications that were filled at Ability in the same year, *see generally* ROA.7775-7778, a pharmacy Nourian partially owned and for which Nourian was president, ROA.4889, 6992. And the fraudulent prescriptions in Counts 6-9 were filled at Ability *after* the fraudulent prescriptions Aguilar signed were filled at Ability. *Compare* ROA.4491, 4493, 4495 *with* ROA.7775-7778. Nourian, moreover, worked closely with other members of the scheme, many of which were members of his family. And Nourian profited from the scheme and lied to cover it up. *See* pp.36-37, *supra.*

This evidence is sufficient for a jury to find Nourian guilty of healthcare fraud as a principal. But in any event, contrary to Nourian's

contentions (Nourian Br.25-28), there is sufficient evidence for Nourian to be found guilty of substantive healthcare fraud as an aider and abettor. All the facts discussed above supporting Nourian's guilt as a principal and Nourian's guilt for conspiracy support finding Nourian guilty of the substantive crime as an aider and abettor. *United States v. Sanders*, 952 F.3d 263, 278 (5th Cir. 2020) ("Typically, the same evidence will support both a conspiracy and an aiding and abetting conviction." (quotations omitted)); *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994). In short, Nourian worked in concert with James and Rydberg to further the scheme by owning and operating the pharmacies used to fill the prescriptions; brought in Aguilar and obtained those additional prescriptions, which were generally for James's employees; was a contact person on and signed documents critical to carrying out the fraud, and was a signer on many of the relevant pharmacies' accounts. *See* pp.32-38, *supra.*

"[I]t is not necessary to prove the defendant had knowledge of the particular means by which the principal in the crime would carry out the criminal activity." *United States v. Westbo*, 746 F.2d 1022, 1025 (5th Cir. 1984) (per curiam). Instead, "[t]o aid and abet means to assist the

perpetrator of the crime while sharing in the requisite intent." *Id.* Because these affirmative acts established that Nourian actively participated in the fraudulent scheme knowing its extent, the jury could reasonably infer that Nourian intended the scheme's commission. *See Rosemond v. United States*, 572 U.S. 65, 77 (2014); *see, e.g., United States v. Iriele*, 977 F.3d 1155, 1172-73 (11th Cir. 2020) (sufficient evidence that pharmacist aided and abetted where pharmacist knew doctor's office was issuing illegitimate prescriptions and allowed pharmacists he employed to fill them).

ii.    Contrary to Nourian's contentions (Nourian Br.25-28), sufficient evidence also supports Nourian's convictions for substantive healthcare fraud under *Pinkerton.*

Under *Pinkerton v. United States*, 328 U.S. 640 (1946), each member of a conspiracy can be found guilty of a substantive offense committed by a co-conspirator during the course of and in furtherance of the conspiracy, unless the act "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* at 647-48.

42

Here, a jury could find that it was within the scope of the conspiracy and reasonably foreseeable to Nourian that one of his co-conspirators would engage in the healthcare-fraud offenses alleged in the indictment. As discussed above, Nourian took an active role in the conspiracy, *see* pp.32-38, *supra*, and the substantive healthcare-fraud offenses that were the subject of the *Pinkerton* instruction were "the object of the conspiracy," *Sanjar*, 876 F.3d at 743. Because the healthcare fraud was the primary goal of the conspiracy, it was within the scope of the conspiracy and reasonably foreseeable. *Cf. id.* at 743-44 (explaining that in cases where *Pinkerton* liability extends only to the substantive offense that is the object of the conspiracy, "foreseeability is usually not disputed" because "how could the [healthcare fraud] not be foreseeable to a participant in a [healthcare-fraud] conspiracy?").

Nourian contends that he was not aware of the substantive healthcare fraud involving Drs. Benson and Taba, Nourian Br.23-25, but even if that were so, he would still be responsible for that fraud under *Pinkerton*, which does not require knowledge of the substantive acts. *See United States v. Wilson*, 105 F.3d 219, 221 (5th Cir. 1997).

43

Nourian also contends that his "connection to the offenses in question is so attenuated that due process should bar his conviction." Nourian Br.27. He is mistaken. As Nourian concedes, Nourian Br.27 n.12, this Court has never held that a conviction based on *Pinkerton* was barred by the Due Process Clause. In any event, Nourian was not attenuated from the substantive healthcare-fraud offenses in question: for example, Nourian served as the owner at Industrial & Family, was an owner and president of Ability, had access to and control over the Ability and Industrial & Family bank accounts involved in the scheme, personally recruited Aguilar into the conspiracy, and profited from the scheme while lying to hide the source of the funds. *See* pp.32-38, *supra.* There is no attenuation here because Nourian was an "expediter" and "active participant" in the conspiracy. *United States v. Moreno*, 588 F.2d 490, 493 (5th Cir. 1979).

2. There is sufficient evidence of Rydberg's knowledge and intent to defraud.

There is sufficient evidence that Rydberg had the necessary knowledge and intent to defraud to prove conspiracy to commit healthcare fraud as charged in Count 1.

44

First, Rydberg worked closely with James to lead the scheme and conspiracy. Rydberg was an "extremely smart" man who lived with James and was his "loyal" right-hand man. ROA.4075, 4193, 4227. Indeed, when James was not around, Rydberg was in charge. ROA.4077. A rational jury could infer from how closely Rydberg worked with James and his leadership in James's absence that Rydberg knew of the conspiracy and scheme. *See Willett*, 751 F.3d at 340 (inferring knowledge of a healthcare fraud conspiracy from the defendant's "proximity to the fraudulent activities" and frequent meetings with his alleged co-conspirator).

For example, James told Rydberg to write a check to Dr. Williams. ROA.3991-3992. And James asked a clerical employee at Ability to leave before Dr. Williams arrived, but Rydberg and James stayed to meet with the doctor. ROA.3992-3993. A rational jury could infer from the secrecy and the very fact of paying a doctor that Rydberg knew he was paying Dr. Williams a kickback and that the prescriptions were not medically necessary.

Indeed, evidence of the fraud scheme could be found throughout the pharmacies. At Ability, for example, prescriptions signed by Drs. Benson,

45

Taba, and Williams were "all over the office," ROA.3985, and the pharmacies contained printed reports tracking the amount of money the pharmacies had billed the DOL by each prescribing doctor, ROA.4879-4885, which a jury could reasonably infer was a method for tracking the amount of money owed for kickbacks.

Second, Rydberg was an integral part of this scheme. Rydberg had responsibility for carrying out some of the most important actions that ensured the conspiracy's success: paying kickbacks and handling the millions of dollars he and his family obtained as part of the fraud. *See* pp.5-19, *supra*. Indeed, Rydberg himself re-created template prescription pads with the same formulas designed to maximize reimbursement. *See* ROA.3973. A reasonable jury could determine from the fact that Rydberg was an essential part of the scheme that Rydberg knew about the scope of the scheme and that these prescriptions were not medically necessary. *See Barnes*, 979 F.3d at 295 ("[T]he [g]overnment can use evidence of the conspirators' concerted actions to prove an agreement existed." (quotations omitted)).

Rydberg also concealed the nature of the kickback payments by paying the prescribers through numerous other companies. *See, e.g.*,

ROA.2791-2793. And in the checks Rydberg used to pay the kickbacks, he sometimes included fake descriptions in the memo line. *E.g.*, ROA.5004, 5012-5013, 5015, 5029. A rational jury could infer from this concealment that Rydberg knew the kickbacks were not lawful and that these prescriptions were not medically necessary.

Third, James, with whom Rydberg worked closely, was vocal about the scheme. James frequently admitted that he paid kickbacks to doctors. ROA.4207, 4212. Relatedly, James frequently joked in front of Rydberg and others about how he flooded the pharmacy (which had only paper files) during a prior audit to destroy evidence. ROA.4228-4229. The fact that Rydberg worked so closely with James, who spoke openly about the scheme, allowed a reasonable jury to infer that Rydberg was aware of the nature of the scheme and worked with James to further it.

Rydberg contends that there is no proof that he was aware of the fraud involving Aguilar. Rydberg Br.42. As an initial matter, that contention is irrelevant because the "government need not prove knowledge of all the details of the conspiracy by any [defendant], but only that they had knowledge of the essential object of the conspiracy." *United States v. Rodriguez*, 831 F.3d 663, 668 (5th Cir. 2016) (quotations

47

omitted). In any event, there is sufficient evidence that he had such knowledge. Rydberg was closely associated with James, who was in charge of the scheme, and Rydberg oversaw the pharmacies when James was gone. Moreover, aspects of Aguilar's prescriptions and kickbacks were handled in essentially the same way as the other doctors: James paid Aguilar kickbacks in much the same way he and Rydberg paid kickbacks to the doctors—using checks from Bandoola and Mofid and including false reasons for payment in the memo lines. *See* pp.6-11, *supra.* Indeed, Aguilar signed at least one prescription for Rydberg. ROA.4504-4505, 4546-4547. A rational jury could infer from this that Rydberg was involved in or at least aware of the aspects of the scheme concerning Aguilar—just as he was with the doctors.

This evidence, seen in the light most favorable to the government, was sufficient to allow a rational jury to find that Rydberg had knowledge of the scheme, was aware that the kickbacks were unlawful, and was aware the prescriptions were not medically necessary.

48

3. <u>FECA is a health care benefit program under 18 U.S.C. § 1347.</u>

Nourian and Rydberg additionally contend that FECA is not a health care benefit program under 18 U.S.C. §§ 1347 and 24. Nourian Br.29; Rydberg Br.24-37. They are incorrect.

a.    i.    To find the defendants guilty of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. §§ 1347 & 1349, the government had to prove that the defendants conspired to execute or attempt to execute a scheme or artifice "to defraud any health care benefit program" or "to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program." 18 U.S.C. § 1347. The term "health care benefit program" is defined in 18 U.S.C. § 24(b), which states that the term "means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." The indictment alleged that the defendants conspired to defraud and defrauded two "health care benefit programs": FECA and BCBS. ROA.263-274.

49

ii. "FECA provides compensation for a federal employee's personal injuries 'sustained while in the performance of his duty.'" *White v. United States*, 143 F.3d 232, 234 (5th Cir. 1998) (quoting 5 U.S.C. § 8102(a)). It provides, among other things, that "[t]he United States shall furnish to an employee who is injured while in the performance of duty, the services, appliances, and supplies prescribed or recommended by a qualified physician, which the Secretary of Labor considers likely to cure, give relief, [or] reduce the degree or the period of disability." 5 U.S.C. § 8103(a). An employee covered by FECA is entitled to receive medical services and supplies prescribed by a qualified physician. 20 C.F.R. § 10.310(a). Thus, "FECA benefits for injured workers include . . . certain medical expenses and rehabilitation services." *Sanders*, 952 F.3d at 269; *see generally* 20 C.F.R. § 10.310-316.

The Secretary of Labor administers FECA and has the power to prescribe rules and regulations necessary for the enforcement of the Act. 5 U.S.C. § 8149. The Secretary has delegated this authority to the DOL's OWCP, which administers the benefits. 20 C.F.R. §§ 10.1-.2.

b. FECA is properly considered a "health care benefit program" under 18 U.S.C. § 24(b).

i.      The plain text supports the district court's determination that FECA is a "health care benefit program." There is no dispute that FECA "affect[s] commerce," nor is there any dispute that under FECA a "medical benefit, item, or service is provided to any individual." 18 U.S.C. § 24(b). The only question, then, is whether FECA is "any public or private plan or contract." *Id.* Contrary to the defendants' contentions, it is.

Section 24(b) broadly defines the term "health care benefit program" to include "*any* public or private plan or contract . . . under which *any* medical benefit, item, or service is provided to *any* individual, and includes *any* individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b) (emphases added); *see United States v. Anderson*, 980 F.3d 423, 428 (5th Cir. 2020) (recognizing that "[t]he definition in Section 24(b) of a 'health care benefit program' begins with categorizing the term broadly"). Courts have recognized that "any" has an "expansive meaning." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218-20 (2008); *see, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997). The use of "any," therefore, leaves "no basis in the text for limiting the

[statutory] phrase." *Ali*, 552 U.S. at 219 (quotations omitted). Because Congress did not add language limiting the breadth of "any," Section 24(b) is properly read as referring to all plans of whatever kind that provide a medical benefit of whatever kind—including FECA.

Given the broad statutory language, this Court has directed courts "to apply a broad meaning" to the phrase "'health care benefit program'" as used in Section 24(b). *Anderson*, 980 F.3d at 428. In *United States v. Collins*, 774 F.3d 256 (5th Cir. 2014), for example, this Court explained that automobile-insurance companies were properly considered "health care benefit programs" because "[t]o the extent automobile insurers pay for medical treatment, they are health care benefit programs under the statute." *Id*. at 260. And in *Anderson*, 980 F.3d 423, this Court held that BCBS was a "health care benefit program," even though it served merely as a third-party administrator of American Airlines' benefit plan. *Id*. at 428. As this Court explained, "[u]nder the plain text of the statute, an administrator's payment to a health care provider who has furnished services or equipment to an individual is the provider of a 'medical benefit, item, or service.'" *Id*.

52

FECA is much like from the health care benefit programs in those cases. FECA similarly involves a "payment to a health care provider who has furnished services or equipment to an individual," *Anderson*, 980 F.3d at 428, which makes FECA a "plan . . . under which any medical benefit, item, or service is provided to any individual," 18 U.S.C. § 24(b)

    c.    Defendants' contrary arguments lack merit.

Defendants contend that FECA cannot be a plan because it is "a statute" that "cannot be defrauded of, or cheated out of, money or property." Rydberg Br.27-28. That contention is incorrect. The "plan" is not the statute itself, but the system for payment established by the statute. FECA creates a "plan" in the same way that other statutes create Medicare, Medicaid, and Tricare—which defendants agree are plans, Rydberg Br.25. *See* 42 U.S.C. § 1395 *et seq.* (Medicare); 42 U.S.C. § 1396 *et seq.* (Medicaid); 10 U.S.C. § 1071 *et seq.* (Tricare). And the plan created by FECA is often simply called "FECA." *See* Congressional Research Service, The Federal Employees' Compensation Act (FECA): Workers' Compensation for Federal Employees (March 10, 2025), *available at* https://www.congress.gov/crs-product/R42107 ("The Federal Employees' Compensation Act (FECA) is the workers' compensation program for

federal employees."). So the indictment correctly alleged a scheme to defraud a "plan." And even if the indictment should have alleged a scheme directed at "the plan created by FECA" or, as Rydberg suggests, the DOL's OWCP as "the agency that administers FECA," Rydberg Br.28, this would at most show a non-prejudicial variance between the indictment and the proof at trial. *See United States v. Meza*, 701 F.3d 411, 424-25 (5th Cir. 2012) ("[A] variance between allegations and proof is fatal only when it affects the substantial rights of the defendant by failing to sufficiently notify him so that he can prepare his defense and will not be surprised at trial." (quotations omitted)). It would not show that the defendants failed to defraud a "plan."

Defendants next contend that the phrase "health care benefit program" applies only to insurance plans and not workers' compensation plans because "[a] health care 'plan' is an arrangement . . . to cover the *future* costs of treating a covered illness or injury." Rydberg Br.25, 31, 33-34. But Section 24(b) does not contain language limiting the medical benefit to *future* payments. To the contrary, it makes clear that it includes plans "under which *any* medical benefit, item, or service is provided." 18 U.S.C. § 24(b) (emphasis added). The statute, therefore,

54

mentions nothing about excluding retroactive payments. Workers' compensation programs are thus properly considered "health care benefit programs" under Section 1347. *See United States v. Martinez*, 588 F.3d 301, 306, 315 (6th Cir. 2009).

In any event, even if "plan" in Section 24(b) were limited to arrangements for future medical costs, as defendants contend, FECA would fit within defendants' proposed definition. When an employee is hired by the federal government, part of that agreement includes healthcare benefits provided by the FECA in the event of a work-related injury. *See* 5 U.S.C. § 8103(a) (explaining that "[t]he United States shall furnish" benefits to injured employees). FECA, accordingly, much like Medicare or other insurance programs, is a plan to cover future medical costs. Defendants' contention, therefore, lacks merit.

Defendants assert that "Department of Labor's OWCP—the agency that administers FECA through the exercise of administrative discretion—is the relevant 'plan' for purposes of § 24(b)." Rydberg Br.28. This is partially correct, but incomplete.. Section 24(b) states that a "health care benefit program" is any plan or contract that provides any medical benefit, and "includes any individual or entity who is providing

55

a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). Thus, either the plan itself (here, FECA) or the administrator of the plan (here, as defendants concede, OWCP or the DOL) are properly considered a "health care benefit program" for purposes of Section 1347. *See Anderson*, 980 F.3d at 428 (explaining that a plan administrator "is the provider of a 'medical benefit, item, or service'").

Defendants suggests that the distinct definition of "federal health care program" in 42 U.S.C. § 1320a-7b casts doubt on a reading of "health care benefit program" as including FECA. Rydberg Br.32-34. That definition states that the term "federal health care program" means "any plan or program that provides health benefits, whether directly, through insurance, or otherwise." 42 U.S.C. § 1320a-7b(f). The fact that the definition includes "or otherwise," defendants argue, shows that Congress did not mean to expand the definition to include non-insurance plans in Section 24(b). They are mistaken. First, the definition in Section 1320a-7b casts no doubt on the definition in Section 24(b) because it defines a different statutory term in a different title of the U.S. Code. Second, contrary to the defendants' contention, the definition in Section

56

1320a-7b supports the government's argument. Congress's recognition in Section 1320a-7b that a program could provide health benefits through insurance "or otherwise" shows that the broad language in Section 24(b) referring to "any" plan or contract providing "any" medical benefit is not limited to insurance-type plans.

Finally, defendants suggest that this Court should apply the rule of lenity. Rydberg Br.36-37. But that rule "comes into operation at the end of the process" of statutory interpretation, "not at the beginning as an overriding consideration of being lenient to wrongdoers." *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quotations omitted). It applies only if after applying all the traditional principles of statutory construction, a court "can make no more than a guess as to what Congress intended." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quotations omitted). This case creates no occasion for guessing, because the plain meaning of the definition of "health care benefit program" in Section 24(b) makes clear that it includes FECA, which is a plan that provides medical benefits to government employees.

Because the FECA fits within the broad definition of "health care benefit program" under the plain meaning of Section 24(b)'s text, defendants' contention fails.

**D. Sufficient evidence supports the defendants' convictions for money-laundering conspiracy and substantive money laundering.**

"To establish conspiracy to commit money laundering, the government must prove (1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006).

The money-laundering conspiracy alleged here had two objects: (1) concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and (2) engaging in a monetary transaction in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957(a). Section 1956(a)(1)(B)(i) prohibits concealment money laundering, which is conducting or attempting to conduct a "financial transaction" involving the proceeds of "specified unlawful activity" with knowledge that the transaction involves such proceeds and with intent

58

"to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." 18 U.S.C. § 1956(a)(1)(B)(i). Section 1957 prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000," which "is derived from specified unlawful activity." 18 U.S.C. § 1957.

Count 10 charged Nourian and Rydberg with a money-laundering conspiracy, in violation of 18 U.S.C. § 1957. ROA.279-280. Counts 11-16 charged Rydberg with concealment money laundering, and Counts 11-12 and 14-16 charged Nourian with concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). ROA.281-282.

1. <u>Sufficient evidence shows that the funds in question derived from unlawful activity and that the defendants were aware of that fact.</u>

Defendants contend that there is insufficient evidence of money laundering because (a) there is insufficient evidence of healthcare fraud, Nourian Br.32-33; Rydberg Br.43-45; (b) FECA is not a health care benefit program, Rydberg Br.45; and (c) the evidence does not show Nourian knew the relevant funds were derived from healthcare fraud,

59

Nourian Br.32-33. Those arguments fail for the reasons explained above. *See* pp.30-58, *supra.*

### 2. There is sufficient evidence of Nourian's guilt for conspiring to launder money.

Sufficient evidence supports Nourian's guilt for conspiring to launder money. Contrary to Nourian's contention (Nourian Br.33-34), a jury could rationally determine that Nourian was aware that the transactions involving the fraud proceeds were designed to conceal the nature and source of the funds and that he knowingly agreed to further the purpose of the conspiracy.

First, as discussed above, Nourian was an integral part of the healthcare-fraud scheme. *See* pp.32-44, *supra.* Thus, a jury could determine that Nourian knew that the money he was receiving from DOL and BCBS was fraud proceeds. A jury could further reasonably determine that because Nourian knew the millions the pharmacies were receiving were fraud proceeds, he also knew that the conspirators would need to conceal the nature and source of these funds. *Cf. United States v. Griffin*, 324 F.3d 330, 352 (5th Cir. 2003).

Second, the money was moved from the pharmacies' bank accounts in an unnecessary, complex, and intricate series of financial transfers.

For example, once DOL paid the pharmacies, where Nourian held high-ranking positions, that money was moved through as many as six accounts in a few days. ROA.6662, 6679. There was no legitimate business purpose for those convoluted and inefficient transactions. *See* ROA.6663, 6680. "[A] series of unusual financial moves [culminating] in the transaction, ha[s] been found to support an inference of an intent to conceal." *United States v. Willey*, 57 F.3d 1374, 1385-86 (5th Cir. 1995) (quotations omitted); *see also United States v. Pendleton*, 761 F. App'x 339, 347 (5th Cir. 2019) (per curiam) (unpublished). And "[m]oving money through a large number of accounts has, in the light of other evidence, also been found to support the design element of this offense, even when all the accounts to which the defendant transferred the money and from which he withdrew it were in his own name." *Willey*, 57 F.3d at 1386. Moreover, the use of cashier's checks to move large sums of money as the defendants did here could "indicate [an] attempt to conceal the source of the funds." ROA.6643. A jury could reasonably infer from this series of complicated and unnecessary financial transactions beginning at pharmacies where Nourian held a high-ranking position that Nourian

61

knew about the transactions and knew the purpose of these transactions was to conceal the source and nature of the funds.

Third, some of the accounts through which the money was moved were for holding companies that ostensibly had no affiliation with the pharmacies. *See* ROA.3995 (Jade and Joy); ROA.5672, 5691 (HJLM). *See United States v. Ways*, 832 F.3d 887, 897 (8th Cir. 2016) (noting that it was indicative of an intent to conceal that the defendant "had numerous bank accounts at six different banks, and he used a corporate alter ego"). Sending the money through these holding-company accounts was further evidence from which a rational jury could infer the purpose to conceal the source and nature of the funds. *See United States v. Burns*, 162 F.3d 840, 849 (5th Cir. 1998) (noting that "using third parties to conceal the real owner" is an indicator of intent to conceal (emphasis and quotations omitted)).

The DOL proceeds, moreover, were commingled with other funds. *See* pp.15-18, *supra*. "Evidence that the defendant commingled illegal proceeds with legitimate business funds has been held to be sufficient to support the design element." *Willey*, 57 F.3d at 1386. Moving the money through Jade and Joy, for example, commingled the funds because Jade

62

and Joy apparently received some rental income from properties. ROA.6525-6527. Indeed, Nourian himself further commingled the funds by personally depositing them into his TD Ameritrade account. ROA.6676-6677.

Fourth, Nourian was a signatory on many of the accounts involved in money laundering. DOL fraud proceeds were initially deposited into accounts for Ability and Industrial & Family and Nourian was a signatory during the relevant time period for many of these accounts; and the money was then moved through numerous accounts for which he was also a signatory, sometimes ending with money being moved into his personal accounts. *See* pp.15-18, *supra.* Indeed, Nourian was added as a signatory to the Industrial & Family Wells Fargo account involved in Counts 11 and 12 only a few weeks before the transfers of $3.5 million in Industrial & Family fraud proceeds that form the basis of those counts. ROA.281, 7081. A rational jury could infer from the fact that the fraud proceeds moved through accounts for which Nourian was a signer that Nourian was aware of the transactions occurring in these accounts and of their purpose.

Fifth, after the series of unusual transactions involving holding companies, significant sums of fraud proceeds were placed in two brokerage accounts, one of those being Nourian's. *Cf. Willey*, 57 F.3d at 1385 (noting that using a third-party entity "to purchase goods on one's behalf or from which one will benefit usually constitutes sufficient proof of a design to conceal").

Sixth, Nourian himself engaged in some transactions to further the money laundering. The same day that over $5 million was moved from Jade and Joy into Nourian's Wells Fargo account, Nourian deposited that money into his TD Ameritrade account using three checks. *See* p.16, *supra.* Executing this series of transactions, involving millions in fraud proceeds, over the span of just two days required close coordination between Nourian and his co-conspirators. *United States v. Vasquez*, 766 F.3d 373, 377 (5th Cir. 2014). A jury could infer from this coordination that Nourian was aware that the transactions were designed to conceal the source and nature of the funds. *See United States v. Gallo*, 927 F.2d 815, 820-21 (5th Cir. 1991).

Seventh, when a TD employee asked Nourian about the source of the money, Nourian falsely stated that it was the result of real estate

investments. *See* p.19, *supra.* A jury could reasonably infer that Nourian wanted to conceal the source of the funds, not only through lying about them but also through an intricate web of financial transactions. *See Burns*, 162 F.3d at 849 (noting the relevance of "statements by a defendant probative of intent to conceal" (quotations omitted)); *cf. United States v. Hasson*, 333 F.3d 1264, 1275 (11th Cir. 2003) (noting that it was evidence that the transactions were designed to conceal that the defendant "lied to FBI investigators and to an IRS agent").

Nourian contends that transfers between accounts belonging to the same account holder can never be used for concealment money laundering. Nourian Br.33. To the contrary, "[m]oving money through a large number of accounts has, in the light of other evidence, also been found to support the design element of this offense, even when all the accounts to which the defendant transferred the money and from which he withdrew it were in his own name." *Willey*, 57 F.3d at 1386; *see also United States v. Tencer*, 107 F.3d 1120, 1129-30 (5th Cir. 1997). Even if a transaction, viewed in isolation, conceals little, the transaction might serve to conceal source, nature, ownership, or control of illegal proceeds when viewed as part of a series of transactions. *See, e.g., Burns*, 162 F.3d

65

at 848-49; *Willey*, 57 F.3d at 1386. As discussed above, the transactions at issue here, when viewed in context, were part of a series of unusual and complicated financial moves that a jury could reasonably determine were designed to conceal the source and nature of the funds. *See United States v. Brown*, 553 F.3d 768, 786-87 (5th Cir. 2008).

3. <u>There is sufficient evidence of Nourian's guilt for substantive money laundering.</u>

Sufficient evidence supports the jury's finding that Nourian had the necessary knowledge and intent required to prove substantive money laundering as charged in Counts 11-12 and 14-16. Sufficient evidence exists for a reasonable jury to find Nourian guilty as either a principal or an aider and abettor, or under a *Pinkerton* theory.

a.    There is sufficient evidence for a rational jury to find Nourian guilty as a principal, or, at the very least, as an aider and abettor.

Nourian contends that he was not aware of the specific transactions underlying the substantive counts. Nourian Br.34. But sufficient evidence exists for a jury to reasonably find that Nourian was aware of these transactions. Many of these transactions occurred using bank accounts for which Nourian was a signer; the proceeds laundered originated from fraud carried out by Nourian and his family using

66

pharmacies that Nourian owned and operated; and some of the fraud proceeds were deposited into Nourian's personal accounts, at least one time by Nourian himself, which would have required Nourian to coordinate with his co-conspirators. *See* pp.14-18, *supra*. For example, around the time the laundering transactions in Counts 14-16 were executed, Nourian was added as a signatory to the Industrial & Family Wells Fargo account involved in Counts 11 and 12. ROA.281, 7081. And a few weeks after the transactions in Counts 14-16 were executed, the transfers of $3.5 million in Industrial & Family fraud proceeds, which form the basis of Counts 11 and 12, occurred. *See* pp.15-18, *supra*.

Many facts allowed the jury to infer that Nourian was aware of the transactions involved in the substantive money-laundering counts, including the nature and timing of the transactions, Nourian's actions in furtherance of the money laundering, the close association and coordinated actions between Nourian and his co-conspirators, the evidence concerning each defendant's role in the criminal conspiracies, and the fact that Nourian benefitted from the laundering.

In any event, contrary to Nourian's assertion, Nourian Br.34-36, a rational jury could find that Nourian aided and abetted his co-defendants

67

in committing money laundering by moving the fraud proceeds with the intent to conceal their source and nature. The evidence discussed above supports finding Nourian guilty of the substantive crime as an aider and abettor. *See Sanders*, 952 F.3d at 278. That evidence showed that the funds laundered in Counts 11-12 and 14-16 represented proceeds generated by the fraud the defendants committed through Ability, Industrial & Family, and Park Row; Nourian worked in concert with James and Rydberg to further the scheme by being an owner of Ability, the sole owner of Industrial & Family, and the pharmacist-in-charge at Park Row; Nourian was the contact person on paperwork submitted to the DOL on Industrial & Family's behalf, enabling the deposits of fraud proceeds that would be laundered; Nourian was added as a signatory to the Industrial & Family Wells Fargo account around the time the laundering transactions in Counts 14-16 were executed and a few weeks before the transactions involved in Counts 11-12; Nourian moved fraud proceeds between his accounts on the same day that his co-conspirators moved that money into his account; and Nourian helped to conceal the scheme and the source of the funds by lying to the TD Ameritrade employee about the funds. *See* pp.15-18, *supra.*

68

These affirmative acts allowed a reasonable jury to find that Nourian "actively participate[d] in [the] criminal scheme knowing its extent and character" while "intend[ing] that scheme's commission." *Rosemond*, 572 U.S. at 77.

b.     Moreover, contrary to Nourian's contention, Nourian Br.34-36, Nourian was also liable for the money-laundering counts under *Pinkerton*. The jury could find that it was within the scope of the conspiracy and reasonably foreseeable to Nourian that one of his co-conspirators would engage in the money-laundering offenses alleged in the indictment. As discussed above, Nourian took an active role in the money-laundering conspiracy, *see* pp.60-66, *supra*, and the substantive money-laundering offenses that were the subject of the *Pinkerton* instruction were "the object of the conspiracy," *Sanjar*, 876 F.3d at 743. Because the substantive money laundering at issue here was the primary goal of the conspiracy, it was within the scope of the conspiracy and reasonably foreseeable. *Cf. id.* at 743-44. Indeed, the evidence showed that these transactions were reasonably foreseeable to Nourian because his actions lined up with those of the other co-conspirators engaged in

69

moving the money. *Vasquez*, 766 F.3d at 377 (noting that "[a]n agreement may be inferred from a concert of action" (quotations omitted)).

Nourian contends that he was not aware of the individual transactions charged as the substantive money-laundering counts, Nourian Br.34-35, but even if that were so, he can be held liable under *Pinkerton* "regardless of whether he had knowledge of or participated in the substantive acts." *United States v. Portillo*, 969 F.3d 144, 166 (5th Cir. 2020) (quotations omitted). Finally, Nourian suggests that he is too attenuated from the substantive counts, Nourian Br.36, but the evidence above shows that Nourian was closely connected to and intimately involved in the conspiracy to launder money. *See generally United States v. Gonzales*, 841 F.3d 339, 351 (5th Cir. 2016).

> 4. There is sufficient evidence of Rydberg's guilt for conspiring to launder money and substantive money laundering.

Rydberg asserts only that there is insufficient evidence of his guilt on the money-laundering conspiracy and substantive money laundering counts because there is insufficient evidence of healthcare fraud. Rydberg Br.43-45; *see* pp.59-60, *supra*. Accordingly, he has forfeit any other challenge to the sufficiency of the evidence for these counts. *See*

*Indigenous Peoples of Coastal Bend v. United States Army Corps of Eng'rs*, 132 F.4th 872, 884 (5th Cir. 2025). In any event, there is sufficient evidence of Rydberg's guilt on these counts. For example, Rydberg worked closely with James, who controlled many of the holding companies, and both he and Rydberg together signed the paperwork for these companies and handled their money, ROA.3996, 5855; Rydberg was in charge in James's absence, ROA.4077; Rydberg was in charge of "transfers of money," ROA.5743-5744; Rydberg withdrew millions of dollars using numerous cashier's checks from Ability's and Industrial & Family's bank accounts, only to redeposit that money soon after, ROA.6638-6642, 6664-6665; Rydberg was a signer on many of the accounts used to launder the fraud proceeds, and Rydberg purchased a BMW sedan using over $100,000 of DOL funds. *See* pp.14-19, *supra*. This evidence is sufficient to support the jury's verdict that Rydberg was guilty of conspiring with others to launder money, and that Rydberg was guilty of the substantive counts of money laundering—either as a principal, as an aider and abettor, or under *Pinkerton*.

**E.    Sufficient evidence supports the defendants' convictions for conspiring to defraud the United States by impeding the functions of the IRS.**

Count 17 charged the defendants with conspiring to defraud the United States by impeding the functions of the IRS, in violation of 18 U.S.C. § 371. "To convict a defendant of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, the [g]overnment is required to prove beyond a reasonable doubt: '(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.'" *United States v. Green*, 47 F.4th 279, 289 (5th Cir. 2022).

Nourian and Rydberg assert that there is insufficient evidence that they knew about the objective to defraud the government of tax revenue and that they intended to join the conspiracy. Nourian Br.37; Rydberg Br.51-52. They are mistaken.

"The existence of an agreement, as well as a defendant's knowledge of its objective and intent to join, can be established by circumstantial evidence alone." *Green*, 47 F.4th at 291. The evidence need not "show an

72

express or formal agreement; evidence of a tacit understanding is sufficient." *Id.* (quotations omitted). A rational jury could find that Rydberg and Nourian knew about the objective to defraud the government of tax revenue and that they intended to join the conspiracy.

First, Nourian's and Rydberg's knowledge and intent can be inferred from their active roles in the financial transactions. Rydberg oversaw "taxes" and "transfers of money." ROA.5743-5744. In that role, Rydberg took out over 200 cashier's checks primarily made payable to three major pharmaceutical suppliers to make the checks appear as if they were being used to pay for business expenses. *E.g.*, ROA.6672, 6940-6941, 6945. Many of these cashier's checks were then redeposited the next tax year into the same Ability, Industrial & Family, and Park Row bank accounts. *E.g.*, ROA.6940-6941, 6981-6982. Nourian was a signatory on many of these accounts. *See* pp.15-18, *supra.* And Nourian deposited some of those cashier's checks into his own account. ROA.6961-6963, 6966. Nourian, as the owner of these pharmacies with access to and control over the pharmacies' bank accounts, was well-positioned to notice the extraordinary number of fictitious cashier's check transactions appearing on the pharmacies' bank statements.

73

Second, Nourian's and Rydberg's knowledge and intent can be inferred from the use of cashier's checks to move millions of dollars out of accounts and then back into those accounts in the new tax year. *See* pp.19-21, *supra.* The use of these checks indicates that the defendants knew that they were engaged in defrauding the IRS because there was no legitimate business reason to use cashier's check in this way. *E.g.*, ROA.6642, 6680. And there was no legitimate business reason to withdraw money with a cashier's check and re-deposit it in the next tax year. *E.g.*, ROA.6642-6643.

Moreover, the number and value of the cashier's checks was significant. *See* ROA.6940-6941; *United States v. Yoon*, 128 F.3d 515, 524 (7th Cir. 1997) ("[T]he sheer numbers of checks and amounts of money involved in this scheme during the ten-month period provide a surrogate for [defendant's] knowledge."); *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself."). A rational jury could infer that misstatements to the IRS about these sums would not be an accident but instead shows knowledge of the goals of the conspiracy. *Cf. United States v. Bishop*, 264 F.3d 535, 550

(5th Cir. 2001) (explaining that a willful attempt to evade taxation can be proven by, among other things, "a consistent pattern of underreporting large amounts of income").

Third, the defendants' knowledge and intent can be inferred from the defendants' lies to their tax preparer, Imtiyazuddin. Nourian, Rydberg, or both, provided misleading bank statements to Imtiyazuddin. ROA.6059, 6067. And they both directed Imtiyazuddin to classify the cashier's check transactions as business expenses. *See* pp.21-22, *supra.* Rydberg, who withdrew the cashier's checks, and Nourian, who deposited some of these cashier's checks into his account, would have known that these were not for business expenses. *Cf. Bishop*, 264 F.3d at 550 (explaining that a willful attempt to evade taxation can be proven by, among other things, "covering up sources of income" and "providing false explanations"). Nourian then reviewed and signed Industrial & Family's 2015 tax return and his personal 2015 tax return, which included the fictitious expenses and fraudulently reduced his own tax liability by nearly $10 million. ROA.6074-6075, 7001-7002, 7006, 7013-7014. *See United States v. Mubayyid*, 658 F.3d 35, 57 (1st Cir. 2011) ("[W]here the conspirators have effectively agreed to falsify IRS documents to misstate

75

or misattribute income, . . . the factfinder may infer a purpose to defraud the government by interfering with IRS functions." (quotations omitted)).

Moreover, both Nourian and Khavarmanesh lied to their tax preparers again the next year by stating that the amounts deposited in January 2016 were loans. ROA.6090-6092. These identical lies allowed a rational jury to infer that they were working as part of a conspiracy, which included Rydberg, to defraud the IRS by falsifying the nature of the money moved though the cashier's check scheme.

Fourth, the conspiracy required coordination between Nourian and Rydberg in redepositing money in a new tax year and lying to the tax preparer. This "[c]oncerted action between the conspirators illustrates that an agreement had to exist because the individuals would not have otherwise acted in that particular manner." *United States v. Ganji*, 880 F.3d 760, 768 (5th Cir. 2018).

More generally, Nourian and Rydberg were family members who both worked closely together for several small companies. The jury could rationally infer from the small size of the companies and the closeness of the defendants that they agreed to work together with knowledge of the conspiracy's aims. *Ismoila,* 100 F.3d at 389; *cf. United States v. Peters,*

732 F.2d 1004, 1007 (1st Cir. 1984) (recognizing that "[t]he jury could reasonably have disbelieved that [defendants], as cousins and as president and vice president, respectively, of a relatively small company, acted entirely independently of one another" (footnote omitted)). Defendants' leadership roles in the organizations and authority over the relevant bank accounts suggests that the misrepresentations were not accidental. *See Mubayyid*, 658 F.3d at 58.

Finally, the defendants' knowledge and intent can be inferred from the fact that they, their businesses, and their family profited. *See United States v. Jimenez*, 77 F.3d 95, 97 (5th Cir. 1996) (explaining that "engag[ing] in the venture to make a profit" allows a finding of intent to defraud); *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (explaining that circumstantial evidence of fraudulent intent can include profits). By lying about the profits made by the pharmacies, for example, Nourian's 2015 tax return declared income tax liability of $10 million less than what it should have been. ROA.5300, 5304, 7013-7014.

## II.    The government's rebuttal argument was neither improper nor prejudicial.

Defendants contend that the government's closing argument was improper and requires a new trial. Nourian Br.43-48; Rydberg Br.52. They are mistaken.

### A.    Background

1.    Before trial, the government proposed a deliberate-ignorance instruction, which explained that the jury could find that "a defendant had knowledge of a fact if . . . the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her." ROA.719; *see also* ROA.1322. Nourian and Rydberg objected to the instruction, ROA.7687-7689, and the district court declined to give it, ROA.7684, because the court did "not believe under the facts of the case that such an instruction should be given," ROA.7690.

2.    Before the closing arguments, the court instructed the jury that "[t]he word 'knowingly,' as that term is used in these Instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident." ROA.1610; *see also* ROA.1612.

3.    After the court instructed the jury, the parties gave their closing arguments.

78

a.      Nourian's counsel argued that Nourian had no knowledge of the crimes he and his co-conspirators were charged with committing. *E.g.*, ROA.7826, 7844, 7849. Rydberg's counsel similarly argued that Rydberg had no knowledge of the charged crimes. *E.g.*, ROA.7858, 7860, 7867, 7868-7879, 7881-7883.

b.      During the government's rebuttal argument, the government began by reiterating, "[W]hat I say, what any of the lawyers for any of the Defendants say, that is not evidence." ROA.7923. The government then argued that Nourian's and Rydberg's lack-of-knowledge defense was not believable considering the evidence. ROA.7933-7941. The government explained, "They really want you to think . . . that the brother of James Noryian, the pharmacist, Christopher Rydberg, the loyal stepson, they were just on an island of purity that is surrounded by a sea [of] corruption. They didn't see anything. They didn't know anything. They didn't talk to anyone about anything." ROA.7933. Following that argument, government counsel showed a slide that included emojis of three monkeys covering their eyes, ears, or mouth. ROA.7933-7934; *see* ROA.2954. Government counsel explained, "[W]hen I was thinking about their defenses, this was truly first thing that

jumped to my mind. . . . I just thought about this idea that you are closing your eyes, closing ears, closing your mouth. That is just not believable." ROA.7933-7934.

c.    At a bench conference outside the presence of the jury,[10] Nourian and Rydberg objected to the government's use of the "three monkeys" slide and requested a curative instruction. ROA.7948-7949. The government explained that the slide was designed to "characterize [Nourian's and Rydberg's] defense of see no evil, hear no evil, speak no evil" because "[t]hey have asserted no knowledge and all the things that knowledge entails." ROA.7949. The court, however, believed that the government's argument suggested to the jury that they could find the defendants guilty if they were deliberately ignorant even though the court had refused to give a deliberate-ignorance instruction. ROA.7950. The court thus determined that it would "instruct the jury to disregard that portion of the government's argument." ROA.7951. The court then instructed the jury, "[D]uring the rebuttal by [the prosecutor], you may

---

[10] The court reporter misheard who was speaking during this colloquy, leading to the transcript containing errors. ROA.2963-2965. The district court ordered that the reporter file an amended corrected transcript, but the transcript in the ROA is uncorrected. *See* ROA.7950.

recall that he put up a slide where I believe there were three emojis of monkeys with one covering his eyes. You are to completely disregard that slide and not take it into consideration during the course of your deliberations." ROA.7952. Defendants did not object to that curative instruction or otherwise request a new trial. *See* ROA.7952.

4.    a.    After trial, Nourian and Rydberg moved for a new trial, arguing, among other things, that the government's rebuttal argument was essentially a deliberate-ignorance instruction. ROA.2181, 13011-13015. Nourian and Rydberg also contended that the district court's curative instruction was insufficient because it merely instructed the jury to disregard the slide, not the government's arguments accompanying the slide. ROA.2183-2184, 13015.

b.    The district court denied the motions. ROA.2939, 2977, 13949; *see* ROA.13953.

The court stated that "the [g]overnment's inartful choice of words[] ran afoul of the court's prior ruling." ROA.2961. The court recognized, however, that "it is apparent from the context in which the argument was made . . . that the intended purpose of the slide or argument was to discredit the lack-of-knowledge defense urged by [the defendants']

81

counsel in their closing arguments and in cross-examining witnesses." ROA.2961-2962.

The court further explained that the remarks did not cause prejudice. ROA.2965, 2967-2968. The court recognized that "the objectionable argument was limited to two passing references to the message depicted by the slide" and that those two "remarks occurred in the middle of the [g]overnment's 45-minute rebuttal argument." ROA.2965. And the court had instructed the jury "what the [g]overnment was required to prove beyond a reasonable doubt with respect to [the defendants'] knowledge," "that the jurors were required to follow [the court's] instructions regarding the law, and that attorney arguments are not evidence." ROA.2967.

Finally, the court rejected the defendants' claim that the curative instruction was insufficient. ROA.2966. The court first noted that defendants' waived this contention by failing to assert it at trial. ROA.2966. The court explained that it "gave the instruction regarding the emojis because the focal point of [the] objection was the slide, which was related to the argument that the [g]overnment was making at that time." ROA.2966. And the court rejected the defendants' argument

because "it defies logic that jurors would throw all common sense to the wind and disregard the slide but not the related remarks." ROA.2967.

## B.     Legal background and standard of review

1.     This Court conducts a two-part inquiry when evaluating the propriety of the government's closing argument. It will review *de novo* whether the government made an improper remark. *See United States v. Barnes*, 979 F.3d 283, 299 (5th Cir. 2020). "The court evaluates the remark in light of the context in which it is made." *United States v. Valencia*, 600 F.3d 389, 409 (5th Cir. 2010) (per curiam) (quotations omitted).

If an improper remark was made, the Court then "evaluate[s] whether the remark affected the substantial rights of the defendant" by "consider[ing] (1) the magnitude of the prejudicial effect of the prosecutor's remark, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Barnes*, 979 F.3d at 299 (quotations omitted). At this step, the Court applies an abuse-of-discretion standard. *Id*.

"Even with a contemporaneous objection to an allegedly improper remark by the prosecutor, the defendant's burden of establishing that it

constitutes reversible error is substantial." *United States v. Mares*, 402 F.3d 511, 515-16 (5th Cir. 2005), *abrogated on other grounds by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024); *see also United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007) ("A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." (quotations omitted)).

2.    Here, however, this Court should review only for plain error because Nourian and Rydberg failed to preserve their claim below.

Although they objected to the prosecutor's remarks, that "mere objection . . . does not suffice" because "the trial court sustained" the objection, instructed the jury "not to consider any of the challenged remarks," and neither defendant "took exception to the district court's handling of his objections" or "requested that the district court declare a mistrial." *United States v. Potts*, 644 F.3d 233, 236 (5th Cir. 2011) (quotations omitted); *see also United States v. Canales*, 744 F.2d 413, 431 (5th Cir. 1984). Plain error review is accordingly "appropriate, because the defendant[s] 'effectively received all of the relief that [they] requested from the district court.'" *Potts*, 644 F.3d at 236 (explaining that "[the defendant] accepted the court's curative instruction without objection,

84

thus failing to preserve error"). Although Nourian and Rydberg filed a post-trial motion arguing that the three-monkeys slide and the related argument warranted a mistrial, they failed to make that objection contemporaneously at trial. *See United States v. Rice*, 607 F.3d 133, 138 (5th Cir. 2010); *see generally Puckett v. United States*, 556 U.S. 129, 135 (2009). Thus, plain-error review applies.

To establish reversible plain error, the defendants must demonstrate (1) error; (2) that is plain or obvious; (3) that affected substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-36 (1993); *see, e.g., Puckett*, 556 U.S. at 135. "Meeting all four prongs is difficult, 'as it should be.'" *Puckett*, 556 U.S. at 135.

### C.    The government's closing rebuttal was proper.

Nourian and Rydberg wrongly contend that comments made in the government's rebuttal closing amounted to the government improperly asking the jury to convict on a theory of deliberate ignorance. Nourian Br.43-48; Rydberg Br.52. They also incorrectly claim that the emojis and accompanying argument prejudiced them and that the court's instruction

was insufficient. Nourian Br.43-48. There was no error—plain or otherwise.

1. The argument and emojis were not improper. Counsel may not "argue to the jury . . . inapplicable theories of law that [are] embraced in . . . refused instructions." *United States v. Scales*, 599 F.2d 78, 81 (5th Cir. 1979). Here, however, the government's slide and argument were not intended to suggest that the jury could find the defendants guilty if they were deliberately ignorant. To the contrary, they were used for the opposite purpose: to undermine the notion that the defendants were ignorant—deliberately or not.

Deliberate ignorance occurs when a defendant takes proactive steps to avoid actual knowledge of illegal conduct. *See United States v. Lee*, 966 F.3d 310, 326 (5th Cir. 2020). Nourian and Rydberg argued that they did not have knowledge of the criminal conduct occurring around them. *See* p.79, *supra.* In response, the government rebutted their defense by arguing that they had *actual knowledge* about the fraud James was committing and participated in it. ROA.7933-7934. The slide depicting emojis of the three monkeys was meant to depict the defendants' argument—not the government's—that they were not aware of what was

86

occurring. ROA.7934. And the government then argued that the defendant's lack of knowledge defense was unbelievable. ROA.7934. Indeed, the district court recognized "that the intended purpose of the slide or argument was to discredit the lack-of-knowledge defense urged by [the defendants'] counsel." ROA.2961-2962. Accordingly, this argument did not suggest to the jury that they could convict the defendants for deliberate ignorance. Instead, it countered the defendants' arguments that they were ignorant of the criminal conduct.

Defendants thus cannot show any plain error because the government's argument, when viewed "in light of the context in which it is made," *Valencia*, 600 F.3d at 409 (quotations omitted), was not improper.

2.    Even if this argument were improper, it did not affect the defendants' substantial rights.

First, any prejudicial effect was minimal. Any improper comments "were isolated" and "comprised only a small portion of" the government's "closing argument." *United States v. Mendoza*, 522 F.3d 482, 494 (5th Cir. 2008). As the district court noted, "the objectionable argument was limited to two passing references to the message depicted by the slide,"

87

and that those two "remarks occurred in the middle of the [g]overnment's 45-minute rebuttal." ROA.2965. The prosecutor, moreover, "made no other similar comments, either before or after the challenged comment." *United States v. Murra,* 879 F.3d 669, 684 (5th Cir. 2018). Finally, the comments were, as the district court explained, intended "to discredit the [defendants'] lack-of-knowledge defense," ROA.2961-2962, and so, at the very least, the comments did not clearly ask the jurors to find defendants guilty on a legal theory not presented to them and it is unlikely that a "reasonable jury would interpret the argument as such," *United States v. Fierro,* 38 F.3d 761, 772 (5th Cir. 1994).

Second, the district court's instructions to the jury cured any prejudice. After rebuttal, the district court sustained the defendants' objection and provided the curative instruction that jury "completely disregard that slide and not take it into consideration during the course of [its] deliberations." ROA.7951-7952. The district court, moreover, had previously instructed the jury that "arguments made by the lawyers are not evidence"—an instruction with the government reiterated during its rebuttal, ROA.7923—and instructed that the jury must "apply the law" provided in the jury instructions. ROA.1596-1597. Finally, the court

88

clearly instructed the jury that it was required to find that the defendants had actual knowledge to find them guilty. ROA.1610; *see* ROA.2967. Juries are presumed to follow the court's instructions. *United States v. Burden*, 964 F.3d 339, 345 (5th Cir. 2020). These instructions cured any possible juror confusion. *See United States v. Hitt*, 473 F.3d 146, 162 (5th Cir. 2006).

Third, the evidence here was overwhelming. As discussed above, the evidence showed that the defendants were active participants in the conspiracies and schemes to bill the DOL and BCBS for medically unnecessary medications, move that money to conceal its source and nature, and then defraud the IRS by hiding the extent of the profits. *See* pp.30-77, *supra*. Given the significant evidence proving the defendants' guilt, the isolated comments in the government's rebuttal argument caused no substantial prejudice. *See United States v. Griffith*, 118 F.3d 318, 325 (5th Cir. 1997). And, moreover, affirming their convictions would not call into question the fairness, integrity, or public reputation of judicial proceedings.

3.    Finally, Nourian and Rydberg now contend that the district court's curative instruction was insufficient. Nourian Br.47-48. Neither

89

defendant objected to the court's curative instruction at trial, and thus this claim is also reviewed only for plain error. *See United States v. Hill*, 80 F.4th 595, 604 (5th Cir. 2023).

To the extent any curative instruction was needed, the instruction here was not plainly insufficient. District courts have broad discretion in crafting curative instructions. *United States v. Diaz*, 585 F.2d 116, 118 (5th Cir. 1978); *United States v. Quiroz-Hernandez*, 306 F. App'x 155, 159 (5th Cir. 2009) (unpublished). The court properly acted within its broad discretion here. First, as the district court noted, it "gave the instruction regarding the emojis because the focal point of [the defendants'] objection was the slide, which was related to the argument that the [g]overnment was making at that time." ROA.2966. Second, as the court further explained, "as the slide and two remarks were related, it defies logic that jurors would throw all common sense to the wind and disregard the slide but not the related remarks." ROA.2967. Third, the curative instruction should be viewed in the context of the court's other instructions, which made clear that the jury must follow the court's instructions and that the jury must find that defendants had knowledge to find them guilty. *See* p.82, *supra.* There was thus no error—plain or otherwise. The

90

defendants, moreover, cannot show prejudice from the lack of an additional instruction, and affirming their convictions would not call into question the fairness of their trial.

## III. The district court did not err in sentencing Nourian and Rydberg.

### A.    Background

1.    The Probation Office prepared presentence reports (PSRs) for Nourian and Rydberg, which calculated their sentences under the 2023 Sentencing Guidelines Manual. ROA.8984, 14039. The Probation Office determined, after grouping the counts, that both Nourian's and Rydberg's base offense level under U.S.S.G. § 2B1.1(a)(2) was 6. ROA.8984-8986, 14039-14040. The Probation Office then added 32 levels under Section 2B1.1, including two levels under Section 2B1.1(b)(2)(A)(i) because the offense involved more than 10 victims. ROA.8986-8987, 14040.

2.    The district court calculated both defendants' total offense level as 40. ROA.8007, 16941-16942. As the court noted, the two-level enhancement under Guidelines § 2B1.1(b)(2)(A)(i) applied to both defendants because "a means of identification of 746 claimants and/or patients were used unlawfully or without authority." ROA.8003; *see also* ROA.16941.

Both Nourian and Rydberg had a criminal history category of I. ROA.8007, 16944. Thus, both Nourian's and Rydberg's advisory Guidelines range was 292-365 months of imprisonment. ROA.8007, 16944.

3.    The district court gave both Nourian and Rydberg below-Guidelines sentences. ROA.8091, 17018. The court varied downward as to Nourian because of his age, the low risk of recidivism, and Nourian's family ties and responsibilities, including caretaking for his brother. ROA.8084-8085, 8087. But the court also recognized that these "were all serious offenses" and that Nourian had gained a significant amount of money from his fraud. ROA.8085, 8086-8087. The court thus sentenced Nourian to 210 months of imprisonment—82 months below the bottom of his advisory-Guidelines range. ROA.8091.

When sentencing Rydberg, the court explained that it considered his family ties and caretaking responsibilities, his post-trial acceptance of responsibility, his age, and his lack of risk of recidivism. ROA.17003-17005, 17008, 17010-17011. The court accordingly varied downward and sentenced Rydberg to 180 months of imprisonment—112 months below the bottom of his advisory Guidelines range. ROA.17018-17019.

After sentencing Nourian, the district court explained that "if the Court has made any mistake with respect to the calculation or determination of the advisory guidelines, regardless of the objections that the defendant made to the presentence report, it would impose the same sentence." ROA.8092. Similarly, after sentencing Rydberg, the court explained that "even if the Court has miscalculated the guidelines or wrongly applied some enhancement or some specific offense characteristic, it would still impose a sentence of 180 months, because considering everything involved, the Court believes that that is the appropriate sentence." ROA.17019.

**B.     The district court correctly determined that there were more than ten victims of Nourian and Rydberg's fraud.**

1. <u>Facts</u>

In adding Section 2B1.1(b)(2)(A)(i)'s two-level enhancement for an offense involving more than 10 victims, the PSR noted that "the means of identification of 746 claimants and/or patients were used unlawfully or without authority," and each such claimant was considered a victim under Section 2B1.1(b)(2)(A)(i). ROA.8985, 14040.

Nourian objected to the victim enhancement, ROA.9013-9015, contending that the beneficiaries whose identities were used were not

93

properly classified as victims, ROA.9103. The district court overruled Nourian's objection. *See* ROA.10515-10516. The court explained that "the Fifth Circuit has already approved application of this enhancement under similar circumstances" and that the district court "must follow controlling Fifth Circuit precedent." ROA.10515-10516 (citing *United States v. Barson*, 845 F.3d 159, 167 (5th Cir. 2016) (per curiam); *United States v. Kalu*, 936 F.3d 678, 683 (5th Cir. 2019); and *United States v. Ainabe*, 938 F.3d 685, 689 (5th Cir. 2019)).

### 2. Standard of review

When the issue is preserved, this Court will "review the district court's interpretation and application of the [Sentencing] Guidelines de novo and its factual findings for clear error." *United States v. Bourrage*, 138 F.4th 327, 352-53 (5th Cir. 2025) (quotations omitted). A factual finding is not clearly erroneous if it is plausible in light of the entire record. *United States v. Odom*, 694 F.3d 544, 547 (5th Cir. 2012) (per curiam).

Nourian preserved this issue by objecting to the PSR. *See* ROA.9013-9015. Rydberg, however, concedes that he failed preserve this

94

issue. Rydberg Br.53. His claim, therefore, is reviewed for plain error. *See United States v. Sudeen*, 434 F.3d 384, 392 (5th Cir. 2005).

### 3. The court properly determined that Nourian and Rydberg's offense affected more than 10 victims.

a.      Section 2B1.1(b)(2)(A)(i) of the Guidelines provides for a two-level increase to the base offense level for fraud offenses involving "10 or more victims." In a case such as this, involving means of identification, the term "victim" includes "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1, cmt. n.4(E). "[S]ubmitting a fraudulent Medicare claim is an unlawful use of a beneficiary's information." *United States v. Ramirez*, 979 F.3d 276, 282 (5th Cir. 2020). Accordingly, "patients or Medicare beneficiaries for whom the conspirators falsely claimed benefits" are "'victims'" within the meaning of Application Note 4(E). *Barson*, 845 F.3d at 167.

b.      Nourian and Rydberg do not dispute that they and their co-conspirators used the "means of identification" of more than ten FECA beneficiaries "unlawfully" when they billed FECA for medically unnecessary prescriptions. Instead, they argue that the FECA beneficiaries for whom the pharmacies submitted claims were not "victims" of their fraud under the Guidelines. Nourian Br.49-56; Rydberg

Br.52-53. But that argument is foreclosed by this Court's decisions in *Barson*, 845 F.3d at 167, *Ainabe*, 938 F.3d at 689, *Kalu*, 936 F.3d at 683, and *Ramirez*, 979 F.3d at 282.

As this Court explained in *Barson*, "[a]pplication Note 4(E) of U.S.S.G. § 2B1.1 defines 'victim' in a way that encompasses the Medicare beneficiaries because it includes 'any individual whose means of identification was used unlawfully or without authority.'" 845 F.3d at 167. This Court's "precedent therefore dictates that each Medicare beneficiary whose information was used in a fraudulent claim is a 'victim' within the meaning of § 2B1.1(b)(2)(A)(i)." *Ramirez*, 979 F.3d at 282. Although those cases address Medicare beneficiaries, they apply with equal force to FECA (and BCBS), which are entities that provide coverage for healthcare-related expenses. *Cf. United States v. Rhode Island Insurers' Insolvency Fund*, 80 F.3d 616, 620 (1st Cir. 1996) (describing FECA and Medicare as "insurance-like" (quotations omitted)).

c.    Nourian and Rydberg contend, however, that this Court should not follow Application Note 4(E) because that commentary is inconsistent with the text of the Guidelines § 2B1.1(b)(2)(A)(i). Nourian Br.51-53. They are mistaken.

i.    In *Stinson v. United States*, the Supreme Court held that Guidelines commentary "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." 508 U.S. 36, 38 (1993). The Court explained that the administrative-law principle often called *Auer* deference applies to the Guidelines commentary. *Id.* at 44-45. That principle requires courts to give "controlling weight" to an agency's interpretation of its own regulation unless it is "plainly erroneous or inconsistent with the regulation." *Id.* at 45 (quotations omitted).

In *Kisor*, the Supreme Court clarified the circumstances requiring deference to an agency's interpretation of its regulations. *See Kisor v. Wilkie*, 588 U.S. 558 (2019). Although some courts have applied *Kisor* deference to Guidelines commentary, this Court continues to apply *Stinson*'s rule that "guidelines commentary is 'authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.'" *United States v. Vargas*, 74 F.4th 673, 677 (5th Cir. 2023) (*en banc*); *see also United States v. Jones*, 136 F.4th 272, 278 & n.24 (5th Cir. 2025).

ii.    As an initial matter, the defendants' contention that Application Note 4(E) does not satisfy *Stinson* is foreclosed because this Court has repeatedly followed Application Note 4(E) under the *Stinson* framework. *See* pp.95-96, *supra.* Nourian and Rydberg argue that their contention is not foreclosed because none of the cases applying Application Note 4(E) expressly discussed *Stinson*. Nourian Br.52; Rydberg Br.52-53. But those cases, the earliest of which dates to 2016, were decided long after the Supreme Court had adopted the *Stinson* framework in 1993. And this Court's deference to Guidelines commentary in those cases without noting that it was "inconsistent with, or a plainly erroneous reading of," the Guidelines, *Vargas*, 74 F.4th at 677 (quotations omitted), indicates that it found that the commentary satisfied *Stinson*. *E.g.*, *Barson*, 845 F.3d at 167. Indeed, the *Barson* dissent expressly disagreed with the majority's reading of the word "victim" under the *Stinson* framework, showing the Court was applying the *Stinson* framework. *Id.* at 169 (Jones, J., dissenting in part).

iii.    Even were this court to review the question anew, the Guidelines commentary in Application Note 4(E) is "authoritative"

because it is not "inconsistent with . . . that guideline." *Stinson*, 508 U.S. at 38.

The plain text of U.S.S.G. § 2B1.1(b)(2)(A)(i) permits counting victims whose identity was stolen. The term "victims" is most naturally read to include anyone who is harmed by a defendant's crimes, including those who had their identities misappropriated. *See* Webster's New World College Dictionary 1592 (4th ed. 2007) (defining "victim" to include "someone or something killed, destroyed, injured, or otherwise harmed by, or suffering from, some act, condition, or circumstance" and "a person who suffers some loss, esp[ecially] by being swindled"); Black's Law Dictionary 1703 (9th ed. 2009) (defining "victim" as "[a] person harmed by a crime, tort, or other wrong"); *see also* 18 U.S.C. § 3771(e)(2)(A) (defining "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense"). Thus, "'victim' under U.S.S.G. § 2B1.1(b)(2) . . . include[s] individuals whose identities are stolen because victims of identity theft are encompassed within the plain meaning of 'victim.'" *United States v. Barkers-Woode*, 136 F.4th 496, 501 (3d Cir. 2025).

99

The Guidelines' structure supports this reading. The "[r]elevant [c]onduct" provision directs that "specific offense characteristics . . . in Chapter Two" (which includes Section 2B1.1(b)(1)) "shall be determined on the basis of," among other things, "*all* harm that resulted from the acts and omissions [of the defendant]." U.S.S.G. § 1B1.3(a)(3) (emphasis added). This strongly indicates that the Sentencing Commission intended the term "victims" in Section 2B1.1(b)(2) to include victims that were harmed by a defendant's use of their identity, even if the harm is indirect.

And, if any doubt remained, the Guidelines' purpose would put it to rest. The general objective of Section 2B1.1's provisions, the Commission has explained, is not to assess victims' harm but to measure "the seriousness of the offense and the defendant's relative culpability." U.S.S.G. § 2B1.1, cmt. backg'd. And the number of individuals whose means of identification a defendant uses to fraudulently profit is highly relevant to the culpability inquiry. *See* U.S.S.G. App. C, Amend. 726 (effective Nov. 1, 2009) (noting that individuals whose identification is used "must often spend significant time resolving credit problems and related issues, and such lost time may not be adequately accounted for in the loss calculations").

100

d.     Nourian and Rydberg finally contend (Nourian Br.50-51; Rydberg Br.52-53) that this Court should apply *Kisor*, rather than *Stinson*, when relying on the Guidelines commentary. As they acknowledge (Nourian Br.50-51), this Court, sitting *en banc*, rejected the argument that "*Kisor* undermined *Stinson*'s foundations." *Vargas*, 74 F.4th at 678, 683.

Even if this Court applied *Kisor* to the Guidelines, Nourian and Rydberg's argument would still fail. In *Kisor*, the Supreme Court clarified the circumstances requiring deference to an agency's interpretation of its regulations. First, the regulation must be "genuinely ambiguous" after a court "exhaust[s] all the 'traditional tools' of construction," including analyzing the regulation's "text, structure, history, and purpose." 588 U.S. at 575. Second, if the regulation remains ambiguous, the agency's reading must be "'reasonable'" and "come within the zone of ambiguity the court has identified." *Id*. at 575-76. Third, the court must independently determine "whether the character and context of the agency interpretation entitles it to controlling weight." *Id*. at 576. This means the interpretation must be "actually made by the agency," must

"implicate [the agency's] substantive expertise," and "must reflect fair and considered judgment." *Id.* at 577, 579 (quotations omitted).

As discussed above, read in proper context, the reference to "victims" in Guidelines § 2B1.1(b)(1) unambiguously includes individuals whose identities are stolen. *See* pp.99-100, *supra.* And even if "victims" were ambiguous, the commentary embodies an interpretation of the Guidelines that is at least "reasonable." *Kisor*, 588 U.S. at 575 (quotations omitted). Such an interpretation is entitled to "controlling weight" under *Kisor* if it is "the agency's authoritative or official position," implicates the agency's "substantive expertise," and represents the agency's "fair and considered judgment" rather than a mere convenient litigating position or post hoc rationalization. *Id.* at 576-79 (quotations omitted). The commentary here checks all those boxes. It plainly states the Commission's authoritative or official position. *See* U.S.S.G. § 1B1.7 (describing the commentary's significance). It is the product of the Commission's substantive sentencing expertise. *See, e.g.*, U.S.S.G. App. C, Amend. 726. And having been on the books since 2009, it represents the Commission's fair and considered judgment rather than a position of convenience. *See id.*

102

The commentary defining victim as including individuals whose identities were stolen is accordingly valid, and the district court correctly applied it here.

### 4. Any procedural error caused no prejudice.

A preserved Guidelines calculation error is harmless if (1) "the district court would have imposed the same sentence had it not made the error" and (2) "it would have done so for the same reasons it gave at . . . sentencing." *United States v. Perlaza-Ortiz*, 869 F.3d 375, 377 (5th Cir. 2017) (quotations omitted). The same principle applies with even greater force in the plain-error context, where the defendant bears the burden of showing prejudice. *See United States v. Olano*, 507 U.S. 725, 734-35 (1993) (explaining burden). Thus, "under either a harmless-error standard or a plain-error standard," this Court "will not reverse a sentence if [it is] convinced that the district court would have imposed the same sentence, regardless of the error." *United States v. Munoz-Canellas*, 695 F. App'x 748, 750 (5th Cir. 2017) (unpublished). *See also Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016).

The record shows that the district court would have imposed the same below-Guidelines sentences irrespective of the Guidelines range.

103

First, the district court offered "a detailed explanation of the reasons the selected sentence [was] appropriate" under the 18 U.S.C. § 3553(a) factors. *Molina-Martinez*, 578 U.S. at 200. The court explained that it was varying downward based on, among other things, Nourian's and Rydberg's ages, family ties, caregiving responsibilities, and lack of likely recidivism. *See* p.92, *supra*. Second, the court stated that if it had "made any mistake with respect to the calculation or determination of the advisory guidelines . . . it would impose the same sentence." ROA.8092, 17019. This Court has observed numerous times that similar statements establish the harmlessness of a procedural error. *See United States v. Hott*, 866 F.3d 618, 621 (5th Cir. 2017); *United States v. Cook*, No. 21-10387, 2022 WL 175546, at *2 (5th Cir. Jan. 18, 2022) (per curiam) (unpublished); *United States v. May*, No. 21-10308, 2022 WL 152506, at *1 (5th Cir. Jan. 14, 2022) (per curiam) (unpublished); *United States v. Pardo-Oseguera*, 844 F. App'x 739, 740 (5th Cir. 2021) (per curiam) (unpublished); *United States v. Rodgers*, 855 F. App'x 229, 230-31 (5th Cir. 2021) (per curiam) (unpublished); *see generally United States v. Castro-Alfonso*, 841 F.3d 292, 298 (5th Cir. 2016).

Because the court would have imposed the same sentence for the same reasons in any event, the error in calculating the Guidelines range did not affect Nourian's or Rydberg's sentence.

## C.   The district court properly considered Nourian's perceived lack of remorse in sentencing him.

### 1. Facts

a.   The PSR noted that Nourian "was interviewed by [a] probation officer," that Nourian "was cooperative during the interview," but that, "[u]pon advice of counsel, [Nourian] declined to discuss the case, the trial, or the pending appeal." ROA.8983.

During his allocution at sentencing, Nourian stated, "I have tried to do whatever I can to prove that maybe I'm not part of this, but unfortunately we saw the jury." ROA.8061. He also asked the court to consider his family and caregiving obligations when imposing a sentence. ROA.8061.

b.   Toward the end of the court's discussion of the Section 3553(a) factors, the court noted that "while the Court believes that Mr. Dehshid Nourian has learned his lesson, he did not say he was sorry, he did not say he learned his lesson." ROA.8090. The court continued by noting that it "has a pretty good feel when someone is sorry" and that the reason the

105

court "believe[d] he did not say he was sorry to the Court because he believes that that would be an admission of guilt, and he doesn't want to do anything to hurt his chances on appeal." ROA.8090.

The court then sentenced Nourian to a total of 210 months of imprisonment, which the court noted was "substantially less" than the bottom of Nourian's Guidelines range. ROA.8091. After the court finished imposing the sentence, including forfeiture and restitution, the court asked the parties if there was "anything else the Court needs to cover." ROA.8101. Nourian's counsel raised Nourian's surrender date and motion for bail. ROA.8101-8106. After those issues had been dealt with, the court asked whether there was "anything else we need to discuss" and whether "the Court [had] overlooked anything." ROA.8106-8107. Nourian did not raise any objections. ROA.8107.

### 2. Standard of review

a.    This Court generally reviews challenges to "the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," *United States v. Rodriguez*, 660 F.3d 231, 233 (5th Cir. 2011) (quotations omitted), and generally reviews *de novo* challenges to a sentence's procedural reasonableness and constitutional sentencing

issues, *United States v. Parkerson*, 984 F.3d 1124, 1127 (5th Cir. 2021); *United States v. Doggett*, 230 F.3d 160, 165 (5th Cir. 2000).

This Court has sometimes stated that a district court's consideration of a defendant's lack of remorse is reviewed for substantive reasonableness, *see United States v. Rodriguez*, 136 F.4th 258, 269 (5th Cir. 2025); *United States v. Simpson*, 796 F.3d 548, 558 (5th Cir. 2015); *United States v. Navarro-Jusino*, 993 F.3d 360, 362 (5th Cir. 2021), and has other times suggested that it is reviewed for procedural reasonableness, *United States v. Duran-Munez*, 539 F. App'x 407, 407 (5th Cir. 2013) (per curiam) (unpublished); *United States v. Douglas*, 569 F.3d 523, 527 (5th Cir. 2009); *see also United States v. Sepulveda*, 64 F.4th 700, 709 (5th Cir. 2023) (declining to decide whether review is for procedural or substantive reasonableness).

Because Nourian's claim is a constitutional claim, it would ordinarily be best reviewed *de novo* as a standalone constitutional claim, *e.g., United States v. Kurns*, 129 F.4th 589, 597 (9th Cir. 2025); *United States v. Christian*, 404 F. App'x 989, 992 (6th Cir. 2010) (unpublished), or, at the very least, as a procedural-reasonableness claim based on the district court's consideration of an impermissible factor, *see United States*

107

*v. Whitson*, 77 F.4th 452, 456-57 (6th Cir. 2023); *United States v. Smith*, 553 F. App'x 130, 133 (3d Cir. 2014) (unpublished).

Regardless, because Nourian failed to object to the district court's statements at sentencing, he failed to preserve his challenge, which is accordingly reviewed only for plain error. *See Sepulveda*, 64 F.4th at 709; *United States v. Ronquillo*, 508 F.3d 744, 748 (5th Cir. 2007).

b.      Nourian, citing *Holguin-Hernandez v. United States*, 589 U.S. 169 (2020), argues that he has preserved his claim by asking for a lower sentence than that ultimately imposed. Nourian Br.57 n.20. He is incorrect. In *Holguin-Hernandez*, the Court held that a defendant preserves his reasonableness challenge by advocating for a specific sentence and that a defendant need not specifically object at the end of sentencing. 589 U.S. at 173-75.

*Holguin-Hernandez* is inapplicable to procedural reasonableness claims and to claims that a court violated the right against self-incrimination. *Holguin-Hernandez*, 589 U.S. at 175. It applies only to a true substantive-reasonableness claim: that the sentence "was unreasonably long" to achieve the goals of sentencing in 18 U.S.C. § 3553(a). *Id.* at 172. And even when applied to traditional substantive-

108

reasonableness claims, *Holguin-Hernandez* merely "explained that the question at the crux of the preservation requirement 'is simply whether the claimed error was "brought to the court's attention."'" *United States v. Zarco-Beiza*, 24 F.4th 477, 481 (5th Cir. 2022). Thus, when a defendant's objections and arguments could not "have reasonably 'informed the court of the legal error at issue,'" *id.* at 482, plain error review applies, *see United States v. Curry*, 125 F.4th 733, 738 (5th Cir. 2025); *United States v. Chiasson*, 90 F.4th 832, 838 (5th Cir. 2024).

Here, Nourian's general request for a lower sentence did not apprise the district court that he was challenging the court's use of his perceived lack of remorse at sentencing. Because this issue is raised for the first time on appeal, it is reviewed for plain error.

### 3. Analysis

Nourian contends that the court violated his Fifth Amendment privilege against self-incrimination by noting his lack of remorse at sentencing. Nourian Br.58-63. Nourian cannot satisfy the four plain-error prongs because, at the very least, he cannot show error—let alone plain error.

a.     Section 3553(a) lists several factors courts must consider in determining the appropriate sentence for a defendant. *See* 18 U.S.C. § 3553(a). Under Section 3553(a), a defendant's lack of remorse and acceptance of responsibly are appropriate sentencing considerations. *See Douglas*, 569 F.3d at 527.

A defendant, however, retains his Fifth Amendment privilege against self-incrimination at sentencing. *Mitchell v. United States*, 526 U.S. 314, 321 (1999). When a defendant invokes his right to remain silent at sentencing, the judge may not draw an adverse inference from that silence in "determining facts about the crime which bear upon the severity of the sentence." *Id.* at 316-17. Thus, "a defendant's Fifth Amendment privilege against self-incrimination is violated where a sentencing court takes into consideration a defendant's refusal to confess after a not guilty plea." *United States v. Laca*, 499 F.2d 922, 927 (5th Cir. 1974).

b.     At the outset, the premise of Nourian's contention is flawed. Nourian asserts that the district court erred because it "factored into [his] sentence" his failure to "waiv[e] his Fifth Amendment privilege and admit[] guilt." Nourian Br.60. In fact, Nourian *did* waive his Fifth

Amendment right when he allocuted at sentencing. *See also* ROA.10660-10661 (Nouran's letter to the court). The district court's discussion of Nourian's decision to not exhibit remorse, therefore, was not based on his silence, but on his *affirmative statements* at sentencing. *See* ROA.8090 (noting that Nourian "did not say he was sorry"). The district court's discussion at sentencing did not refer to Nourian's silence or invocation of his privilege against self-incrimination; instead, it properly focused on Nourian's failure to accept responsibility in his statements at sentencing. The district court, therefore, did not plainly err.

b.      Nourian relies on *Laca*, 499 F.2d 922, where this Court held that the district "court erred by predicating the length of these sentences on whether the defendants had confessed their crimes." *Id.* at 927. But *Laca* is inapposite.

First, *Laca* does not mention whether the defendants invoked their Fifth Amendment privilege during sentencing and remained silent as to their culpability, or whether, like Nourian, they freely allocuted at sentencing. This Court has "previously recognized that a defendant's lack of remorse and acceptance of responsibility are acceptable sentencing considerations." *Simpson*, 796 F.3d at 558; *see also Navarro-Jusino*, 993

111

F.3d at 361-62; *United States v. Kippers*, 685 F.3d 491, 499 (5th Cir. 2012); *Duran-Munez*, 539 F. App'x at 407-08; *Douglas*, 569 F.3d at 527; *see also United States v. Robinson*, 741 F.3d 588, 600 (5th Cir. 2014). Thus, while *Laca* prohibits a court from relying on a defendant's constitutionally guaranteed refusal to speak or incriminate himself, "*Laca* says little about a district court's consideration of a defendant's voluntary statements made at his own initiative during allocution." *United States v. Stanley*, 739 F.3d 633, 653 (11th Cir. 2014).

Second, *Laca*, at most, prohibits a district court's imposition of a higher sentence based on a court's violating a defendant's Fifth Amendment right against self-incrimination. *See Sepulveda*, 64 F.4th at 711. But Nourian cannot carry his burden of showing clear or obvious error here because "[a]t no point in the sentencing transcript does the court indicate that it imposed a higher sentence because [Nourian] refused to express guilt or remorse." *Rodriguez*, 136 F.4th at 272. The court's discussion of Nourian's refusal to accept responsibility is far from the express condemnation necessary to prove a Fifth Amendment violation. *See Ronquillo*, 508 F.3d at 749. In *Mitchell*, for example, the district court told the defendant that it "held it against [her] that [she]

112

didn't come forward." *Mitchell*, 526 U.S. at 319 (quotations omitted). Similarly, Nourian's citation to *Laca*, is unhelpful because there the court stated that it had "no intention of re-considering this sentence because . . . there is no showing of any repentance on the part of any of you." *Laca*, 499 F.2d at 927 (quotations omitted). That is a far cry from the district court here, which simply discussed Nourian's lack of remorse before stating his ultimate sentence. Because it is not clear that the district court "rel[ied] on [Nourian's] lack of remorse in its § 3553(a) analysis, [Nourian] fails to rebut the presumption that his [below]-Guidelines sentence was reasonable." *Rodriguez*, 136 F.4th at 272.

Given this, the district court did not plainly err in discussing Nourian's lack of remorse. Nourian, moreover, cannot show that affirming his sentence would call into question the fairness, integrity, or public reputation of judicial proceedings.

**D.    The district court properly found that the entirety of the 4516 brokerage account was subject to forfeiture.**

1. <u>Facts</u>

a.    The superseding indictment notified Nourian of potential forfeiture if he were convicted of the offenses in the indictment. ROA.287-289; *see generally* 18 U.S.C. § 982(a)(1) & (7). The government later filed

a bill of particulars that listed, among other assets, "funds and holdings (including appreciation and interest traceable to such funds and holdings) in Charles Schwab account ending in 4516." ROA.1550.

Around 93.7% of the funds in the 4516 account were proceeds directly traceable to the defendants' fraud. ROA.2102. The government explained that the 93.7% was subject to forfeiture under 18 U.S.C. § 982(a)(7), which requires forfeiture of proceeds of healthcare fraud. ROA.2101-2102. The other 6.3% of the funds in the account were two stocks—for Twitter and Alon USA Energy—which were purchased prior to the fraud. ROA.2102 & n.1. The government explained that the Twitter and Alon stocks, although not proceeds of the fraud, were forfeitable under 18 U.S.C. § 982(a)(1), which requires forfeiture of property "involved in" a money-laundering offense. ROA.2101-2102.

b.    After trial, the government moved for a preliminary order of forfeiture, ROA.1722-1757, and that motion was referred to a magistrate judge, ROA.2045.[11] The magistrate judge held an evidentiary hearing, at

---

[11] The parties agreed to let the court "decide whether or not the government established the requisite nexus between the forfeitable property and the offense." ROA.329-331; *see generally* Fed. R. Crim. P. 32.2(b)(5).

114

which Nourian argued that the Twitter and Alon stocks were not forfeitable because they were not involved in money laundering. *See* ROA.16621. After the hearing, *see* ROA.16595-16649, the magistrate judge recommended that the government's forfeiture motion should be granted, ROA.2883.

The magistrate judge explained that under Section 982(a)(1), any property "involved in" money laundering is subject to forfeiture, and noted that "[p]roperty 'involved in' or, in other words, used to 'facilitate' money laundering includes 'any legitimate funds . . . providing a cover for tainted funds.'" ROA.2888. Regarding the 4516 account, the magistrate judge found that the government "established the requisite nexus between the" account "and the underlying money laundering scheme." ROA.2900.

The magistrate judge further determined that Nourian's "contention that 7,000 Alon stocks and 4,000 Twitter stocks were purchased prior to the money laundering scheme and, thus, could not be used to facilitate money laundering is incorrect." ROA.2900. Instead, the magistrate judge found that "[t]he [g]overnment's request for forfeiture is . . . supported by sufficient evidence showing that the forfeitable

115

brokerage accounts were used to facilitate money laundering, and the funds used therein were traceable to DOL and BCBS health care fraud proceeds." ROA.2901. "Indeed, the two brokerage accounts are subject to forfeiture because the [g]overnment's evidence reveals an extensive scheme of transactions to and from accounts, in the purchase of real and personal property used to conceal and facilitate the underlying money laundering and health care fraud offenses." ROA.2901.

Nourian objected to the magistrate judge's report and recommendation. ROA.2920-2923.

c.    The district court entered a preliminary order adopting the magistrate judge's conclusions and findings of fact. *See* ROA.3016; *see also* ROA.3164. Regarding the 4516 account, the court explained that the funds in the account were subject to forfeiture "because there was evidence of commingling." ROA.3015; *see also* ROA.3163. The district court recognized that "[a]lthough merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture, untainted funds are forfeitable if a defendant commingled them with tainted funds to disguise the nature and source of his scheme." ROA.3015 (quotations omitted); *see also* ROA.3163. The court recognized

116

that "[t]he magistrate judge determined that the [g]overnment met its burden in this regard, and . . . the court finds no error as to this." ROA.3015; *see also* ROA.3163-3164.

d.    At sentencing, the court issued a final forfeiture order. *See* ROA.8098; *see also* ROA.3173-3175.

### 2. Standard of review

This Court will "review[] the district court's findings of fact under the clearly erroneous standard of review, and the question of whether those facts constitute legally proper forfeiture de novo." *United States v. Reed*, 908 F.3d 102, 125 (5th Cir. 2018) (quotations omitted).

### 3. Analysis

a.    Under 18 U.S.C. § 982(a)(1), upon conviction of any money laundering offense violating 18 U.S.C. § 1956, the court must "order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." Section 982(a)(1) explains that "[a]ny property 'involved in' money laundering, or property traceable to such property, is subject to forfeiture." *United States v. Real Prop. Located at 1407 N. Collins St., Arlington, Texas*, 901 F.3d 268, 274 (5th Cir. 2018). "Property is 'involved' with money laundering if it is used 'to facilitate' the laundering." *Id.*;

*United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997). "Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *Real Prop. Located at 1407 N. Collins St.*, 901 F.3d at 274 (quotations omitted). Although "merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture," untainted funds are forfeitable if a defendant commingled them with tainted funds "to disguise the nature and source of his scheme." *Tencer*, 107 F.3d at 1134-35.

b.     The district court correctly ordered forfeiture of the stocks in the 4516 account under 18 U.S.C. § 982(a)(1). As the district court explained, the government proved "that the forfeitable brokerage accounts were used to facilitate money laundering," and that Nourian and his co-conspirators engaged in "an extensive scheme of transactions to and from accounts, in the purchase of real and personal property used to conceal and facilitate the underlying money laundering and health care fraud offenses." ROA.2901.

The district court did not clearly err in making that finding because the evidence showed by a preponderance of the evidence that the stocks

118

in the 4516 account were used to facilitate money laundering. *See United States v. Gasanova*, 332 F.3d 297, 301 (5th Cir. 2003) (standard of proof).

First, the evidence at trial showed that Nourian and other co-defendants conspired to conceal the source of the illicit funds through transfers and misrepresentations of the source of the funds and that the 4516 account acted as part of this large money-laundering machine. *See generally* pp.14-19, *supra.* The court could reasonably find, based on Nourian's conspiracy and actions to launder money, that his use of the 4516 account to commingle tainted and untainted funds was designed to further his overarching goal of laundering the money. *See United States v. Cessa*, 872 F.3d 267, 274 (5th Cir. 2017) (noting that evidence "that the forfeited bank accounts were used to facilitate money laundering" supported the district court's finding that the funds were commingled to facilitate money laundering).

Second, evidence showed that Nourian commingled fraud proceeds with untainted funds, which further supports the district court's finding that Nourian moved the money in order to facilitate money laundering. *See Real Prop. Located at 1407 N. Collins St.*, 901 F.3d at 276; *see also Cessa*, 872 F.3d at 274; *see also* ROA.1770.

Third, the evidence showed that Nourin had taken out a margin loan against the value of the stocks in the 4516 account, and he used proceeds of the fraud to pay that loan. ROA.2115, 2120-2122, 2840-2844, 2871-2872. The use of these fraud proceeds to pay off a legitimate loan secured with seemingly legitimate funds is further evidence of commingling which facilitated money laundering. *Cf. United States v. Willey*, 57 F.3d 1374, 1384 (5th Cir. 1995) (noting that converting criminal proceeds "into an ostensibly legitimate form, such as business profits or loans" may show the requisite purpose (quotations omitted)).

Fourth, before commingling the funds in the 4516 account, the defendants moved the fraud funds through several accounts, *see* ROA.2206-2208, which further supports the district court's finding that the funds were commingled in order to facilitate the money-laundering crime, *Real Prop. Located at 1407 N. Collins St.*, 901 F.3d at 276 (noting that "moving money through a large number of accounts" supports the design element (quotations omitted)); *see also Willey*, 57 F.3d at 1386.

c.     Nourian contends that the district court never "made a specific finding" that Nourian "commingled tainted funds with untainted funds in the[ ]*4516 account for the purpose of disguising the nature and

source of the tainted funds." Nourian Br.67. That is incorrect. The district court adopted the magistrate judge's fact findings, ROA.3164, and the magistrate judge specifically found that "the forfeitable brokerage accounts *were used to facilitate* money laundering" and that there was "an extensive scheme of transactions . . . *used to conceal and facilitate the underlying money laundering* and health care fraud offenses." ROA.2901 (emphases added).

The district court itself recognized that, "[a]lthough merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture, untainted funds are forfeitable if a defendant commingled them with tainted funds to disguise the nature and source of his scheme." ROA.3015 (quotations omitted); *see also* ROA.3163. And the court stated that "[t]he magistrate judge determined that the [g]overnment *met its burden in this regard*, and . . . the court finds no error as to this." ROA.3015 (emphasis added); *see also* ROA.3163-3164.

Nourian contends that the district court clearly erred in finding that the stocks were involved in money laundering because the 4516 account was opened long before the fraud, the account had a consistent

121

history of legitimate trading, and the tainted money transferred into the account came from another account in Nourian's name. Nourian Br.68. None of these facts undercuts the evidence showing that Nourian commingled the funds to disguise their nature and source. To the contrary, the fact that Nourian placed fraud proceeds in an account that also contained untainted funds and had been used for seemingly legitimate transactions is evidence that Nourian deposited those funds there—rather than in a newly-opened account which had never been used for legitimate transactions—specifically to give the funds a patina of legitimacy and help conceal the funds' unlawful origins. *See Real Prop. Located at 1407 N. Collins St.*, 901 F.3d at 276; *see also Willey*, 57 F.3d at 1386. The district court, therefore, did not clearly err.

### E. The district court properly found facts relating to the restitution award under the Mandatory Victims Restitution Act.

1. Before trial, Nourian objected to the lack of a jury determination of the restitution amount. ROA.9016-9017. Nourian recognized, however, that his claim was foreclosed by precedent. ROA.9016-9017. The district court determined Nourian's restitution

amount at sentencing, ROA.8094-8097, and imposed restitution in the amount of $115,389,128.20, ROA.3154, 8094-8096; *see* ROA.8983.

2.     Nourian briefly contends that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the amount of restitution must be charged in an indictment and proved to a jury beyond a reasonable doubt. Nourian Br.70-72. But as Nourian concedes (Nourian Br.70-72), his claim is foreclosed by precedent. *See United States v. Rosbottom*, 763 F.3d 408, 420 (5th Cir. 2014). This Court "may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or [the] *en banc* court." *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). Nourian's claim, accordingly, lacks merit.

# CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

A. TYSEN DUVA
    Assistant Attorney General

JOSH A. GOLDFOOT
    Deputy Assistant Attorney
    General

ETHAN WOMBLE
EDWARD EMOKPAE
    Attorneys, Fraud Section
    Criminal Division

/s/ Javier A. Sinha
JAVIER A. SINHA
    Attorney, Appellate Section
    Criminal Division
    U.S. Department of Justice
    950 Pennsylvania Ave. NW,
    Suite 1264
    Washington, DC 20530
    (202) 353-1787
    javier.sinha@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on January 23, 2026, I caused the foregoing brief to be served upon the Filing Users identified below through the Court's Case Management/Electronic Case Files ("CM/ECF") system:

David Gerger
Ashley Kaper
GERGER HENNESSY MARTIN &
PETERSON LLP
700 Louisiana Street, Suite 2300
Houston, Texas 77002

*Attorneys for Defendant-Appellant Dehshid Nourian*

Brent Evan Newton
19 Treworthy Road
Gaithersburg, MD 20878

*Attorney for Defendant-Appellant Christopher Rydberg*

/S/ JAVIER A. SINHA____
JAVIER A. SINHA
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., NW, Ste. 1264
Washington, DC 20530
TEL 202.353.1787/FAX 202.305.2121
javier.sinha@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with this Court's January 16, 2026 Order because it contains 22,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced, 14-point font in text and footnotes using Microsoft Word for Office 365.

3.    This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a) because it contains no personal data identifiers.

4.    The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk.

5.    This brief has been scanned for viruses with the most recent version of CrowdStrike Falcon Sensor, which is continuously updated, and according to that program, is free of viruses.

/S/ JAVIER A. SINHA
JAVIER A. SINHA
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., NW, Ste. 1264
Washington, DC 20530
TEL 202.353.1787/FAX 202.305.2121
javier.sinha@usdoj.gov